# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CALEB BARNETT, *et al.,*<br>        Plaintiffs,<br><br>                    v.<br><br>KWAME RAOUL, *et al.,*<br>        Defendants. | Case No. 23-cv-00209-SPM (Lead Case) |
| DANE HARREL, *et al.,*<br>        Plaintiffs,<br><br>                    v.<br><br>KWAME RAOUL, *et al.,*<br>        Defendants. | Case No. 23-cv-00141-SPM |
| JEREMY W. LANGLEY, *et al.,*<br>        Plaintiffs,<br><br>                    v.<br><br>BRENDAN KELLY, *et al.,*<br>        Defendants. | Case No. 23-cv-00192-SPM |
| FEDERAL FIREARMS<br>LICENSEES OF ILLINOIS, *et al.,*<br>        Plaintiffs,<br><br>                    v.<br><br>JAY ROBERT "J.B." PRITZKER, *et al.,*<br>        Defendants. | Case No. 23-cv-00215-SPM |

**McGLYNN, District Judge:**

# FINDINGS OF FACT AND CONCLUSIONS OF LAW

## INTRODUCTION

Why are there small lifeboats on gigantic steel ocean liners? Why do we spend thousands equipping our vehicles with airbags? Why do we wear seatbelts and place our infants in safety seats? Why do we build storm shelters under our homes? Why do we install ground-fault interrupter outlets by sinks and bathtubs? Why do we get painful inoculations? Why do we voluntarily undergo sickening chemotherapy?

And why do we protect ourselves with firearms?

In life, we face many perils. Some are natural weather phenomena such as hurricanes, tornadoes, or floods. Some are biological such as viruses, disease, or malignant cells. Some perils are associated with important products like electricity, natural gas, matches, automobiles, and pain-relieving medications.

Too often, the perils we face are forced upon us by other people. By people who are negligent, reckless, insane, impaired, or evil. Sometimes it is the proverbial lone wolf; sometimes, it is the whole wolf pack. Truly, life comes at you quickly.

And who comes to our aid in times of peril? Sometimes, it is the police or first responders; other times it is healthcare professionals; and sometimes it is family, friends, or neighbors. Sometimes, it is no one.

*Rabbit and Duck Illusion – What Do You See?*[1]



This illustration posits the question on the top line, written in German, "[w]hich two animals are most like each other?" Beneath the image are the words "[R]abbit and duck." The image distinguishes perception from interpretation. If you see only a duck, your interpretation of the data is too narrow. Yet once you become aware of the duality of the image, your interpretation of the data allows you to see both a duck and a rabbit. This image illustrates the way in which perspective and context enable one to see the same information in entirely different ways.

The AR-15 is the Rorschach test of America's gun debate. In listening to the political debate and in reading various judicial interpretations of what the AR-15 represents, it is obvious that many are seeing very different creatures. Many see one, but not the other. Our task here is to understand the duality of much of the data and

---

[1] "*Kaninchen und Ente*" ("*Rabbit and Duck*"), FLIEGENDE BLÄTTER (Oct. 23, 1892), https://commons.wikimedia.org/wiki/File:Flegende-Blatter-1892.png [https://perma.cc/78WL-F99T] (Ger.).

the reasons for varying interpretations. Are they seeing a dragon to be slayed or a horse to pull a carriage? Often, the different perspectives are defined by whom they picture using the weapon—either a menacing criminal or a law-abiding citizen involved in a dangerous confrontation.

### *The Protect Illinois Communities Act*

The Protect Illinois Communities Act, Ill. Pub. Act 102-1116 § 1 (codified at 720 ILL. COMP. STAT. 5/24-1.9–1.10) [hereinafter PICA] criminalizes knowing possession of hundreds of previously lawful rifles, handguns, and shotguns. It also bans various attachments, accessories, configurations, and so-called "large capacity" magazines. It also created a firearm registration program requiring registry of arms possessed prior to January 1, 2024, the date after which PICA would be enforced.

The stated impetus for imposing these sweeping gun restrictions was a tragic incident where a young person armed with a semiautomatic rifle opened fire on a crowd gathered for an Independence Day parade. The goal was to impede violent criminals from deploying semiautomatic firearms and ammunition magazines designated as "high capacity."

So much about firearms is contentious, from the political debate to the jurisprudential debate. At the crossroads of this debate stands the Second Amendment of the United States Constitution.

The United States Supreme Court has issued several landmark decisions that seemingly answered several important questions about the right to keep and bear arms. Those decisions were not unanimous. Dissenting justices advanced divergent

arguments, including that the Second Amendment is an anachronism with no relevance to the present day and no power to thwart government gun control laws. Additionally, modern gun violence demands that the "unqualified reach" of the Second Amendment's directive that the "right to keep and bear arms shall not be infringed" surrender wide latitude to the government's efforts to minimize gun violence.

There is no happy consensus on guns, particularly those defined as "assault weapons." With malice toward none on either side of these debates, and with no desire to impose policy judgments by judicial fiat, this Court seeks to understand what exactly it means for a firearm to be "dangerous," "unusual," "bearable," "in common use," in "dual use," and/or a "military weapon."

As the Second Amendment's guarantee centers around the right to self-defense, one cannot identify the delimits of its reach unless one understands what falls within the parameters of confrontation with an adversary. The Court will examine the soldier in military confrontation as well as the civilian in dangerous or deadly confrontation and determine whether clear lines of demarcation exist between the two and where those lines may blur.

This Court will analyze Supreme Court jurisprudence on the Second Amendment as well as the Seventh Circuit's holdings in *Friedman v. City of Highland Park*, 784 F.3d 406 (2015) and in *Bevis v. City of Naperville*, 85 F.4th 1175 (Nov. 3, 2023). This Court will determine if, in the process of more clearly defining important

terms, the established caselaw gives way to a more harmonious synthesis of both Supreme Court and Seventh Circuit jurisprudence.

## FACTUAL AND PROCEDURAL BACKGROUND

Within months of the Supreme Court's decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022), Illinois Governor J.B. Pritzker signed PICA in response to the Highland Park shooting on July 4, 2022.[2] Governor Pritzker declared that Illinois became "the ninth state to institute an assault weapons ban and one of the strongest assault weapons bans in the nation."[3] This matter is before the Court for a final adjudication on the merits of the equitable claims[4] brought by the Plaintiffs in *Barnett v. Raoul*, 23-cv-00209-SPM[5]; *Harrel v. Raoul*, 23-cv-00141-SPM[6]; *Langley v. Kelly*, 23-cv-00192-SPM[7]; and *Federal Firearms Licensees of Illinois v. Pritzker*, 23-cv-00215-SPM[8] against various Illinois state and municipal

---

[2] *See, e.g.*, Jessica D'Onofrio, Craig Wall & Eric Horng, *Assault Weapons Ban Illinois: Gov. Pritzker Signs Gun Law After House Passes Amended Version*, ABC7 CHI. (Jan. 10, 2023), https://abc7chicago.com/illinois-assault-weapons-ban-bill-2023/12683807/ [https://perma.cc/6MUG-FVAS]; Mawa Iqbal, *Downstate Judge Set to Rule Next Month on Constitutionality of Illinois' Assault Weapons Ban*, NAT'L PUBLIC RADIO ILL. (Sept. 19, 2024, 5:59 PM), https://www.nprillinois.org/illinois/2024-09-19/downstate-judge-set-to-rule-next-month-on-constitutionality-of-illinois-assault-weapons-ban [https://perma.cc/4QM8-E55X].

[3] CBS Chi., *Illinois Gov. JB Pritzker Signs Assault Weapons Ban* at 0:26 (Jan. 10. 2023), https://www.youtube.com/watch?v=9UBEdOfnT90 [https://perma.cc/3BWR-HHLK].

[4] While one group of plaintiffs brought claims for damages pursuant to 42 U.S.C. § 1983 in their amended complaint, those same plaintiffs have since withdrawn those claims.

[5] The named *Barnett* Plaintiffs are Caleb Barnett, Brian Norman, Hoods Guns & More, Pro Gun and Indoor Range, and National Shooting Sports Foundation, Inc.

[6] The named *Harrel* Plaintiffs Dane Harrel; C4 Gun Store, LLC; Marengo Guns, Inc.; the Illinois State Rifle Association; Firearms Policy Coalition, Inc.; and the Second Amendment Foundation.

[7] The *Langley* Plaintiffs are Jeremy W. Langley, Timothy B. Jones, and Matthew Wilson.

[8] The *Federal Firearms Licensees of Illinois* ("*FFL*") Plaintiffs are Federal Firearms Licensees of Illinois, Guns Save Life, Gun Owners of America, Gun Owners Foundation, Piasa Armory, Jasmine Young, Chris Moore. While Debra Clark was originally a named Plaintiff, this Court granted a stipulation of dismissal dismissing all claims against Ms. Clark on August 27, 2024. *See FFL* (Doc. 79).

government Defendants.[9] The Plaintiffs in each of the four consolidated cases[10] seek declaratory judgment that PICA is unconstitutional under the Second and Fourteenth Amendments.[11] *See Bruen*, 597 U.S. 1 (2022); *United States v. Rahimi*, 144 S. Ct. 1889 (2024); *see also McDonald v. City of Chicago*, 561 U.S. 742 (2010); *District of Columbia v. Heller*, 554 U.S. 570 (2008).

The Plaintiffs sought preliminary injunctions to enjoin the enforcement of PICA in each of the four cases,[12] which were granted by this Court in *Barnett* on April 28, 2023. (Doc. 101). The Seventh Circuit vacated the preliminary injunction on November 3, 2023. *See Bevis v. City of Naperville*, 85 F.4th 1175 (7th Cir. Nov. 3, 2023). The *Federal Firearms Licensees of Illinois* Plaintiffs filed a second motion for preliminary injunction on November 13, 2023, which this Court denied on December 22, 2023. *See* 23-cv-00215-SPM (Docs. 57, 75). Various *Bevis* Plaintiffs (including the *Barnett* and *Langley* Plaintiffs) concurrently filed petitions for rehearing by the same panel and for rehearing en banc, *see Bevis* (Docs. 129, 139), which were denied by the Seventh Circuit on December 11, 2023. *See id.* (Docs. 146, 147).

---

[9] The Defendants in *Barnett* are Attorney General Kwame Raoul and Illinois State Police Director Brendan F. Kelly. The Defendants in *Harrel* are Attorney General Raoul, Director Kelly, State's Attorney James Gomric of St. Clair County, State's Attorney Jeremy Walker of Randolph County, State's Attorney Patrick D. Kenneally of McHenry County, Sheriff Richard Watson of St. Clair County, Sheriff Jarrod Peters of Randolph County, and Sheriff Robb Tadelman of McHenry County. The Defendants in *Langley* are Director Kelly and State's Attorney Cole Price Shaner of Crawford County. The Defendants in *FFL* are Illinois Governor J.B. Pritzker, Attorney General Raoul, and Director Kelly.

[10] This Court consolidated *Barnett*, *Harrel*, *Langley*, and *FFL* for purposes of discovery and injunctive relief. (*See* Doc. 32). *Barnett* was designated as the lead case. (*See id.*).

[11] While the *Langley* Plaintiffs also alleged Fifth Amendment self-incrimination claims in their Complaint, *see* 23-cv-00192-SPM (Doc. 1), the Court denied their Motion for Partial Summary Judgement (Doc. 133) and granted the Government's Cross-Motion for Partial Summary Judgment (Doc. 151) on this issue on September 10, 2024. (*See* Doc. 226).

[12] *See Harrel*, 23-cv-00141-SPM (Doc. 16); *Langley*, 23-cv-00192-SPM (Doc. 6); *Barnett*, 23-cv-00209-SPM (Doc. 10); and *Fed. Firearms Licensees of Ill.*, 23-cv-00215-SPM (Doc. 28).

Three *Bevis* plaintiffs[13] next filed an application for writ of injunction with the
Supreme Court—Justice Amy Coney Barrett referred the application to the full
Supreme Court, which denied it on December 14, 2023. *See Nat'l Ass'n for Gun Rts.
v. City of Naperville*, No. 23A486 (Dec. 14, 2023). All four groups of plaintiffs also filed
petitions for writs of certiorari before the Supreme Court; all of these petitions were
denied on July 2, 2024. *See Harrel v. Raoul*, 144 S. Ct. 2491 (July 2, 2024) (Mem.); *see
also Harrel v. Raoul*, No. 23-877 (2024); *Barnett v. Raoul*, No. 23-879 (2024)[14]; *Langley
v. Kelly*, No. 23-944 (2024).

This Court notes that the Government's objections[15] to various evidence and
expert testimony offered by the Plaintiffs are addressed via a separate order. (*See*
Doc. 257). There is one additional motion pending—the Government submitted a
Motion for Partial Summary Judgment on the *Langley* Plaintiffs' Counts IV and VI
on August 30, 2024 (Doc. 220). From September 16 to September 19, 2024, this Court
held a bench trial during which the Plaintiffs and the consolidated Defendants[16] in
this matter called witnesses and presented evidence. Various other issues were
presented to the Court via post-trial proposed findings of fact and conclusions of law
submitted on October 21, 2024. (*See* Docs. 247, 248, 249, 253, 254, 255).

---

[13] The National Association for Gun Rights, Robert C. Bevis, and Law Weapons, Inc. d/b/a Law
Weapons and Supply filed the application in question. *See Nat'l Ass'n for Gun Rts. v. City of Naperville*,
No. 23A486 (Dec. 14, 2023).
[14] The *Barnett* and *FFL* Plaintiffs jointly filed a petition for writ of certiorari.
[15] The Government filed a Motion to Preclude Consideration of survey evidence proffered by the
Plaintiffs' experts on September 6, 2024 (Doc. 223) and a Motion to Bar Certain Opinions of Plaintiffs'
Experts on September 13, 2024 (Doc. 229).
[16] *See supra* note 9.

ANALYSIS

**I. Are the Covered Weapons, Attachments, Configurations, and Ammunition Magazines "Arms" Implicated by the Second Amendment?**

**A. Supreme Court Jurisprudence**

**1. Majority Opinions**

**a. *District of Columbia v. Heller*, 554 U.S. 570 (2008)**

In *District of Columbia v. Heller*, the Supreme Court stated that "[t]here seems to us no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms." 554 U.S. at 595. The *Heller* Court stated that "the Second Amendment, like the First and Fourth Amendments, codified a *pre-existing right*." *Id.* at 592; *see also id.* at 599 (stating that the Second Amendment "codified a right 'inherited from our English ancestors'" (quoting *Robertson v. Baldwin*, 165 U.S. 275, 281 (1897))). After analyzing the text of the Second Amendment in detail, the *Heller* Court held that that the prefatory clause ("A well regulated Militia, being necessary to the security of a free State . . . .", U.S. CONST. amend II) "announces the purpose for which the right was codified: to prevent elimination of the militia" yet "does not suggest that preserving the militia was the only reason Americans valued the ancient right; most undoubtedly thought it even more important for self-defense and hunting." *Heller* at 595–600.

That being said, the *Heller* Court clarified that "the right was not unlimited, just as the First Amendment's right of free speech was not." *Id.* at 595. They continued, stating that they "do not read the Second Amendment to protect the right of citizens to carry arms for *any sort* of confrontation, just as we do not read the First

Amendment to protect the right of citizens to speak for *any purpose*." *Id.* at 595 (citing *United States v. Williams*, 553 U.S. 285 (2008)). Thus, provisions restricting firearm possession by felons, "imposing conditions and qualifications on the commercial sale of arms," or restricting "dangerous and unusual weapons" are permissible. *Id.* at 626–27 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)). Apart from these conditions, the key metric is whether the firearm in question was "in common use at the time." *Id.* at 627 (citing *Miller*, 307 U.S. at 179). The Court held that this "limitation is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* (citing 4 WILLIAM BLACKSTONE, COMMENTARIES 148–149 (1769); 3 B. WILSON, WORKS OF THE HONOURABLE JAMES WILSON 79 (1804); J. DUNLAP, THE NEW–YORK JUSTICE 8 (1815); C. HUMPHREYS, A COMPENDIUM OF THE COMMON LAW IN FORCE IN KENTUCKY 482 (1822); 1 W. RUSSELL, A TREATISE ON CRIMES AND INDICTABLE MISDEMEANORS 271–272 (1831); H. STEPHEN, SUMMARY OF THE CRIMINAL LAW 48 (1840); E. LEWIS, AN ABRIDGMENT OF THE CRIMINAL LAW OF THE UNITED STATES 64 (1847); F. WHARTON, A TREATISE ON THE CRIMINAL LAW OF THE UNITED STATES 726 (1852); *State v. Langford*, 10 N.C. 381, 383–384 (1824); *O'Neill v. State*, 16 Ala. 65, 67 (1849); *English v. State*, 35 Tex. 473, 476 (1871); *State v. Lanier*, 71 N.C. 288, 289 (1874)). Moreover, while "[i]t may be objected that if weapons that are most useful in military service—M–16 rifles and the like— may be banned, then the Second Amendment right is completely detached from the prefatory clause," the *Heller* Court noted that even though "it may be true that no amount of small arms could be useful against modern-day bombers and tanks[,] . . .

the fact that modern developments have limited the degree of fit between the prefatory clause and the protected right cannot change our interpretation of the right." *Id.* at 627–28. Thus, this "common use" determination overrides whether or not the weapon in question was restricted in the past; what matters is that the weapon would not be considered "highly unusual in society at large." *Heller* at 627.

### b. *McDonald v. City of Chicago*, 561 U.S. 742 (2010)

The Supreme Court in *McDonald v. City of Chicago* ruled that the Fourteenth Amendment's Due Process Clause incorporated the Second Amendment, making it applicable to the states in addition to the federal government. 561 U.S. 742, 790 (2010). After analyzing the historical record in detail, the Supreme Court wrote that "[u]nless considerations of *stare decisis* counsel otherwise, a provision of the Bill of Rights that protects a right that is fundamental from an American perspective applies equally to the Federal Government and the States." *Id.* (citing *Duncan v. Louisiana*, 391 U.S. 145, 149 (1968)). Moreover, "if a Bill of Rights guarantee is fundamental from an American perspective, then, unless *stare decisis* counsels otherwise, that guarantee is fully binding on the States and thus *limits* (but by no means eliminates) their ability to devise solutions to social problems that suit local needs and values." *Id.* at 784–85 (footnote omitted).

The Supreme Court held that "[s]elf-defense is a basic right, recognized by many legal systems from ancient times to the present day." *Id.* at 767 (footnote omitted). They wrote that "it is clear that the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental

rights necessary to our system of ordered liberty." *Id.* at 778. The *McDonald* Court wrote that "[i]n *Heller*, we recognized that the codification of this right was prompted by fear that the Federal Government would disarm and thus disable the militias, but we rejected the suggestion that the right was valued only as a means of preserving the militias." *McDonald* at 787 (citing *Heller* 598–99). "On the contrary, we stressed that the right was also valued because the possession of firearms was thought to be essential for self-defense [because] [a]s we put it, self-defense was 'the *central component* of the right itself.'" *Id.* (citing *Heller* at 599).

The *McDonald* Court also stated that "[t]he right to keep and bear arms was considered no less fundamental by those who drafted and ratified the Bill of Rights." *Id.* at 768. "During the 1788 ratification debates, the fear that the federal government would disarm the people in order to impose rule through a standing army or select militia was pervasive in Antifederalist rhetoric." *Id.* at 768–69 (quoting *Heller* at 598) (citing Letters from The Federal Farmer III (Oct. 10, 1787), *in* 2 THE COMPLETE ANTI–FEDERALIST 234, 242 (H. Storing ed. 1981)); Federal Farmer: An Additional Number of Letters to the Republican, Letter XVIII (Jan. 25, 1788), *in* 17 DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 360, 362–63 (J. Kaminski & G. Saladino eds. 1995); S. HALBROOK, THE FOUNDERS' SECOND AMENDMENT 171–278 (2008)). "Federalists responded, not by arguing that the right was insufficiently important to warrant protection but by contending that the right was adequately protected by the Constitution's assignment of only limited powers to the Federal Government." *Id.* at 769 (citing *Heller* at 599). "Thus, Antifederalists and Federalists

alike agreed that the right to bear arms was fundamental to the newly formed system of government." *Id.* at 769. "This understanding persisted in the years immediately following the ratification of the Bill of Rights. In addition to the four States that had adopted Second Amendment analogues before ratification, nine more States adopted state constitutional provisions protecting an individual right to keep and bear arms between 1789 and 1820." *Id.* at 769 (citing *Heller* at 600–03).

"By the 1850's, the perceived threat that had prompted the inclusion of the Second Amendment in the Bill of Rights—the fear that the National Government would disarm the universal militia—had largely faded as a popular concern, but the right to keep and bear arms was highly valued for purposes of self-defense." *Id.* at 770 (citing M. DOUBLER, CIVILIAN IN PEACE, SOLDIER IN WAR 87–90 (2003); A. AMAR, THE BILL OF RIGHTS: CREATION AND RECONSTRUCTION 258–59 (1998)). "When attempts were made to disarm 'Free–Soilers' in 'Bloody Kansas,' Senator Charles Sumner, who later played a leading role in the adoption of the Fourteenth Amendment, proclaimed that '[n]ever was [the rifle] more needed in just self-defense than now in Kansas.' *Id.* (quoting THE CRIME AGAINST KANSAS: THE APOLOGIES FOR THE CRIME: THE TRUE REMEDY, SPEECH OF HON. CHARLES SUMNER IN THE SENATE OF THE UNITED STATES 64–65 (1856)). "After the Civil War, many of the over 180,000 African-Americans who served in the Union Army returned to the States of the old Confederacy, where systematic efforts were made to disarm them and other blacks." *Id.* at 771 (citing *Heller*, 554 U.S. at 614). "Throughout the South, armed parties, often consisting of ex-Confederate soldiers serving in the state militias, forcibly took

firearms from newly freed slaves." *Id.* at 772. "In the first session of the 39th Congress, Senator Henry Wilson told his colleagues: 'In Mississippi rebel State forces, men who were in the rebel armies, are traversing the State, visiting the freedmen, disarming them, perpetrating murders and outrages upon them; and the same things are done in other sections of the country.'" *Id.* (citing 39th CONG. GLOBE 40 (1865)).

Additionally, the *McDonald* Court writes that "the 39th Congress concluded that legislative action was necessary" and that "[i]ts efforts to safeguard the right to keep and bear arms demonstrate that the right was still recognized to be fundamental." *Id.* at 773. They stated that:

> The most explicit evidence of Congress' aim appears in § 14 of the Freedmen's Bureau Act of 1866, which provided that "the right . . . to have full and equal benefit of all laws and proceedings concerning personal liberty, personal security, and the acquisition, enjoyment, and disposition of estate, real and personal, *including the constitutional right to bear arms*, shall be secured to and enjoyed by all the citizens . . . without respect to race or color, or previous condition of slavery."

*Id.* (citing 14 Stat. 176–77 (alteration in original) (emphasis added)). "The Civil Rights Act of 1866, 14 Stat. 27, which was considered at the same time as the Freedmen's Bureau Act, similarly sought to protect the right of all citizens to keep and bear arms." *Id.* at 774 (footnote omitted). "Section 1 of the Civil Rights Act guaranteed the 'full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens.'" *Id.* (citing Civil Rights Act of 1866, 14 Stat. 27). The *McDonald* Court writes that "[t]his language was virtually identical to language in § 14 of the Freedmen's Bureau Act, 14 Stat. 176 ("the right . . . to have full and equal benefit of all laws and proceedings concerning personal

liberty, personal security, and the acquisition, enjoyment, and disposition of estate, real and personal").

### c. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022)

In *New York State Rifle & Pistol Association, Inc. v. Bruen*, the Supreme Court readdressed the Second Amendment rights codified in *Heller* and *McDonald*, ruling that "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." 597 U.S. 1, 17 (2022). "Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50, n.10 (1961)). The Supreme Court thus eliminated the two-step test previously in use in the circuit courts, saying that tests employed "one step too many." *Id.* at 19. Therefore, "the constitutional right to bear arms in public for self-defense is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" *Id.* at 6 (quoting *McDonald*, 561 U.S. at 780 (plurality opinion)).

While the Supreme Court previously stated that "the need for armed self-defense is perhaps 'most acute' in the home," *Heller* at 628; *see Bruen* at 33 (citing the same), it also recognized the reality that "[m]any Americans hazard greater danger outside the home than in it." *Bruen* at 33 (citing *Moore v. Madigan*, 702 F.3d 933, 937 (7th Cir. 2012)). Moreover, "confining the right to 'bear' arms to the home would make little sense given that self-defense is 'the *central component* of the [Second Amendment] right itself.'" *Id.* at 32 (quoting *Heller* at 599). The Supreme Court stated

that "the Second Amendment guarantees an 'individual right to possess and carry weapons in case of confrontation,' and confrontation can surely take place outside the home." *Id.* at 33 (quoting *Heller* at 592).

Additionally, the Supreme Court stated that the "definition of 'bear' naturally encompasses public carry" because "[m]ost gun owners do not wear a holstered pistol at their hip in their bedroom or while sitting at the dinner table." *Bruen* at 32. "Although individuals often 'keep' firearms in their home, at the ready for self-defense, most do not 'bear' (i.e., carry) them in the home beyond moments of actual confrontation. To confine the right to 'bear' arms to the home would nullify half of the Second Amendment's operative protections." *Id.*

### d. *United States v. Rahimi*, 144 S. Ct. 1889 (2024)

At the end of its 2023 Term, the Supreme Court once again assessed the Second Amendment in *United States v. Rahimi*, 144 S. Ct. 1889 (2024). The Supreme Court wrote that "some courts have misunderstood the methodology of our recent Second Amendment cases. These precedents were not meant to suggest a law trapped in amber." *Id.* at 1897. "As we explained in *Heller*, for example, the reach of the Second Amendment is not limited only to those arms that were in existence at the founding." *Id.* (citing 554 U.S. at 582). "Rather, it 'extends, prima facie, to all instruments that constitute bearable arms, even those that were not [yet] in existence.'" *Id.* Additionally, "[b]y that same logic, the Second Amendment permits more than just those regulations identical to ones that could be found in 1791. Holding otherwise would be as mistaken as applying the protections of the right only to muskets and

sabers." *Id.* at 1897–98 (quoting *Heller* at 582). "As we explained in *Bruen*, the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition. A court must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.'" *Id.* at 1898. "Discerning and developing the law in this way is 'a commonplace task for any lawyer or judge.'" *Id.* (quoting *Bruen* at 28, 29) (citing *Bruen* at 26–31). Critically:

> Why and how the regulation burdens the right are central to this inquiry. For example, if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations. Even when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so to an extent beyond what was done at the founding. And when a challenged regulation does not precisely match its historical precursors, "it still may be analogous enough to pass constitutional muster."

*Id.* "The law must comport with the principles underlying the Second Amendment, but it need not be a 'dead ringer' or a 'historical twin.'" *Id.* (quoting *Bruen* at 30) (citing *Bruen* at 29).

To summarize, "[t]he Second Amendment's plain text thus presumptively guarantees . . . a right to 'bear' arms in public for self-defense." *Bruen* at 33. This right includes "the possession and use of weapons that are 'in common use at the time,'" but does not include weapons that are "dangerous and unusual." *Id.* at 21 (citing *Heller* at 627). The burden is on the government to prove that there is a historical analogue to the modern prohibition in question that shows a historical

tradition of regulation of the weapon in question. *Id.* at 29. Central to this inquiry are "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.*

*Rahimi*'s principal holding is that, when an individual has been "found by a court to pose a credible threat to the physical safety of another," that person "may be temporarily disarmed consistent with the Second Amendment." 144 S. Ct. at 1903. Unlike the regulation struck down in *Bruen*, § 922(g) does not broadly restrict firearms use by the general public. *Rahimi* at 1901; *see Bruen* at 11–12.

### 2. Dissenting Opinions

It is also worth examining the dissents in *Heller* and in *Bruen* to see which interpretations and analyses of the Second Amendment were rejected by the majority in those cases. This is especially salient to this case, as arguments expressly rejected by the Supreme Court in *Heller* and in *Bruen* continue to be advanced in Second Amendment cases, both in this District and before other federal courts across the nation.

### a. *District of Columbia v. Heller*

The dissenting Justices in *Heller* advanced two independent arguments against the majority decision. First, Justice Stevens argued that the scope of the Second Amendment did not extend further than militia-related interests. Additionally, Justice Breyer argued that, even if there is a self-defense interest in the Second Amendment, that protection is not absolute. Rather, a violation of this protection must be due to the law being "unreasonable or inappropriate in Second

Amendment Terms." *District of Columbia v. Heller*, 554 U.S. 570, 681 (2008) (Breyer,

J., dissenting).

### i. Justice Stevens's Dissent

Justice Stevens not only opposed the majority holding regarding the District of

Columbia law at the heart of the case but also found the scope of the Second

Amendment described by the majority to be entirely absent from both the text and

drafting history of the amendment. Unlike the majority opinion, Justice Stevens

found a plain reading of the text to do no more than provide a "right to keep and bear

arms for certain military purposes, but that it does not curtail the Legislature's power

to regulate the nonmilitary use and ownership of weapons." *Heller*, 554 U.S. at 637

(Stevens, J., dissenting).

This narrow reading of the Second Amendment begins with the text of the

preamble of the Second Amendment, in which Justice Stevens found three important

points. First, he found that the purpose of the amendment was to preserve the militia.

*Id.* at 640. Further, it established the militia's importance to the preservation of a

free state. *Id.* Finally, he found that the preamble recognized that this militia must

be well-regulated. *Id.* This focus on the role of the militia in the newly formed nation

defined Justice Stevens' view of the scope of this Amendment, which he saw as further

bolstered when comparing the Second Amendment to similar provisions in certain

state constitutions. *See id.* at 642–43 (discussing provisions of the Pennsylvania and

Vermont Constitutions which discuss not only the right to bear arms for the

preservation of the state, but also for such purposes and self-defense or hunting); *see*

*also* PA. CONST. OF 1776, art. XIII ("That the people have a right to bear arms for the defence of themselves and the state."); PA CONST. OF 1776, art. XIII ("The inhabitants of this state shall have liberty to fowl and hunt."); VT. CONST. OF 1777, Ch. I, art. XV ("That the people have a right to bear arms for the defence of themselves and the State."). Justice Stevens argued that the framing of this Amendment in the preamble not only provided context for the amendment, but also "informs the remainder of its text." *Id.* at 643.

Moving to the operative clause of the Second Amendment, Justice Stevens found that "the people" refers to the collective action of individuals who are under a duty to serve in the militia. *Id.* at 645. Further, he argued that the language of "to keep and bear arms" continued to describe a unitary right of the people "to possess arms if needed for military purposes and to use them in conjunction with military activities." *Id.* at 646. Justice Stevens found this interpretation not only due to the gloss given to the operative clause by the preamble, but also based on the definition of the term "bear arms" relating to military service or acting as a soldier. *Id.* (citing 1 OXFORD ENGLISH DICTIONARY 634 (2d ed. 1989)).

Aside from the text of the Amendment, Justice Stevens found that the drafting history of the Second Amendment revealed two themes that provided insight into the intended scope of the Amendment. First, Justice Stevens recounted the fear of the Framers that a standing army would threaten both individual liberty and the sovereignty of the separate states. *Id.* at 653 (citing 3 JONATHAN ELLIOT, DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION

401 (2d ed. 1863) ("With respect to standing army, I believe there was not a member

in the federal Convention, who did not feel indignation at such an institution."

(quoting Governor Edmund Randolph)). However, during the drafting of this

Amendment, the danger of relying solely on inadequately trained militia members

for the common defense of the nation was also a recognized concern. *Heller* at 653

(Stevens, J., dissenting) (citing Frederick Bernays Wiener, *The Militia Clause of the

Constitution*, 54 HARV. L. REV. 181, 182 (1940) (discussing the difficulty in the

Revolutionary War of utilizing an armed, but largely untrained militia)). Justice

Stevens thus described the resulting framework to be a compromise under which the

Congress and the States each received divided authority over the various militias. *Id.*

at 655. However, even this compromise did not quell the fear that the Congress could

still disarm the militia. *Id.* (citing 3 JONATHAN ELLIOT, DEBATES IN THE SEVERAL

STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION 379 (2d ed.

1863)). Justice Stevens believed the Second Amendment to be written specifically to

address this concern.

Justice Stevens argued that this lack of concern over the private rights of

citizens to carry firearms in nonmilitary contexts is supported by similar

amendments that were proposed and rejected during the drafting of the Bill of Rights.

*Id.* at 660 (quoting and citing THE COMPLETE BILL OF RIGHTS 169 (Neil H. Cogan, 1st

ed. 1997) (discussing proposed amendments from Virginia which secured the right to

keep and bear arms in a military context)). While some states' proposed amendments

would have broadly protected the right to use of firearms without tying it to military

use, other states did make such a connection. *Id.* at 655–58 (quoting and citing 2 SCHWARTZ, THE BILL OF RIGHTS 758, 761, 932–933, 912 (1971) (discussing proposed amendments from New Hampshire which placed this right in personal terms, outside of military context, as well as proposed amendments from Virginia, North Carolina, and New York which placed this right within a military context)). The original draft of the Second Amendment was modeled after the latter amendments. Thus, while the drafters of the Bill of Rights were aware of efforts to broadly protect this right without tying it to military service, Justice Stevens argued that they ultimately *rejected* such a protection. *Id.* at 660.

In response to the majority's commentary on historical sources, Justice Stevens examined the sources on which the majority relied, providing a view of how each may not actually be as important to the interpretation of the Second Amendment as the majority believed. First, while the English Bill of Rights may have protected the disarming of citizens, it was designed to address different concerns than those addressed by the Second Amendment. *Id.* at 664. Unlike the Second Amendment's focus on the importance of militias, the English Bill of Rights protected against the selective disarmament of certain groups by the monarch. *Id.*; (quoting and citing LOIS G. SCHWOERER, THE DECLARATION OF RIGHTS, 1689, App. 1, p. 295 (1981)). Further, there was no preamble to limit the English Bill of Rights. *Id.* at 664.

Finally, Justice Stevens argued that the English Bill of Rights was far more limited than the majority's interpretation of the Second Amendment because not all persons were protected under the English Bill of Rights. Only those of a certain social

and economic status were included and they were only protected "subject to regulation by Parliament." *Id.* (quoting and citing LOIS G. SCHWOERER, THE DECLARATION OF RIGHTS, 1689, App. 1, 297 (1981) (quoting the language of Article VII of the English Bill of Rights). For the same reasons that the majority's reliance on the English Bill of Rights is not appropriate, Justice Stevens found any reliance on Blackstone's Commentaries to be misplaced. *Heller* at 665 (Stevens, J., dissenting). Justice Stevens argued that Blackstone specifically wrote in reference to the English Bill of Rights, thus making his commentary ill-fit for interpretation of the Second Amendment. *Id.* However, he argued that Blackstone's Commentaries do reveal a method of interpretation which places far more weight on preambles than the majority would give in this case. *Id.* at 665 (quoting and citing WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND, VOL. 1 59–60 (1765)).

In a similar fashion, Justice Stevens found post-enactment commentary to be of little relevancy. Not only were these commentaries not entirely clear, he argued, but much of this work conflated the Second Amendment and the English Bill of Rights. *Id.* at 666. Further, he argued that many of these sources seemed to be entirely unfamiliar with the drafting history of the Second Amendment. *Id.* While one of the sources on which the majority relied was Justice Joseph Story, Justice Stevens argued that Story's commentary supported Stevens's own interpretation. Story exclusively focused on the importance of the militia when writing on the Second Amendment, even tying this discussion back to the fear of standing armies that animated the drafters of the Second Amendment. *Id.* at 669 (quoting and citing

JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES VOL. 2 620-21 (4th ed. 1873)). At no point did Story discuss the scope of the Second Amendment to include hunting or self-defense.

By the post-Civil War period, the majority claimed that there was an understanding that the Second Amendment protected not only military use of firearms, but also "purely private purposes, like self-defense." *Id.* at 670. While Justice Stevens conceded that this was true for much of this period's legislative history, he argued that it should be entitled to little, if any, weight. *Id.* Not only does this history exist long after the enactment, but, based on the heightened political circumstances, Justice Stevens viewed this history as advocacy rather than honest interpretation. *Id.*

Justice Stevens further contended that "the invalidity of Second-Amendment-based objections to firearms regulations has been well settled and uncontroversial." *Id.* at 676 (footnote omitted). This proposition was supported by the examination of three cases touching upon the Second Amendment in the 19th and 20th centuries. First, *United States v. Cruikshank*, 92 U.S. 542 (1875) held that the Second Amendment did no more than protect the right to keep and bear arms from infringement by Congress. *Heller* at 673 (Stevens, J., dissenting). Following *Cruikshank*, the Court in *Presser v. Illinois*, 116 U.S. 252 (1886) affirmed the holding in *Cruikshank* and at least suggested that the Second Amendment provided no protection outside the context of the militia. *Heller* at 674–75 (Stevens, J., dissenting). Finally, in *United States v. Miller*, 307 U.S. 174 (1939), the Court unanimously held

that the Second Amendment extends no further than the military use of firearms and thus required at least some reasonable relationship between the law at issue and the militia. *Heller* at 677 (Stevens, J., dissenting). According to Justice Stevens, the cases make clear that the scope of the Second Amendment had already been decided by the Court, contrary to the majority.

Therefore, due to the text of the Second Amendment, its drafting history, and the treatment of the Amendment post-enactment, Justice Stevens found that the protected right had no connection to self-defense, but rather is exclusively oriented towards the preservation of the militia. Justice Stevens warned that the new rule created by the majority would have far-reaching ramifications. Not only would it require future cases to parse out permissible from impermissible regulations, but he argued that it would also invite the judiciary to play an active role that was not envisioned. *Id.* at 679–80.

### ii. Justice Breyer's Dissent

While Justice Breyer agreed with the analysis written by Justice Stevens, he penned an individual dissent that further developed the second independent argument against the majority opinion—that the Second Amendment is not absolute. Even assuming the Second Amendment does protect a right to self-defense, Justice Breyer did not assume that this means there is "an untouchable right to keep guns in the house to shoot burglars." *Id.* at 683 (Breyer, J., dissenting). Rather, he argued that the state retains the ability to tailor specific laws that may burden Second Amendment interests so long as it is not "unreasonable or inappropriate." *Id.* at 681.

To support this proposition, Justice Breyer looked toward colonial history which demonstrates a history of regulations that burden the right to self-defense in some manners yet were not considered unreasonable restrictions at the time. *Id.* at 683. Several colonies prohibited the discharge of firearms within the limits of towns, and others regulated the storage of gunpowder in the home. *Id.* at 684–86 (citing Robert H. Churchill, *Gun Regulation, the Police Power, and the Right To Keep Arms in Early America*, 25 LAW & HIST. REV. 138, 162 (2007) (discussing Philadelphia, New York, and Boston laws prohibiting the firing of guns within the city); Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487, 510–512 (2004) (discussing laws in the same cities which regulated the storage of gunpowder, for fire safety reasons)). Both regulations could be burdensome to the ability to defend oneself, but this, apparently, was not seen as a restraint on their existence. While the majority claimed that these laws must have had an implicit self-defense exception, Justice Breyer was skeptical of this assumption. *Id.* at 686. However, even assuming this exception to exist, Justice Breyer asserted that the laws would still place some burden on the right to self-defense. *Id.* at 687. Thus, he argued that the question must be *how* courts should determine which regulations are prohibited by the Second Amendment. *Id.*

While the Respondent in *Heller* argued for the application of strict scrutiny, the majority was unconcerned over which level of scrutiny applied because it found that the law in question would fail under *any* level of scrutiny. Justice Breyer, on the other hand, argued in favor of applying an interest-balancing inquiry under which

the Second Amendment interests are weighed against the government's public safety interest. *Id.* at 689. Because both interests are important, Justice Breyer would not presume either constitutionality or unconstitutionality when addressing gun-control legislation. *Id.* This approach would assess the constitutionality of the provision by asking "whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests." *Id.* at 689–90.

Applying this standard to the District of Columbia's challenged gun-control law, Justice Breyer began by describing the governmental interest as saving lives. *Id.* at 693. The Council of the District of Columbia enacted this law to reduce both firearm deaths and firearm-related crimes. *Id* at 693–94 (quoting and citing Firearms Control Regulations Act of 1975 (Council Act No. 1-142), Hearing and Disposition before the House Committee on the District of Columbia, 94th Cong., 2d Sess., on H. Con. Res. 694, Ser. No. 94–24, at 25 (1976) [hereinafter D.C. Report]). The Council based this decision on research and hearings conducted by the House Committee on the District of Columbia (the "Committee") prior to enacting this law. *Id.* at 694 (quoting D.C. Report at 24). Nationally, the Committee found that 69 people were killed by firearms each day, with 25,000 killed each year. *Id.* (quoting D.C. Report at 25). Tragically, the Committee found 3,000 of these deaths to be due to accidents. *Id.* (quoting D.C. Report at 25). Aside from deaths, 200,000 gun-related injuries were found to occur each year. *Id.* (quoting D.C. Report at 25). Within the District, the Committee observed that, in 1974, there were 285 murders, 155 of which were committed using handguns. *Id.* at

695 (quoting D.C. Report at 26). The Committee found that handguns were not only

the choice of murderers, but also used in around 60% of robberies and 26% of assaults.

*Id.* (quoting D.C. Report at 26). Further, when a handgun is used in crime, the event

is far more likely to be lethal than crimes utilizing any other type of weapon. *Id.*

(quoting D.C. Report at 25). Based on this evidence and the realities of handgun

prevalence in the District, the Council adopted the challenged legislation.

At the time of Justice Breyer's drafting of his dissent, he argued that the facts

of firearm-related deaths and injuries told the same story. *Heller* at 696 (Breyer, J.,

dissenting). Between 1993 and 1997, the nation saw an average of 36,000 firearm-

related deaths per year. *Id.* at 696 (citing MARIANNE W. ZAWITZ & KEVIN J. STROM,

DEPT. OF JUST., BUREAU OF JUST. STAT., FIREARM INJURY AND DEATH FROM CRIME,

1993–97, at 7 (2000) [hereinafter FIREARM INJURY AND DEATH FROM CRIME]). A slight

majority of these deaths were suicides, 51%, while 44% were the result of homicides.

*Id.* (citing FIREARM INJURY AND DEATH FROM CRIME at 2). Only 1% were legal

interventions. *Id.* (citing FIREARM INJURY AND DEATH FROM CRIME at 2). Further,

during this period 82,000 nonfatal firearm injuries occurred in the nation. *Id.* (citing

FIREARM INJURY AND DEATH FROM CRIME at 2). The rate at which children and

adolescents fall victim to firearms further illuminates the problem as well. One out

of eight deaths caused by firearms in 1997 killed someone under 20 years of age. *Id.*

at 697 (citing American Academy of Pediatrics, *Firearm–Related Injuries Affecting

the Pediatric Population*, 105 PEDIATRICS 888, 888 (2000) [hereinafter *Firearm-

Related Injuries*]). Out of the total number of injury deaths for those aged 1 to 19,

22.5% were caused by firearms. *Id.* at 697 (citing *Firearm-Related Injuries* at 888).

Nearly half of all hospital-treated firearm injury victims between June of 1992 and

May of 1993 were under the age of 25. *Id.* (citing *Firearm-Related Injuries* at 891).

Justice Breyer noted that handguns were particularly destructive during this

period. *Id.* In fact, *most* of the deaths and injuries caused by firearms were committed

using handguns. *Id.* (citing *Firearm-Related Injuries* at 888). Between 1993 and 1997,

the vast majority of homicide victims—81%—were victimized by handguns. *Id.* (citing

FIREARM INJURY AND DEATH FROM CRIME at 4). Further, the vast majority—70%—of

teenage firearm-related suicides were committed with handguns. *Id.* (citing *Firearm-

Related Injuries* at 890). For those under the age of 20, 70% of unintentional firearm-

related injuries and deaths occurred with a handgun. *Id.* (citing *Firearm-Related

Injuries* at 889). A 1997 study indicated that handguns are the weapon of choice for

the overwhelming majority of criminals. *Id.* at 698. In this study of those incarcerated

who were armed during their crime, 83.2% of state inmates and 86.7% of federal

inmates reported to have been armed with a handgun. *Id.* (citing CAROLINE W.

HARLOW, DEPT. OF JUSTICE, BUREAU OF JUST. STAT., FIREARM USE BY OFFENDERS 3

(2001) [hereinafter FIREARM USE BY OFFENDERS]). In addition to being the *tool* of

criminals, Justice Breyer also found that handguns were often the *object* of criminals

as well. *Id.* (citing M. ZAWITZ, DEPT. OF JUST., BUREAU OF JUST. STAT., GUNS USED IN

CRIME 3 (July 1995) [hereinafter GUNS USED IN CRIME]). Between 1985 and 1994,

nearly 60% of the over 274,000 reports of stolen guns were handguns. *Id.* (citing GUNS

USED IN CRIME at 3).

Finally, Justice Breyer argued that urban areas experienced gun-related death, injury, and crime differently than rural areas. *Id.* (citing D. DUHART, DEPT. OF JUST., BUREAU OF JUST. STAT., URBAN, SUBURBAN, AND RURAL VICTIMIZATION, 1993–98, pp. 1, 9 (Oct. 2000)). Both property and violent crime occur disproportionally in urban areas, with half of the nation's homicides occurring in cities with 16% of the nation's population between 1985 and 1993. *Id.* (citing Wintemute, *The Future of Firearm Violence Prevention*, 282 JAMA 475 (1999)). Further, the link between handguns and firearm deaths and injuries is much stronger in urban areas than in rural areas. *Id.* at 699 (citing Lee T. Dresang, *Gun Deaths in Rural and Urban Settings*, 14 J. AM. BD. FAMILY PRACTICE 107, 108 (2001) [hereinafter *Gun Deaths in Rural and Urban Settings*]). While in urban areas, the greater number of gun deaths are from handguns, in rural areas, the greater number of gun deaths are from rifles and shotguns. *Id.* (citing *Gun Deaths in Rural and Urban Settings* at 108).

The Respondent in this case did not disagree with these facts; rather, they disagreed that the District's gun control regulation would help to solve the issues it was meant to address. *Id.* They presented numerous arguments as to why this was true, including that the ban since its enactment did not actually decrease violent crime—rather, it increased. *Id.* at 699–700 (citing Brief for Academics et al. as Amici Curiae 7–10; Brief for Criminologists et al. as Amici Curiae 6–9, 3a–4a, 7a). Further, they presented evidence to show that strict gun laws were "correlated with more murders, not fewer." *Id.* at 700 (citing Don. B. Kates & Gary Mauser, *Would Banning Firearms Reduce Murder and Suicide?*, 30 HARV. J.L. & PUB. POL'Y 649, 651–94

(2007)). They also presented evidence of the beneficial self-defense effect of firearm ownership, including the brandishing of firearms for self-defense. *Id.* at 700–01 (citing Gary Kleck & Mark Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, 86 J. CRIM. L. & CRIMINOLOGY 150, 164 (1995)). Finally, the Respondent argued that the criminalization of gun ownership does not stop criminals from acquiring guns, instead only preventing law-abiding citizens from obtaining them. *Id.* at 701 (citing Brief for President Pro Tempore of Senate of Pennsylvania as Amicus Curiae 35, 35 and n.15). This evidence, argued the Respondent, demonstrated that the gun ban does not bear a reasonable relation to the problem the District sought to solve. *Id.* at 702.

Considering all this evidence, Justice Breyer found that the Respondent's evidence did not demonstrate a lack of a reasonable relation; it only established uncertainty about the effectiveness of the legislation. *Id.* at 704. Further, he argued that the fact that the District was able to provide studies that rebutted the claims made by the Respondent demonstrated that this is not a settled area of policy. *Id.* at 703. Giving substantial weight to the democratic process, Justice Breyer concluded that the District did properly attempt to further a compelling interest. *Id.* at 705.

Justice Breyer continued the application of his interest-balancing approach by investigating the burden that gun control legislation such as this would have on the three interests identified by the majority. *Id.* at 706First, Justice Breyer found that the law hardly burdens the preservation of a well-regulated militia, as this law has nothing to do with military service. *Id.* Further, it did not interfere with military

training. *Id.* at 707–08. The only real restriction the law had on training would be the training with handguns inside the District. *Id.* at 708–09. However, the small size of the district meant that residents of the District remained able to train with handguns in close proximity to their homes. *Id.* at 709. Therefore, he argued that this small expense and hassle minimally burdened the primary objective of the Second Amendment. *Id.* Similarly, the law did not impose a large burden on any hunting interest contained within the Second Amendment, as the District is so small and urban that hunting simply did not exist within its boundaries. *Id.* at 709–10. Therefore, he argued that any hunting interests were not burdened by this law. *Id.* at 710. Finally, Justice Breyer did concede that the law in question does make self-defense with a handgun in the home more difficult. *Id.*

Since the government's interest is compelling and the Second Amendment interests are burdened, at least, in some way, Justice Breyer proceeded to ask whether there was a less restrictive means of promoting the same goals. However, in this case, Justice Breyer found there to be no less restrictive alternative that would have the same effect, seeing as the very objective of the ban was to reduce the number of handguns within the District. *Id.* at 711. Other schemes such as licensing restrictions would not quell the fear that the firearm may still be stolen and placed into the hands of a criminal. *Id.* at 712. While requiring safety devices or safe storage requirements would substantially burden the self-defense interest of the Second Amendment, this would also permit the firearm to be used to commit crimes by the owner. *Id.* Justice Breyer wrote that the fact that other States and urban centers

have similar laws to the District demonstrated that other means would not be effective. *Id.*

Therefore, the only question left under his analysis was whether the burden of the Second Amendment interest is disproportionate to the interest being advanced by the law. Justice Breyer relied upon several factors to conclude that it was not. *Id.* at 714. First, the law was "tailored to the life-threatening problems it attempts to address." *Id.* While the law does restrict one type of firearm that is particularly problematic for urban areas, it does not interfere with residents' ability to defend themselves with other weapons like shotguns and rifles. *Id.* Second, the self-defense interest of the Second Amendment is not the primary interest but could rather be classified as a subsidiary interest. *Id.* Further, the specific interest in self-defense possibly conceived by the drafters could not have been focused on urban crime related dangers, or the use of handguns as a self-defense tool. *Id.* at 715–16 (citing DEPT. OF COMM., BUREAU OF CENSUS, POPULATION: 1790 TO 1990 (1998) (Table 4), https://www2.census.gov/programs-surveys/decennial/1990/tables/cph-2/table-4.pdf [https://perma.cc/BX8X-3V4M]). Third, Justice Breyer found that the Founders did not think such a law to be unconstitutional as evidenced by Samuel Adams' advocation for an amendment that would protect the right of peaceable citizens to keep their own arms. *Id.* at 716 (citing 6 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 1453 (John P. Kaminski et al. eds. 2000) [hereinafter DOCUMENTARY HISTORY OF THE RATIFICATION]). While Adams advocated for such an amendment, he knew that the Massachusetts Constitution contained a

similar provision, while Boston prohibited keeping loaded guns in the home. *Id.* (citing DOCUMENTARY HISTORY OF THE RATIFICATION at 1453). Thus, Adams must not have thought that such a gun control law violated either the Massachusetts Constitution or his proposed Federal Constitutional amendment. Fourth, Justice Breyer pointed out the unfortunate consequences of the majority's decision, which he claimed would encourage legal challenges throughout the nation, without a clear standard for their resolution. *Id.* at 718.

Justice Breyer concluded that the District's law was not disproportionate in its burdening of the Second Amendment's interests, and that, therefore, it was a permissible regulation of firearms under the standards of the Second Amendment.

**b. Justice Breyer's Dissent in *New York State Rifle & Pistol Association, Inc. v. Bruen***

The dissent in *Bruen*, written by Justice Breyer, contains a different vision of the Second Amendment's protections than does the majority opinion. Unlike the majority, the dissent would have engaged in means-end scrutiny that takes account not only the historical tradition of firearms regulation exclusively, but also allows the court to "take account of the serious problems posed by gun violence." *New York State Rifle & Pistol Ass'n Inc. v. Bruen*, 597 U.S. 1, 91 (2022) (Breyer, J., dissenting). As recounted by the dissent, these problems are not only serious (with 45,222 gun deaths in 2020) but are becoming *more* prevalent in recent years, with gun violence increasing by about 25% between 2015 and 2020. *Id.* at 85 (citing CENTERS FOR DISEASE CONTROL & PREVENTION, FAST FACTS: FIREARM VIOLENCE PREVENTION,

https://www.cdc.gov.violenceprevention/firearms/fastfacts.html (last updated May 4,
2022); M. Siegel et al., *Easiness of Legal Access to Concealed Firearm Permits and
Homicide Rates in the United States*, 107 AM. J. PUB. HEALTH 1923 (2017)). Justice
Breyer was also deeply concerned with those upon whom this issue falls, with gun
violence becoming the leading cause of death for children and adolescents, as well as
disproportionately affecting Black communities. *Id.* at 85–86 (citing Josiah Bates,
*Guns Became the Leading Cause of Death for American Children and Teens in 2020*,
TIME MAG. (Apr. 27, 2022); CENTERS FOR DISEASE CONTROL & PREVENTION, AGE-
ADJUSTED RATES OF FIREARM-RELATED HOMICIDE, BY RACE, HISPANIC ORIGIN, AND
SEX—NATIONAL VITAL STATISTICS SYSTEM, UNITED STATES, 2019, at 1491 (Oct. 22,
2021,    https://www.cdc.gov/mmwr/volumes/70/wr/pdfs/mm7042a6-H.pdf    [https://
perma.cc/NY3G-XDKQ]). In addition to the tragedy of this problem, the dissent also
recounts how it is unique that, when compared to other similar nations, our nation
ranks among the highest in gun violence. *Id.* at 85 (citing Brief for Educational Fund
to Stop Gun Violence et al. as Amici Curiae 17–18). The dissent further discussed
how this problem with gun violence makes other scenarios more dangerous and
deadly, including road rage incidents, protests, domestic disputes, and police
interactions. *Id.* at 87–89 (citing Sarah Burd-Sharps et al.*, Road Rage Shootings are
Continuing      to      Surge*,      EVERYTOWN      (Mar.      20,      2023),
https://everytownresearch.org/reports-of-road-rage-shootings-are-on-the-rise/
[https://perma.cc/287J-R8CH]; EVERYTOWN FOR GUN SAFETY, ARMED ASSEMBLY:
GUNS, DEMONSTRATIONS, AND POLITICAL VIOLENCE IN AMERICA (Aug. 23, 2021),

https://www.everytownresearch.org/report/armed-assembly-guns-demonstrations-and-political-violence-in-america/ [https://perma.cc/4ZUE-G37L]; April M. Zeoli et al., *Risks and Targeted Interventions: Firearms in Intimate Partner Violence*, 38 EPIDEMIOLOGIC REVS. 125 (2016); David I. Swedler et al., *Firearm Prevalence and Homicides of Law Enforcement Officers in the United States*, 105 AM. J. PUB. HEALTH 2042, 2045 (2015)).

Thus, while the dissent acknowledged that some Americans use firearms for lawful purposes, the legislature must balance the lawful uses with the dangers of firearms. *Id.* at 89. In doing so, the dissent envisioned taking account of the fact that "different types of firearms may pose different risks and serve different purposes." *Id.* at 89. Further, legislatures may consider that the risks and benefits of firearms will differ depending on whether the area is urban or rural. *Id.* at 90 (citation omitted). The dissent saw these considerations and the dangers associated with firearms as demonstrating the complexity of this issue—because of this, the dissent argued that this issue ought to be solved by legislatures, not the courts. *Id.* at 90–91.

Beyond the serious problems associated with firearms in this nation, Justice Breyer proceeded to argue against the majority's exclusive reliance on history. First, the dissent pointed out how "anomalous" it is for the court to reject means-end scrutiny and adopt their "history-only approach." *Id.* at 107. While the lower courts each adopted a two-step framework that began with asking whether the regulated activity fell within the Second Amendment's scope and then proceeded to apply either intermediate or strict scrutiny depending on the burden of the regulation, the

majority rejected such an approach. *Id.* at 103 (citing *Ezell v. City of Chicago*, 846
F.3d 888, 892 (7th Cir. 2017)). While the majority claimed that their historical
approach falls in line with the treatment of other constitutional rights, the dissent
claimed that this is plainly wrong, pointing to First Amendment and Equal Protection
Clause jurisprudence both as evidence of means-ends scrutiny being applied to
safeguard constitutional rights. *Id.* at 106–07 (citing *Ariz. Free Enter. Club's Freedom
Club PAC v. Bennett*, 564 U.S. 721, 734 (2011) (applying strict scrutiny under the
First Amendment for political speech); *Ward v. Rock Against Racism*, 491 U.S. 781,
791 (1989) (applying intermediate scrutiny under the First Amendment to time,
place, and manner restrictions); *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200,
227 (1995) (applying strict scrutiny under the Equal Protection Clause for race-based
classifications); *Clark v. Jeter*, 486 U.S. 456, 461 (1988) (applying intermediate
scrutiny for sex-based classifications under the Equal Protection Clause)).

    Further, the dissent alleged that the history-only approach is also "deeply
impractical" for numerous reasons. *Id.* at 107. To begin, judges, while practiced in
weighing ends against means, have little experience grappling with difficult
historical questions. *Id.* Thus, requiring a near-exclusive reliance on history raises
numerous troubling issues, including lower courts' lack of research resources, lack of
guidance for what history qualifies as "analogous," unknown credibility of historians,
lack of guidance for the treatment of new historical evidence, as well as the fact that
this approach could assist judges in simply cloaking their preferred outcomes in the
"language of history." *Id.* The dissent saw some of these problems illustrated in the

majority decision in *Heller*. *Id.* at 108. Not only did the dissent believe *Heller*'s majority misread their own historical sources, but it also believed that the majority erred in rejecting what he believes to be a more accurate interpretation of the term "bear Arms" that would only encompass militia service. *Id.* at 109 (citation omitted).

The dissent further pointed toward several practical problems posed by the history-only approach. *Id.* at 111. To begin, Justice Breyer argued that the difficulties of conducting extensive historical analysis would be particularly difficult in the lower courts. *Id.* These courts "have fewer research resources, less assistance from *amici* historians, and higher caseloads" than the Supreme Court. *Id.* These factors make them ill-equipped to do what the majority asks of them, while these courts remain equipped and experienced in conducting means-end scrutiny. *Id.*

Additionally, the dissent also discussed the practical problem of the majority's approach in that it provides lower courts too little instruction on "how to resolve modern constitutional questions based almost solely on history." *Id.* The dissent argued that the majority did not sufficiently explain how close to a historical law is necessary to find the regulation at issue sufficiently analogous. *Id.* at 112. The dissent also argued that the majority described some laws as outliers but failed to explain how lower courts should distinguish these outliers from laws worthy of historical weight. *Id.* at 112. The ambiguity the majority leaves in the application of this test, the dissent feared, will, at best, allow judges to "pick their friends out of history's crowd" and, at worst, "make it nearly impossible to sustain common-sense regulations." *Id.*

Justice Breyer also discussed the problem that history itself will often be too indefinite to provide an answer to the difficult questions litigants will present to courts. *Id.* He argued that historical evidence presented to the courts will often be unclear and that facts will be in dispute or be ambiguous or contradictory to other evidence. *Id.* Additionally, aspects such as the actual enforcement of laws and how they were interpreted centuries ago will not be entirely clear. *Id.* He argued that even historians viewing the same evidence would likely reach different results. *Id.* at 112–13 (citing Patrick J. Charles, *The Faces of the Second Amendment Outside the Home: History Versus Ahistorical Standards of Review*, 60 CLEV. ST. L. REV. 1, 14 (2012), with JOYCE LEE MALCOM, TO KEEP AND BEAR ARMS: THE ORIGINS OF AN ANGLO-AMERICAN RIGHT 104 (1994)). As a result of these problems, the dissent again feared that this method would allow judges to simply choose the historical evidence that best suits the judge's own preferences. *Id.* at 113.

Finally, the dissent was concerned that history will be "an inadequate tool when it comes to modern cases presenting modern problems." *Id.* The country at the time of the Second Amendment's adoption was so different than our country today, that those in the past could not have anticipated the modern problems faced today. *Id.* The nation was "predominantly rural," making it unlikely to have faced the same risks from gun violence that the nation faces today. *Id.* (quoting Charles R. McKirdy, *Misreading the Past: The Faulty Historical Basis Behind the Supreme Court's Decision in* District of Columbia v. Heller, 45 CAPITAL U. L. REV. 107, 151 (2017)). Further, modern technology, such as ghost guns or smart guns, makes it even more

clear that the Framers could not have anticipated how these problems could permissively be dealt with by legislatures. *Id.* (citing White House Briefing Room, FACT SHEET: The Biden Administration Cracks Down on Ghost Guns, Ensures That ATF Has the Leadership it Needs to Enforce our Gun Laws (Apr. 11, 2022)). The majority assumes that analogical reasoning would provide the answer, but the dissent fears that the majority provided too little guidance on how this reasoning is meant to operate. For example, while the majority signaled that laws regulating public carriage in sensitive places are permissible, there is no indication of which areas of a modern city could fall under this exception. *Id.* at 114.

While the dissent would reject a history-only based approach, an application of this approach demonstrates the problems sketched out throughout the dissent, while revealing a historical tradition of regulating the public carriage of firearms. *Id.* at 115. The dissent began its searching historical analysis in England, as our nation inherited the right found in the Second Amendment from these ancestors. *Id.* As far back as the 13th century, laws permitted local authorities to "prohibit any person from 'going armed'" *Id.* (quoting 4 Calendar of the Close Rolls, Edward I, 1296–1302, at 318 (Sept. 15, 1299) (1906)). However, these edicts also permitted those with a "special license" from the king to be exempt from such regulation. *Id.* (quoting 5 Calendar of the Close Rolls, Edward 1, 1302–1307, at 210 (June 10, 1304)). The dissent was unwilling to discount these laws, as the majority does, because they were enacted while England was in turmoil, as this would heighten the need for armed self-defense, not lower it. *Id.* 116–17.

The Statute of Northampton, which criminalized the carrying of weapons unless one had authorization from the king, is another example of this English tradition. *Id.* at 117 (citing 2 Edw. 3, 258, c. 3 (1328)). The majority rejected reliance on this statute for several reasons. First, this statute, as well as the going armed laws, was enacted before firearms arrived in England. *Id.* (citing Sir John Knight's Case, 87 Eng. Rep. 75 (K.B. 1686)). However, the Statute of Northampton eventually was applied to firearms once they became present in England. *Id.* Second, the majority saw the 450-year gap between the enactment of this statute and the ratification of the Second Amendment as discounting the statute's relevance to the Second Amendment. *Id.* at 118. The dissent responded by observing that this statute, while enacted hundreds of years before the Second Amendment, remained the law into the 18th century. *Id.* (citing 4 WILLIAM BLACKSTONE, COMMENTARIES 148–149 (1769)). The majority interpreted the Statute of Northampton to include an "intent to cause terror" element. The dissent, in examining the sources on which the dissent relied, found this to be a misinterpretation of the history. *Id.* at 118–20 (analyzing *Sir John Knight's Case*, 87 Eng. Rep., at 76 and the Hawkins Treatise, 1 Pleas of the Crown 136 (1716)).

While not universally enacted, the dissent found this tradition to be continued in the Colonies and pointed to a law from the colony of East New Jersey that prohibited persons from carrying certain "unusual or unlawful weapons" or from "going armed with sword, pistol, or dagger." *Id.* at 121 (quoting An Act Against Wearing Swords, &c., ch. 9, in GRANTS, CONCESSIONS, AND ORIGINAL CONSTITUTIONS

OF THE PROVINCE OF NEW JERSEY 290 (2d ed. 1881)). Similar prohibitions were in the law of Massachusetts Bay and New Hampshire. *Id.* (citing An Act for the Punishing of Criminal Offenders, 1692 MASS. ACTS AND LAWS, no. 6, at 11–12; An Act for the Punishing of Criminal Offenders, 1771 N. H. ACTS AND LAWS ch. 6, § 5, at 17). The fact that only three colonies enacted such laws raises the question of whether they are outliers or proper historical analogues. While the majority discredited these laws as outliers, the dissent rather saw them as "successors to several centuries of comparable laws in England." *Id.* Further, the majority gave less weight to these laws, seeing as they only applied to particular people, and only to smaller firearms. *Id.* at 122. However, the dissent expressed the concern that the majority may have required too close of a historical twin. *Id.*

In the founding era, the dissent pointed toward several states—including Virginia, North Carolina, and others—which passed laws that largely mirrored the Statute of Northampton's prohibition. *Id.* (citing 1786 VA. ACTS, ch. 21; COLLECTION OF STATUTES, 60–61, ch. 3 (F. Martin ed. 1792) (reporting North Carolina's founding era statute which used the language from the Statute of Northampton)). Just as the majority believed there was an intent to terrify standard in the statute of Northampton, the majority finds this same standard to apply to these laws. *Id.* After examining the historical sources the majority provided for this standard in these American laws, the dissent concluded that, just like the Statute of Northampton, public terror was a *reason* for the prohibition, not an *element* of it. *Id.* at 123 (citing

*State v. Huntly*, 25 N.C. 418 (1843); *O'Neill v. State*, 16 Ala. 65 (1849); *Simpson v. State*, 13 Tenn. 356 (1833)).

In the 19th century, the dissent found two innovations from the Statute of Northampton. *Id.* at 124. First, there were both states and territories that banned concealed carry of firearms, or any type of carrying certain concealable weapons. *Id.* (citing GA. CODE § 4413 (1861)). While there existed some outlier opinions that invalidated these laws on Second Amendment State Analogues, most courts held them to be lawful. *Id.* at 125. In addition to these laws, the dissent further pointed to the introduction of surety laws. *Id.* at 126 (citing MASS. REV. STAT., ch. 134 § 16 (1836)). These laws required those who went armed but could not demonstrate a fear of an assault that was reasonable to pay a surety when a complaint was made by one who had cause to reasonably fear an injury. *Id.* As noted by the dissent, these laws largely resemble the New York law the majority struck down by conditioning the carrying of firearms on a "special showing of need." *Id.* (citing MASS. REV. STAT., ch. 134, § 16). Based on these two innovations, the dissent believed that the 19th century demonstrates that the public carriage of firearms has been subject to "relatively stringent restrictions" that are consistent with the Second Amendment. *Id.* at 127.

Justice Breyer further pointed to support for the idea of extensive regulation of firearms being constitutional in the period after the Civil War. *Id.* During this period, the dissent found many states and western territories prohibited all public carriage of firearms, subject only to limited exceptions. *Id.* at 128 (citing 1871 Tex. Gen. Laws ch. 34, § 1). Further, even when these laws were challenged in court, they

were largely upheld, subject to the condition provided by Congress and others that
the laws could not be discriminatory in design or effect. *Id.* at 127–28 (citing Patrick
J. Charles, *The Facts of the Second Amendment Outside the Home, Take Two: How
We Got Here and Why It Matters*, 64 CLEV. ST. L. REV. 373, 414 (2016)).

      Finally, the dissent analyzed the history of the New York licensing law at issue
in the case, contrasting it with the types of prohibitions found to be presumptively
lawful in *Heller* and noting that the New York law has a "longer historical pedigree
than at least three of the four" presumptively lawful regulations. *Id.* at 129. The fact
that this disconnect exists between *Heller* and the majority in this case, demonstrated
to the dissent that they were either being "unnecessarily cramped" in their view of
the relevant history, or "needlessly rigid" in their analogical reasoning. *Id.* For as the
dissent stated, "if the examples discussed above, taken together, do not show a
tradition and history of regulation that supports the validity of New York's law, what
could?" *Id.*

      While the dissent conceded that they were bound by *Heller*, they recognized
that *Heller* did not create an absolute right, but rather one subject to appropriate
regulations. *Id.* at 131. Further, the dissent read the history to provide a clear picture
of extensive regulation of firearms being able to exist perfectly within the Second
Amendment. *Id.* However, the dissent rejected that history alone is the appropriate
manner to evaluate this right, preferring to rely on means-end scrutiny to resolve
these issues. *Id.* Applying such a balancing approach, the dissent would have found
the law to be substantially related to New York's compelling interest. *Id.* at 132.

### c. Summary

In summation, the Supreme Court majorities in *Heller* and in *Bruen* explicitly rejected the following notions. First, they rejected the argument that the scope of the Second Amendment did not go further than to protect citizens' right to keep and bear arms for military or militia purposes. They also rejected the argument that the "people" identified in the Second Amendment referred only to the collective actions of individuals under a duty to serve in the militia. The Court also flatly rejected any notion that the term "bear arms" related only to military service or acting as a soldier. Additionally rejected was the notion that the only concern addressed by the Second Amendment was a fear of standing armies. Also rejected was any notion that the self-defense interest advanced by the Second Amendment was nothing more than a "subsidiary interest."

The majority decision in *Bruen* explicitly rejected the call to apply *any* form of means-ends scrutiny to Second Amendment challenges, thereby rejecting any notion that the Second Amendment must yield to a state's "compelling interest," even when such an interest can be demonstrated by compelling data. Justice Breyer's argument that the complexity of firearm regulation reserves this issue *only* for legislatures' discretion—without the possibility of judicial review—was also rejected. The fact that urban and rural communities suffer from gun violence in different ways or that different firearms pose different risks and serve different purposes was rejected as a justification for broadly insulating the legislature from extensive judicial review. The *Bruen* Court also rejected the argument that history alone would be both impractical

for judges to utilize and incapable of providing definitive answers. Aside from means-ends scrutiny, the majority in *Heller* rejected an interest-balancing test that would have weighed the burden the Second Amendment against the government's interest in enacting the law.

Finally, the *Bruen* dissent's understanding of history was rejected as a justification for the public carry legislation at issue at issue in the case. English and colonial "going armed laws," the Statute of Northampton, or colonial laws prohibiting the carrying of unlawful weapons were *rejected* as a justification for New York's licensing regime. Similarly, founding-era laws that mirrored the Statute of Northampton were rejected as proper historical analogues to the New York law. Even concealed carry laws and surety laws from the 19th century failed to justify the law struck down in *Bruen*. Finally, postbellum regulation that went as far as to prohibit the carrying of firearms in public also could not stand as a justification for New York's public carry law. The Supreme Court, in rejecting the dissent's arguments, made clear that these regulations did not demonstrate a historical tradition of regulating firearms that would justify all modern legislation.

### 3. Justice Thomas's Statement in *Harrel v. Raoul*, 144 S. Ct. 2491 (July 2, 2024)

This Court notes that, while the Supreme Court denied the petitions for certiorari that sought to set aside the Seventh Circuit's decision in *Bevis*, Justice Thomas wrote in a Statement that "[w]e have never squarely addressed what types of weapons are 'Arms' protected by the Second Amendment." *See Harrel v. Raoul*, 144 S. Ct. 2491, 2492 (July 2, 2024) (Statement of Thomas, J.). He writes:

> To be sure, we explained in *District of Columbia v. Heller*, 554 U.S. 570,
> (2008), that the Second Amendment's protection "extends, prima
> facie, to all instruments that constitute bearable arms, even those that were
> not in existence at the time of the founding." And, we noted that "the
> Second Amendment does not protect those weapons not typically
> possessed by law-abiding citizens for lawful purposes," recognizing "the
> historical tradition of prohibiting the carrying of dangerous and unusual
> weapons[.]" But, this minimal guidance is far from a comprehensive
> framework for evaluating restrictions on types of weapons, and it leaves
> open essential questions such as what makes a weapon "bearable,"
> "dangerous," or "unusual."

*Id.* (quoting *Heller* at 582, 625, 627) (citing *Caetano v. Massachusetts*, 577 U.S. 411,

417–419 (2016) (Alito, J., concurring in judgment)). Justice Thomas writes that "[t]he

Seventh Circuit's decision illustrates why this Court must provide more guidance on

which weapons the Second Amendment covers." *Id.* Additionally, "[b]y contorting

what little guidance our precedents provide, the Seventh Circuit concluded that the

Second Amendment does not protect 'militaristic' weapons," before "tautologically

defin[ing] 'militaristic' weapons as those 'that may be reserved for military use.'" *Id.*

"The Seventh Circuit's contrived 'non-militaristic' limitation on the Arms protected

by the Second Amendment seems unmoored from both text and history." *Id.* (quoting

*Bevis* at 1194) (citing *Bevis* at 1199). Moreover, "even on its own terms, the Seventh

Circuit's application of its definition is nonsensical." *Id.* (citing *Bevis* at 1222

(Brennan, J., dissenting) ("The AR–15 is a civilian, not military, weapon. No army in

the world uses a service rifle that is only semiautomatic." (footnote omitted)). Justice

Thomas writes that "[i]n [his] view, Illinois' ban is 'highly suspect because it broadly

prohibits common semiautomatic firearms used for lawful purposes.'" *Id.* (citing

*Friedman v. City of Highland Park*, 577 U.S. 1039, 1042 (2015) (Opinion of Thomas,

J.). Finally, he states that "[i]t is difficult to see how the Seventh Circuit could have concluded that the most widely owned semiautomatic rifles are not 'Arms' protected by the Second Amendment." *Id.*

## B. Seventh Circuit Jurisprudence

After the issuance of *Heller* but before the Supreme Court issued *Bruen*, the Seventh Circuit issued its opinion in *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015). The case involved a challenge to the constitutionality of Highland Park's ordinance prohibiting the possession of assault weapons and large-capacity magazines (defined as magazines holding more than ten rounds, *see id.* at 407). The challenged ordinance also banned various firearm attachments and features. *Id.*

The *Friedman* Court recited *Heller*'s cautionary language warning "against readings that go beyond the scope of *Heller*'s holding that 'the Second Amendment creates individual rights, one of which is keeping operable handguns at home for self-defense.'" *Id.* at 410 (quoting *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir.2010) (en banc)) (citing *Heller*). After surveying the opinions of other circuits grappling with what level of scrutiny should be applied to laws regulating firearms, the opinion held that "we think it better to ask whether a regulation bans weapons that were common at the time of ratification or those that have 'some reasonable relationship to the preservation or efficiency of a well regulated militia,' and whether law-abiding citizens retain adequate means of self-defense." *Id.* (citing *Heller* at 622–25; *Miller*, 307 U.S. at 178–79). After pointing out that the arms banned by the Highland Park ordinance are not like those arms existing in 1791, *id.*, the *Friedman* Court also

observed that, because some of the arms in questions were commonly used for military and police functions, "they therefore bear a relation to the preservation and effectiveness of state militias." *Id.* "But states, which are in charge of militias, should be allowed to decide when civilians can possess military-grade firearms, so as to have them available when the militia is called to duty." *Id.*

*Friedman* concedes that the banned weapons *can* be used for self-defense. S*ee id.* at 411 ("Since the banned weapons can be used for self-defense, we must consider whether the ordinance leaves residents of Highland Park ample means to exercise the 'inherent right of self-defense' that the Second Amendment protects." *Id.* (quoting *Heller* at 628). In critiquing the plaintiffs' argument that the ordinance substantially restricts their options for armed self-defense, the *Friedman* Court noted that "[i]f criminals can find substitutes for banned assault weapons, then so can law-abiding homeowners." *Id.* They continue, stating that:

> True enough, assault weapons can be beneficial for self-defense because they are lighter than many rifles and less dangerous per shot than large-caliber pistols or revolvers. Householders too frightened or infirm to aim carefully may be able to wield them more effectively than the pistols James Bond preferred. But assault weapons with large-capacity magazines can fire more shots, faster, and thus can be more dangerous in aggregate. Why else are they the weapons of choice in mass shootings? A ban on assault weapons and large-capacity magazines might not prevent shootings in Highland Park (where they are already rare), but it may reduce the carnage if a mass shooting occurs.

*Id.* The *Friedman* Court further noted that "[t]he best way to evaluate the relation among assault weapons, crime, and self-defense is through the political process and scholarly debate, not by parsing ambiguous passages in the Supreme Court's opinions." *Id.* at 412. In summation, the majority noted that "[t]he central role of

representative democracy is no less part of the Constitution than is the Second Amendment: when there is no definitive constitutional rule, matters are left to the legislative process." *Id.* (citing *McCulloch v. Maryland*, 4 Wheat. 316, 17 U.S. 316, 407 (1819)).

In dissent, Judge Manion stated that "[t]o limit self-defense to only those methods acceptable to the government is to effect an enormous transfer of authority from the citizens of this country to the government—a result directly contrary to our constitution and to our political tradition." *Id.* at 413 (Manion, J., dissenting). "The rights contained in the Second Amendment are 'fundamental' and 'necessary to our system of ordered liberty.' The government recognizes these rights; it does not confer them." *Id.* (quoting *McDonald*, 561 U.S. at 778). A further critique was that the "novel test" prescribed by the majority includes the following prongs: (1) "whether the weapons in question were 'common at the time of ratification' or have 'some reasonable relationship to the preservation or efficiency of a well regulated militia'" and (2) "whether law-abiding citizens retain adequate means of self-defense." *Id.* (citing *id.* at 410–11). The issue as Judge Manion saw it was that "*Heller* expressly disclaimed two of the three aspects of this test." *Id. Heller* specifically noted that the argument that the Second Amendment only protected those arms that were in common use in 1791 was "bordering on the frivolous." *Id.* (quoting *Heller* at 582). Likewise, *Heller* "expressly overruled any reading of the Second Amendment that conditioned the rights to keep and bear arms on one's association with a militia." *Id.* at 413–14 (citing *Heller* at 612). For this reason, Judge Manion argued that "there is

no way to square this court's holding with the clear precedents of *Heller* and

*McDonald*." *Id.* at 414. After discussing why the banned arms were "in common use"

and entitled to Second Amendment protection, Judge Manion touched on the use of

weapons for self-defense versus use for criminal activity:

> Whether or how people might use these weapons for illegal purposes
> provides a basis for a state to regulate them, but it has no bearing on
> whether the Second Amendment covers them. Unfortunately, the court
> effectively inverts this equation and considers first the potential illegal
> uses (here: catastrophic public shootings) and then doubles back to
> determine whether attendant lawful use by ordinary citizens might be
> sufficient to warrant some type of Second Amendment protection.

*Id.* at 416.

The *Friedman* plaintiffs sought a writ of certiorari which was denied. *See*

*Friedman v. City of Highland Park*, 577 U.S. 1039 (2015) (Mem.). However, two

justices dissenting from that denial: Justice Scalia, author of the majority opinion in

*Heller*, and Justice Thomas, who would later author the majority opinion in *Bruen*.

This dissent foreshadows the direction the Supreme Court would take as Second

Amendment jurisprudence evolved. They also explained that *Friedman* blatantly

ignored the Supreme Court's opinions in *Heller* and in *McDonald*:

> We excluded from protection only "those weapons not typically
> possessed by law-abiding citizens for lawful purposes." And we stressed
> that "[t]he very enumeration of the right takes out of the hands of
> government—even the Third Branch of Government—the power to
> decide on a case-by-case basis whether the right is really worth insisting
> upon."

*Id.* at 1039 (Scalia, J., dissenting) (first quoting *Heller* at 625; next quoting *Heller* at

634 (emphasis deleted)). Addressing directly the majority's finding that the

regulation of modern weapons should be left to the political process, the dissent

responded that: "[w]e cautioned courts against leaving the rest of the field to the legislative process: 'Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad.'" *Id.* (quoting *Heller* at 634–635). Because "[t]he right to keep and bear arms is an independent, individual right," the dissent wrote that "[i]ts scope is defined not by what the militia needs, but by what private citizens commonly possess." *Id.* (citing *Heller* at 592, 627–629). Therefore, the dissent would have granted the writ of certiorari.

Even considering the above discussion, the Seventh Circuit has stated that their preexisting test from *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015), is consonant with *Bruen*'s historical test. *See Bevis v. City of Naperville*, 85 F.4th 1175, 1190–91 (7th Cir. Nov. 3, 2023); *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022); *see also United States v. Rahimi*, 144 S. Ct. 1889 (2024); *McDonald v. City of Chicago*, 561 U.S. 742 (2010); *District of Columbia v. Heller*, 554 U.S. 570 (2008). The *Bevis* Court stated that the "military use" test employed in *Friedman* is consonant with *Bruen*, even though *Bruen* held that any two-step test is "one step too many." *Bruen* at 19; *see Bevis* at 1191. The Seventh Circuit states that *Friedman* was not explicitly overruled or abrogated unlike other Circuits' two-step tests.[17] The *Bevis* Court writes that "[a]lthough the

---

[17] *Bruen* explicitly notes that following cases as abrogated: *Harley v. Wilkinson*, 988 F. 3d 766 (4th Cir. 2021); *Libertarian Party of Erie County v. Cuomo*, 970 F.3d 106 (2d Cir. 2020); *Worman v. Healey*, 922 F.3d 26 (1st Cir. 2019); *Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019); *Association of New Jersey Rifle and Pistol Clubs, Inc. v. Attorney General New Jersey*, 910 F.3d 106 (3d Cir. 2018); *Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017); *National Rifle Ass'n of America, Inc. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 700 F.3d 185 (5th Cir. 2012).

district court in *Bevis* thought that the reasoning in *Friedman* might not have survived *Bruen*, we see *Friedman* as basically compatible with *Bruen*, insofar as *Friedman* anticipated the need to rest the analysis on history, not on a free-form balancing test."[18] *Bevis* at 1189 (citing *Bruen*, 597 U.S.; *Bevis v. City of Naperville*, 657 F. Supp. 3d 1052 (N.D. Ill.), *aff'd*, 85 F.4th 1175 (7th Cir. 2023), *cert. denied sub nom. Harrel v. Raoul*, 144 S. Ct. 2491 (2024) (Mem.)).

This Circuit adopts a framework in which, prior to conducting any Second Amendment analysis as to a weapon, attachment, or magazine, the burden shifts to the plaintiff to prove by a preponderance of the evidence that the item in question constitutes an "Arm" for purposes of the Second Amendment. *See Bevis* at 1192–93 (quoting *Heller* at 581). If the item does not constitute an "Arm," then the Seventh Circuit holds that the Second Amendment has nothing to say about a law banning or restricting it. *See id.* This method is required even if the item otherwise falls within the definition of what constitutes an "Arm" as set out in *Heller* and in *Bruen*. *See Bevis* at 1192–1202. The Seventh Circuit holds that this precertification process renders *Friedman* consistent with the "methodology approved in *Bruen*" and so they may employ it in *Bevis*. *Id.* at 1191.

The Seventh Circuit also states that "'common use' is a slippery concept." *See Bevis* at 1198.[19] *Friedman* held that "states, which are in charge of militias, should

---

[18] In a concurring opinion, Circuit Judge Jane Richards Roth of the Third Circuit discusses a similar test in *Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, No. 23-1633, 2024 WL 3406290 (3d Cir. July 15, 2024).

[19] This Court finds the definition of weapons reserved for "military use" to be similarly nebulous as it shapeshifts its way through *Bevis*'s majority opinion.

be allowed to decide when civilians can possess military-grade firearms, so as to have them *available when the militia is called to duty*." *Friedman* at 410 (emphasis added).[20] Conceding that "[m]ass shootings are rare, but they are highly salient, and people tend to overestimate the likelihood of salient events," the Seventh Circuit allows that "[i]f a ban on semiautomatic guns and large-capacity magazines reduces the perceived risk from a mass shooting, and makes the public feel safer as a result, that's a substantial benefit." *Id.* at 412.

While *Friedman* uses terms like "semiautomatic guns" and "large-capacity magazines," it does not explicitly link these terms to a workable definition of a "military-grade weapon."[21] *See id.* at 410, 412. In *Bevis*, the Seventh Circuit states that the plaintiffs "have the burden of showing that the weapons addressed in the pertinent legislation are Arms that ordinary people would keep at home for purposes of self-defense, not weapons that are exclusively or predominantly useful in military service, or weapons that are not possessed for lawful purposes." *Id.* at 1194. The question, thus, was whether civilian-model AR-15s are "Arms" as covered by the

---

[20] This is somewhat confusing, as the Seventh Circuit explicitly stated in *Bevis* that the Supreme Court "severed" the prefatory and operative clauses that comprise the Second Amendment. *See Bevis* at 1189 (citing *Heller*). The Court is at a loss to explain how states are able to regulate civilian use of military-grade weapons so that they can be available for the militia when the Supreme Court explicitly eschewed this connection in *Heller*. *See id.* at 595 ("There seems to us no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms."); *see also id.* at 612 ("It is not possible to read this as discussing anything other than an individual right unconnected to militia service. If it did have to do with militia service, the limitation upon it would not be any 'unlawful or unjustifiable purpose,' but any nonmilitary purpose whatsoever.").

[21] Plaintiffs' expert James Ronkainen states that "at Remington, we had an entirely separate division devoted to military firearms development and production (Remington Defense) to meet the distinct needs of the separate military market. We did not consider military grade rifles to be MSRs." (Doc. 229, Ex. 9 (Ronkainen Rep.), p. 6). Ronkainen provides "ferritic nitrocarburization—a kind of barrel surface treatment technology" as an example of a process that "is used to extend the useful life of the gun barrel and improve corrosion protection beyond that offered by standard chrome plating, on military-grade rifles." (*Id.*, p. 5).

Second Amendment's protection or whether, like "machineguns," they are "dedicated exclusively to military use." *Id.* at 1193 (citing *Heller* at 624). The Seventh Circuit specifically considered the AR-15's rate of fire as compared with the military M16, as well as the "core design" and the fact that "both rely on the same patented operating system." *Id.* at 1196. They also state that the AR-15 has a "semiautomatic rate of 'only' 300 rounds per minute" compared with the M16's 700 rounds per minute rate of fire.[22] *Id.* The Seventh Circuit ultimately concluded that "assault weapons and high-capacity magazines are much more like machineguns and military-grade weaponry than they are like the many different types of firearms that are used for individual self-defense (or so the legislature was entitled to conclude)" and, more specifically, that "based on the record before us, we are not persuaded that the AR-15 is materially different from the M16." *Id.* at 1197.

That being said, the Seventh Circuit (in a footnote) adds the following: "[o]bviously, many weapons are 'dual use': private parties have a constitutionally protected right to 'keep and bear' them and the military provides them to its forces. In this sense, there is a thumb on the scale in favor of Second Amendment protection." *Id.* at 1195 n.8. They clarify that "[w]hen we refer to 'military' weapons here, we mean

---

[22] The Seventh Circuit does not cite a source for these figures. It is unclear to this Court how a semiautomatic rifle can workably fire 300 rounds per minute (put another way, 5 trigger pulls per second for 60 seconds). The U.S. Army's marksmanship manual from states that the M16A1 rifle had a "maximum effective rate of fire" of forty-five to sixty-five rounds per minute in semiautomatic and 150 to 200 rounds per minute in automatic. (Doc. 247, ¶¶ 196 (citing *id.*, Ex. 261, U.S. Army, FM 3-22.9 at 2-1)). Notably, even at the high end of the band, sixty-five rounds per minute is 32.5% of the rate of fire of a fully automatic military AR-style rifle (which is not available for purchase by civilians in any capacity). Perhaps the Seventh Circuit used "cyclic" rates of fire, which is "the theoretical mechanical rate at which a firearm is capable of being fired." (Doc. 247, ¶ 282 (citing Doc. 185, Ex. 1 (Yurgealitis Rep.), ¶ 49; Doc. 232, Ex. 19 (Boone Decl.), ¶ 67))).

weapons that may be essentially reserved to the military." *Id.* Such a carve-out means that specific weapons that would be "reserved for military use" by the above definition may not be restricted from use by civilians for self-defense; the most obvious examples would be the civilian variants of the M9 service pistol (sold as the Beretta 92F pistol and M1014 Joint Service Shotgun (sold as the Benelli M4 shotgun). Without this dual-use provision, such weapons would not be "Arms" in accordance with the Seventh Circuit's reckoning.

## C. Harmonizing Seventh Circuit and Supreme Court Case Law

Regardless of the tension between *Friedman*/*Bevis* and *Heller*/*Bruen*, it is this Court's task to try to harmonize these two lines of case law. As discussed in the Order issued on February 23, 2024, the Court will proceed as follows. In line with the *Friedman*/*Bevis* "precertification," the Plaintiffs must establish via a preponderance of the evidence that (1) the weaponry in question is an item an ordinary person would keep at home for purposes of self-defense; (2) the weaponry in question is not exclusively or predominantly useful in military service; and (3) the weaponry in question is not possessed for unlawful purposes. (*See* Doc. 166, pp. 6–7). However, even if a weapon flunks the first or second prong of this test, it can still be considered an "Arm" entitled to Second Amendment protection if "dual use" is demonstrated. *See Bevis* at 1195 n.8.

If the Plaintiffs are able to establish that the weapons, attachments, or ammunition-feeding devices proscribed by PICA are "Arms" included within the protective reach of the Second Amendment in line with *Friedman* and *Bevis*, the

Government "must affirmatively prove" that PICA "is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms" via a showing of "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen* at 19, 29; (*see* Doc. 166, p. 12 (quoting the same)).

## D. Definitions

Justice Thomas wrote that the Supreme Court's "minimal guidance is far from a comprehensive framework for evaluating restrictions on types of weapons, and it leaves open essential questions such as what makes a weapon 'bearable,' 'dangerous,' or 'unusual.'" *See Harrel v. Raoul*, 144 S. Ct. 2491, 2492 (July 2, 2024) (Statement of Thomas, J.). Before assessing the parties' arguments and attempting to harmonize Supreme Court and Seventh Circuit precedent, this Court will create workable definitions for "bearable," "dangerous," "unusual," and "common use."

### 1. "Bearable"

In *Heller*, the Supreme Court wrote that "[a]t the time of the founding, as now, to 'bear' meant to 'carry.'" *Id.* at 584 (citing S. JOHNSON, 1 DICTIONARY OF THE ENGLISH LANGUAGE 161 (4th ed.) (reprinted 1978); N. WEBSTER, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828) (reprinted 1989); T. SHERIDAN, A COMPLETE DICTIONARY OF THE ENGLISH LANGUAGE (1796); 2 OXFORD ENGLISH DICTIONARY 20 (2d ed.1989)). "When used with 'arms,' however, the term has a meaning that refers to carrying for a particular purpose—confrontation." *Id.* The Supreme Court notes Justice Ginsburg's definition from her dissent in *Muscarello v. United States*, 524 U.S. 125 (1998): "[s]urely a most familiar meaning is, as the Constitution's Second Amendment

. . . indicate[s]: 'wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person.'" *Id.* (citing *Muscarello* at 143 (Ginsburg, J., dissenting)); *see also* BLACK'S LAW DICTIONARY 214 (6th ed.1990). The *Heller* Court stated that "[w]e think that Justice Ginsburg accurately captured the natural meaning of 'bear arms.' Although the phrase implies that the carrying of the weapon is for the purpose of 'offensive or defensive action,' it in no way connotes participation in a structured military organization." *Id.*

In the Seventh Circuit, the *Bevis* Court asks "what exactly falls within the scope of 'bearable' Arms?" *Id.* at 1193. "Not machineguns, the [*Heller*] Court said, because they can be dedicated exclusively to military use." *Id.* (citing *Heller* at 624). "Yet a normal person can certainly pick up and carry a machinegun, or for that matter the portable nuclear weapons we mentioned at the outset." *Id.* "'Bearable' thus must mean more than 'transportable' or 'capable of being held.'" *Id.* (citing *Heller* at 627 (discussing "weapons that are most useful in military service—M16 rifles and the like," which "may be banned")).

As additional context, the Third Circuit attempted to refine which "bearable" weapons are Arms in the context of the Second Amendment. In a concurring opinion, Judge Roth of the Third Circuit wrote that although "weapons can be (and are) used for lawful purposes besides self-defense" including "[r]ecreational target shooting, hunting, and pest-control," that "*Heller* holds, and its progeny affirms, that self-defense is 'the core lawful purpose' protected by the Second Amendment" and that

"[w]hile these other uses may be lawful, the Supreme Court has never recognized them as 'core' purposes protected by the Second Amendment." *Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 211 (3d Cir. 2024) (Roth, J., concurring) (footnotes omitted). "Until it might do so, the 'bearable arms' presumptively protected by the Second Amendment are limited to weapons used explicitly for self-defense." *Id.* (footnote omitted).

Admittedly, some of the circuits (including the Seventh Circuit), demand that the right "to keep and bear arms" for any lawful purpose be narrowed to "bearing arms" *only* for self-defense in the home unless the weapon is an arm "useful" for military purposes. This asymmetry can easily derail any effort to fashion a neutral definition of what it means to "bear" an arm. However, it is not necessary to narrow the definition of what constitutes "bearable" to address only what is bearable for the purposes of self-defense. The concerns of the circuits with respect to semiautomatic weapons, attachments, configurations, and magazine capacity are more aptly addressed in how one defines "dangerous," "unusual," "military weapon," and/or "dual use."

It is critical that one does not gloss over this language in *Heller*: "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." 554 U.S. at 582. Prima facie means "legally sufficient to establish a fact or a case unless disproved." *Prima facie*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/prima%20facie [https://perma.cc/B9TT-URBL] (last visited Oct. 31, 2024). Prima

facie evidence sustains a judgment unless contrary evidence is produced. BLACK'S LAW DICTIONARY (12th ed. 2024).

Considering the above, this Court holds that "for the purpose . . . of being armed and ready" is the controlling language. *Muscarello* at 143 (Ginsburg, J., dissenting). The definition of "bearable" clearly includes items like helmets, body armor, and the like. However, because PICA only focuses on handheld or shoulder-mounted firearms, this Court will not attempt to exhaust the list of what *may* be wearable or bearable to be armed and ready for confrontation. For the purposes of this discussion, as the Supreme Court has conclusively accepted Justice Ginsburg's definition of "bearable," the Court will employ it here.

Yet, is any handgun, shotgun, or rifle that can be picked up and carried a bearable arm? Is the ability to safely operate the weapon a function of whether it is bearable? Some firearms may so be awkward, cumbersome, or ponderous to hold, aim, and fire that they may be inherently unbearable as a practical matter. Consider a firearm with a size or intense recoil such that it compromises its ability to be safely or properly used for self-defense. In this category may be a rifle or a handgun that fires .50 caliber rounds. Most adults would struggle mightily to fire five rounds at quick intervals because of the immense recoil.

Moreover, how do we treat a weapon that is only *partially* borne while operating it? Consider an arm that can be deployed remotely or by operation of a radio-controlled device. This Court acknowledges that such issues may be deemed by many to be relevant to what is "bearable." However, given the types of arms banned

by PICA, these queries are more properly addressed in the definitions of the other terms *infra*.

Therefore, this Court defines **bearable** as: **a weapon that an individual carries for the purpose of being armed and ready for offensive or defensive action in a case of conflict with another person**.

### 2. "Dangerous"

*Heller* also discusses what "dangerous" means in the context of firearms. *Id.* at 627. The definition of "dangerous" is inextricably linked to that of "common use." The *Heller* Court wrote that "[w]e also recognize another important limitation on the right to keep and carry arms. *Miller* said, as we have explained, that the sorts of weapons protected were those 'in common use at the time.'" *Heller* at 627 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)). "We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* (citing 4 WILLIAM BLACKSTONE, COMMENTARIES 148–149 (1769); 3 B. WILSON, WORKS OF THE HONOURABLE JAMES WILSON 79 (1804); J. DUNLAP, THE NEW–YORK JUSTICE 8 (1815); C. HUMPHREYS, A COMPENDIUM OF THE COMMON LAW IN FORCE IN KENTUCKY 482 (1822); 1 W. RUSSELL, A TREATISE ON CRIMES AND INDICTABLE MISDEMEANORS 271–272 (1831); H. STEPHEN, SUMMARY OF THE CRIMINAL LAW 48 (1840); E. LEWIS, AN ABRIDGMENT OF THE CRIMINAL LAW OF THE UNITED STATES 64 (1847); F. WHARTON, A TREATISE ON THE CRIMINAL LAW OF THE UNITED STATES 726 (1852); *State v. Langford*, 10 N.C. 381, 383–384 (1824); *O'Neill v. State*, 16 Ala. 65, 67 (1849); *English v. State*, 35 Tex. 473, 476 (1871); *State v. Lanier*, 71

N.C. 288, 289 (1874)). *Heller* specifically stated that "machineguns" and "short-barreled shotguns" are weapons that are excluded from Second Amendment protection. *Id.* at 624–25. In the conclusion to this discussion, the Supreme Court writes:

> It may be objected that if weapons that are most useful in military service—M–16 rifles and the like—may be banned, then the Second Amendment right is completely detached from the prefatory clause. But as we have said, the conception of the militia at the time of the Second Amendment's ratification was the body of all citizens capable of military service, who would bring the sorts of lawful weapons that they possessed at home to militia duty. It may well be true today that a militia, to be as effective as militias in the 18th century, would require sophisticated arms that are highly unusual in society at large. Indeed, it may be true that no amount of small arms could be useful against modern-day bombers and tanks. But the fact that modern developments have limited the degree of fit between the prefatory clause and the protected right cannot change our interpretation of the right.

*Id.* at 627–28.

*Bruen* discussed an 1801 Tennessee statute which "required any person who would 'publicly ride or go armed to the terror of the people, or privately carry any dirk, large knife, pistol or any other dangerous weapon, to the fear or terror of any person' to post a surety; otherwise, his continued violation of the law would be 'punished as for a breach of the peace, or riot at common law.'" *Bruen* at 50 (quoting 1801 Tenn. Acts pp. 260–61). They also pointed to an 1833 Tennessee case where "the Tennessee attorney general once charged a defendant with the common-law offense of affray, arguing that the man committed the crime when he 'arm[ed] himself with dangerous and unusual weapons, in such a manner as will naturally cause terror to the people.'" *Id.* at 51 (quoting *Simpson v. State*, 13 Tenn. 356, 358 (1833)).

As discussed *supra*, the Seventh Circuit in *Bevis* lists "firearms, explosives, Bowie knives, or other like devices" as being regulated in the past as "especially dangerous weapons of the time." *Id.* at 1199.

As additional context, the Fourth Circuit wrote that "[w]e also recognize that the Supreme Court, in the handful of Second Amendment cases that it has decided, has not yet had the opportunity to clarify the full array of weaponry that falls outside the ambit of the Second Amendment." *Bianchi v. Brown*, 111 F.4th 438, 451 (4th Cir. 2024) (en banc). As examples, they discuss "arms that disable an adversary over time, such as those that release slow-acting poison" like "[a]n umbrella gun that fires a ricin-laced pellet, while a bearable arm, is utterly ineffective at countering imminent threats for which the right to self-defense exists because it takes hours for ricin to have a debilitating effect." *Id.* (citing *Ricin and the Umbrella Murder*, CNN (Oct. 23, 2003); CTRS. FOR DISEASE CONTROL AND PREVENTION, QUESTIONS AND ANSWERS ABOUT RICIN (Apr. 4, 2018)). Additionally, some bearable arms deliver force so excessive for self-defense that no reasonable person could posit that the Constitution guarantees civilian access to them." *Id.* at 451–52 (citing *Bevis* at 1198 ("Everyone can also agree, we hope, that a nuclear weapon such as the . . . 51-pound W54 warhead, can be reserved for the military, even though it is light enough for one person to carry."); *Heller* at 627).

The Fourth Circuit continues, writing that "[a]s should be clear, these are not the modern equivalents of weapons that were commonly possessed and employed for self-preservation by your shopkeeper, or your butcher, or your blacksmith up the road

in colonial America—the disarmament of whom the Second Amendment was ratified to prevent." *Id.* at 452 (citing *Heller* at 598–99). "The Second Amendment, with its 'central component' of 'individual self-defense,' is not concerned with ensuring citizens have access to military-grade or gangster-style weapons." *Id.* (quoting *Bruen* at 29) (emphasis omitted). "In short, then, while the Second Amendment jealously safeguards the right to possess weapons that are most appropriate and typically used for self-defense, it emphatically does not stretch to encompass excessively dangerous weapons ill-suited and disproportionate to such a purpose." *Id.*

What are we to make of the frequent references to the Second Amendment's "core lawful purpose as self-defense" when identifying what is an "Arm" protected by the Second Amendment? Is this a fair reading of the Second Amendment, or, rather, an attempt to strangle the more full-throated test of the Supreme Court (whether the weapon is in common use for *any* lawful purpose)? Is there a different test contemplated for arms in common use, but the principal purpose is for, say, hunting or competition shooting instead of confrontation in the home? How about ammunition designed for larger game? What should we make of a flare gun, the principal purpose of which is to help identify a location or signal distress?

Merriam-Webster defines dangerous as "able or likely to inflict injury or harm." *Dangerous*, MERRIAM-WEBSTER, https://www.merriam-webster .com/dictionary/dangerous [https://perma.cc/JRQ6-DK6T] (last visited Oct. 30, 2024). Clearly, the ability to "inflict injury or harm" applies to all firearms; they are designed to maim, wound, and kill. Thus, all firearms could be considered "dangerous" under

this definition, which clearly does not mean what the Supreme Court intended "dangerous" to mean. However, considering the weapons that the Supreme Court has said are not covered by the Second Amendment (machineguns and sawed-off shotguns) provides this Court with context on what exactly is included within the definition of "dangerous."

A machinegun is dangerous in the same way as is a flamethrower, an explosive, or a chemical or biological weapon—in its normal mode of operation, it is extremely difficult, if not impossible, to control the weapon or to fix it on a discrete target. When fired in fully automatic mode, an M16 or other fully automatic military-issued firearm like the M249 Squad Automatic Weapon or M240B machinegun provides "suppressing fire," meaning it is not designed to necessarily hit individual targets, but rather to lay down a "blanket" of fire to cover a fire team or military unit's movement. (*See* Doc. 229, Ex. 6 (Eby & Musselman Rep.), p. 5 ("Fighting against a peer opponent requires a choreographed response during an engagement. The infantry usually meets the opponent by receiving gunfire from an entrenched or hidden force (historically we in the USA are the 'moving' force, attacking a prepared 'defending' force). The infantry rifleman requires a high volume of accurate fire to 'suppress' an opponent into position. Think of suppression as an action that prevents the enemy from rising out of prepared positions to shoot at US forces. Sufficient suppression prevents enemy action and is measured by overwhelming the enemy's ability to return fire for the duration of friendly force firing. These are not precision

aimed fires, as it is very unlikely that an enemy is visible to the approaching US forces . . . ." (footnote omitted))).

This Court notes that this use occurs in military or tactical situations *only*. Continuing this line of reasoning, these weapons are imprecise as an inherent part of their normal operation, even when they are used by trained and skilled military personnel. Thus, it stands to reason that an untrained civilian shooter would have even less control over a machinegun (or, for that matter, flamethrower or grenade). Such weapons would maim or kill an attacker, but the operator would not be able to control the weapon's discharge in any reasonable manner. This quality—the inability of the shooter to control the weapon—is a workable and reasonable definition of "dangerous" in line with the Supreme Court's intentions. Put another way, the "dangerousness" of a weapon is linked to the operator's *control* of fire, not to the *rate* of fire. Thus, machineguns would not necessarily be banned because of the *rapidity* with which they deliver rounds downrange, but because the average civilian operator (and, as it turns out, the military operator, as well[23]) cannot control the weapon when fully automatic in a way that would ensure that shots are reasonably aimed. Such weapons would not be used for self-defense in a confrontation with a discrete,

---

[23] In his report, the Government's expert Craig Tucker states that using an M16 or M4 in fully creates logistical and technical problems because a military rifleman does not carry enough ammunition to enable practical automatic fire and because "[t]he rifle overheats, requiring constant cooling" and because "[t]he heat can misshape the barrel, and the rate of misfires and magazine feed problems increases considerably." (Doc. 222, Ex. 2 (Tucker Decl.), ¶ 13; *see also* Doc. 229, Ex. 6 (Eby & Musselman Rep.), p. 5 ("The riflemen need an extremely high volume of sufficiently accurate shots that will allow time for the 3-man machine-gun teams to be moved forward to the point of contact, mount their weapons onto tripods to support the engagement, locate the target areas, select an engagement criterion, initiate firing shots and to refine their impact areas (of bullets) sufficient to continue suppressing the enemy." (footnote omitted))).

identifiable opponent (or opponents); rather, they are used in military settings against concealed targets. (*See* Doc. 229, Ex. 6 (Eby & Musselman Rep.), p. 5). Using a machinegun in a self-defense situation would result in rounds being fired toward random or unintentional targets.

The same definition applies to sawed-off shotguns for similar reasons. Decreasing the length of the shotgun's barrel decreases not only the effective range of the weapon, but its precision as well; put another way, the projectiles will spray in a wider pattern because the diminished length of the barrel imparts less *control* on the trajectory of the projectiles. A sawed-off shotgun suffers from the same fatal defect as does a machinegun—the operator lacks control over the weapon and its projectiles. Scattershot aptly describes the discharge from a sawed-off shotgun unless at point-blank range.

Therefore, this Court defines **dangerous** as: bearable **arms that a typical operator cannot reasonably control to neutralize discrete, identified aggressors. Once more, it is the lack of the ability to discriminately control the arm and its discharged projectiles that makes it dangerous, not its rate of fire.**

### 3. "Unusual"

Regarding the definition of "unusual," Merriam-Webster defines this term as "uncommon, rare." *Unusual*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/unusual [https://perma.cc/P6M5-Q3HE] (last visited Oct. 30, 2024). Defining "unusual" in the context of the Second Amendment is not as easy as it is to

determine which arms are usually used in self-defense. Historically, "usual" weapons for confrontation included bladed weapons like knives, spears, and swords; blunt weapons like clubs; and ranged weapons like bows, bullet-firing weapons like pistols and rifles, and projectile-firing weapons like crossbows, some rifles, and shotguns. Today, due to advances in technology, our self-defense weapons include electrically charged tasers and canisters spraying mace and pepper liquid.

There are two qualities or characteristics that make an arm unusual. The first quality is the atypical way in which the arm neutralizes an opponent. The second is an arm that harms an opponent in a way that is repulsive. This is odd to contemplate when the focus is the purposeful use of lethal weapons. Nonetheless, included within this category would be arms that use chemicals like acids to inflict horrible pain and leave permanent scars, arms that eject blister agents, and arms that use lasers to blind an adversary. (*See* Doc. 240 (9/18/2024 Trial Tr. (Watt)), 495:16–497:18). Additionally, poisons, including radioactive compounds, are unusual. *See Bianchi* at 451–52. The use of a biological agent, in addition to being dangerous, is also atypical when compared to the types of arms used for self-defense.

Unusual as related to the Second Amendment also has an element of "cruel and unusual" in accordance with the Eighth Amendment. We have banned weapons for use in war because, even in a war setting, they are so cruel, brutal, indiscriminate, and inhumane as to prohibit their use. The 1980 Convention on Certain Conventional

Weapons banned poison gases, non-detectable fragments,[24] land mines, incendiary weapons, poisoned bullets, cluster bombs, and biological weapons. *See* U.N. Convention on Prohibitions or Restrictions on the Use of Certain Conventional Weapons Which May Be Deemed to Be Excessively Injurious or to Have Indiscriminate Effects (with Protocols I, II and III), Dec. 10, 1980, 1342 U.N.T.S. 137, as amended Dec. 21, 2001 [hereinafter U.N. Conventional Weapons Convention].

In the context of the Second Amendment, when it comes to firearms, technical advances and improvements are expected and are not unusual. As an example, prior to 1950, almost all rifle stocks were wooden. With advances in composite materials, now many are made of synthetic materials.

When applied to handheld or shoulder-mounted firearms, "unusual" means those weapons that launch or emit lethal or seriously harmful explosives; chemical or biological agents; poisons; blister agents; aural weapons; or directed-energy weapons like lasers. Handheld or shoulder-mounted weapons that deploy high thermal energy would also fall under the category of "unusual" for Second Amendment purposes.

In looking at the items banned by PICA, the only items that fall under the "unusual" category would be grenade launchers and belt-fed munitions. Grenades are included in this category because no one uses them for self-defense; belt-fed

---

[24] Non-detectable fragments are fragments that cannot be detected in the human body via an X-ray. *See* U.N. Conventional Weapons Convention, Protocol I. Thus, treating the wound would be very difficult and cause unnecessary suffering.

munitions are included because civilians simply do not purchase firearms in which
cartridges are fed through a belt rather than housed in a cylinder or magazine.

Therefore, considering the above, **unusual** is defined as: **an arm deploying
an atypical method to neutralize an opponent in confrontation or that
deploys a neutralizing agent that is caustic, incendiary, noxious, poisonous,
or radioactive. Unusual would also include those weapons that are not
designed for successful self-defense in neutralizing an opponent, but rather
are primarily deployed to inflict cruel, brutal, or inhumane suffering on a
person.**

### 4. "Common Use"

Having developed working definitions for "bearable," "dangerous," and
"unusual," we now arrive at the concept of "common use." Recall that the Supreme
Court stated that it was "fairly supported by the historical tradition of prohibiting
the carrying of dangerous and unusual weapons that the Second Amendment protects
the possession and use of weapons that are in common use at the time." *Bruen* at 21
(quoting *Heller* at 627) (citations omitted) (cleaned up).

In *Bevis*, The Seventh Circuit stated that the fact that AR-15s have been sold
to the public since the expiration of the Federal Assault Weapons Ban is not
dispositive on whether or not they are in "common use" or are "dangerous and
unusual." *See Bevis* at 1198–99 (citing *Friedman*). The Seventh Circuit wrote that:

> We recognized in *Friedman* that "common use" is a slippery concept.
> Suppose, for example, a new type of handgun is introduced to the market
> on January 1, 2024. As of that day, zero guns of that type have been sold.
> Yet if its characteristics are analogous to those of the many other types

of handguns available for consumers, no one would say that this new handgun was not within the class of Arms protected by the Second Amendment. At the other end of the spectrum, consider the actual case of machineguns, which for a time were available for civilian purchase, but which were eventually withdrawn from that market. However popular machineguns might have been, either in organized crime circles or more generally, because their characteristics were military in nature, the decision to reserve them to military use was within the power of the legislature.

. . . .

One brief asserts that at least 20 million AR-15s and similar rifles are owned by some 16 million citizens (though they do not specify how many of these owners would fall within the large carveout created by the grandfather and the trained professional exceptions to the Act). The plaintiffs also assert that at least 150 million magazines with a capacity greater than 10 rounds have been bought for private use. (The state criticizes these numbers for being based, it says, on "an unpublished, non-peer-reviewed paper recounting an online survey that does not disclose its funding or measurement tools." We have no need for present purposes to resolve that dispute.) Cook County offers a different perspective, noting that of all the firearms in the country, only 5.3% are assault weapons, and that percentage includes those held by law-enforcement agencies. One is reminded of Mark Twain's apocryphal remark, "There are three kinds of lies: Lies, Damned Lies, and Statistics."

For the reasons set forth in more detail in *Friedman*, we decline to base our assessment of the constitutionality of these laws on numbers alone. Such an analysis would have anomalous consequences. The problem with this approach can be seen in the case of the AR-15. When, in 1994, the Federal Assault Weapons Ban made civilian possession of AR-15s (among other assault weapons) unlawful, *see* Pub. L. No. 103-322, § 110102, 108 Stat. 1796, 1996, few civilians owned AR-15s. But in 2004, after the legislation was allowed to expire pursuant to its sunset provision, *id.* § 110105(2), 108 Stat. at 2000, these weapons began to occupy a more significant share of the market. Indeed, most of the AR-15s now in use were manufactured in the past two decades. Thus, if we looked to numbers alone, the federal ban would have been constitutional before 2004, but unconstitutional thereafter. This conclusion is essential to the plaintiffs' position, yet it lacks both textual and historical provenance.

> As this example illustrates, the idea of "common use" cannot be severed
> from the historical scope of the common-law right that the Second
> Amendment was designed to protect against encroachment. In other
> words, the relevant question is what are the modern analogues to the
> weapons people used for individual self-defense in 1791, and perhaps as
> late as 1868. This would exclude the weapons used exclusively by the
> military—and every Framer of the Second Amendment was well aware
> by 1791 that the King of England had an impressive standing army, and
> that such weapons existed. The weapons used for self-defense are the
> ones that *Heller*, *McDonald*, *Caetano*, and *Bruen* had in mind—not a
> militaristic weapon such as the AR-15, which is capable of inflicting the
> grisly damage described in some of the briefs.

*Bevis* at 1198–99.

Dissenting in *Bevis*, Judge Brennan wrote that "[e]ven if AR platform rifles

were unusual, they are not more dangerous than handguns. (Recall the test is

'dangerous *and* unusual.'" *Bevis* at 1215 (Brennan, J., dissenting) (citing *Heller* at

627; *Bruen* at 2143.)). Moreover, he writes:

> The semiautomatic mechanism in an AR-15 rifle is, in all material
> respects, the same as in a semiautomatic handgun. That mechanism is
> gas powered, and the impact of the pin firing the bullet pushes back the
> lock mechanism, ejects the old shell, and loads the new round from the
> magazine. If *Bruen* and *Heller* provide that semiautomatic handguns do
> not fail under the "dangerous" prong, the mechanism in the AR-15 must
> survive scrutiny. Indeed, a handgun could be viewed as more dangerous
> than an AR-15 rifle because the handgun is less accurate and more
> concealable.

*Id.* Judge Brennan also notes that "[a]lbeit pre-*Bruen*, two federal appellate courts

also concluded that AR platform rifles are common." *Id.* (citing *N.Y. State Rifle &*

*Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015) ("Even accepting the most

conservative estimates cited by the parties and by amici, the assault weapons and

large-capacity magazines at issue are 'in common use' as that term was used in

*Heller*."); *Heller v. District of Columbia*, 670 F.3d 1244, 1261 (D.C. Cir. 2011) ("We

think it clear enough in the record that semi-automatic rifles and magazines holding more than ten rounds are indeed in 'common use,' . . . .")). Therefore, he argues that "[t]he firearms banned by the Act and ordinances here have achieved common use in the United States. They are not unusual." *Id.* However, this was not the majority's holding in *Bevis.*

The Court of Appeals for the District of Columbia Circuit very recently assessed whether large-capacity magazines were in common use in the appeal of a preliminary injunction. *See Hanson v. District of Columbia*, No. 23-7061 (D.C. Cir. Oct. 29, 2024). The D.C. Circuit easily found that large-capacity magazines were "Arms" protected by the Second Amendment because "[a] magazine is necessary to make meaningful an individual's right to carry a handgun for self-defense. To hold otherwise would allow the government to sidestep the Second Amendment with a regulation prohibiting possession at the component level, 'such as a firing pin.'" *Id.* at *9 (quoting *Kolbe v. Hogan*, 813 F.3d 160, 175 (4th Cir. 2016), *rev'd en banc*, 849 F.3d 114 (2017)). Regarding common use, the D.C. Circuit wrote that "[t]he Supreme Court in *Heller* did not hold, however, that Second Amendment protection does not extend to weapons that are 'most useful' in the military context. Rather, the Court acknowledged that the Second Amendment protects those weapons that are 'in common use at the time,' but not 'dangerous and unusual weapons.'" *Id.* at *11. This means, therefore, that "some 'weapons that are most useful in military service" do not receive Second Amendment protection." *Id.* (citing *Heller* at 627). Moreover, "the answer is not to be found solely by looking to the number of a certain weapon in

private hands." *Id.* at *10 (citing *Bianchi*, 111 F.4th at 460). The D.C. Circuit found that the plaintiffs had shown that the large-capacity magazines at issue were in common use for self-defense purposes. *See id.* at 11–12.

In her dissent in *Garland v. Cargill*, 602 U.S. 406 (2024), Justice Sotomayor wrote that the weapon used in the deadly 2017 Las Vegas shooting used "commonly available, semiautomatic rifles" to which bump stocks were attached. *Id.* at 430 (Sotomayor, J., dissenting). While in dissent, this language certainly rings close to a statement that such rifles are "in common use."

One additional takeaway from the *Bevis* majority opinion is that "in common use" is not a mathematical equation. This is particularly true in light of *Bevis*'s reference to the "AR-15 . . . and its many cousins covered by the Act." 85 F.4th at 1196. Therefore, the number sold of *each* particular make and model is, essentially, irrelevant. However, if raw sales data is not determinative, then what is?

This Court interprets *Bevis* to require focus on form and function. By that analysis, this Court holds that any bearable rifle or pistol that is capable of semiautomatic fire and is or has been available for purchase by law-abiding citizens is presumptively in common use provided that it is not otherwise "dangerous and unusual." Thus, this Court will dispense with any laborious recitation of the sales data for the many different firearms banned by PICA. What is also noteworthy is the very real problem that sales data may not be readily available. (*See* Doc. 247, ¶ 145 ("How many of these weapons are personally owned by Americans is unknown, because available data sources are problematic . . . . Annual data collected by ATF

from firearms manufacturers, known as the Annual Firearms Manufacturing and
Exporting Report ("AFMER"), is limited to production numbers, not ownership
numbers. ATF's AFMER data also does not distinguish between 'modern sporting
rifles' and other rifles, and it includes rifles that are ultimately acquired by law
enforcement." (first citing Doc. 185, Ex. 7 (Klarevas Rep.), p. 4; then citing Doc. 236
(9/17/2024 Trial Tr. (Ronkainen)), 332:11–333:07; then citing Doc. 236 (9/17/2024
Trial Tr. (Ronkainen)), 331:11–332:10)).

Therefore, in relation to the weapons banned by PICA, this Court defines
**common use** as presumptively encompassing: **any bearable rifle, shotgun, or
pistol that is capable of semiautomatic fire and is or has been available for
purchase, possession, and usage by law-abiding citizens for self-defense,
provided that it is not otherwise "dangerous and unusual." Moreover, for
the sake of clarity, the Court will also include essential features (like
magazines) and nonessential features that increase operability, accuracy,
or safety (like the various attachments prohibited by PICA) as items that
are presumptively in common use.**

**E. Firearm Usage in Military and Civilian Contexts**

**1. Military Confrontation**

While ambushes can and do occur in military conflict, military members are
rarely thrust into battle without the benefit of pertinent weapons, equipment, and
supplies; a coordinated and planned response; and significant training.

To begin, soldiers, marines, airmen, and sailors are deployed with various other pieces of equipment: a Kevlar helmet, body armor, utility uniforms, load-bearing vests, knives, flashlights, a sidearm, and spare ammunition, to list a few. (*See* Doc. 240 (9/18/2024 Trial Tr. (Watt)), 489:22–492:5). An Infantry rifleman carries 210 rounds of spare ammunition spread across seven magazines. (*See* Doc. 222, Ex. 2 (Tucker Decl.), ¶ 13; Doc. 240 (9/18/2024 Trial Tr. (Watt)), 491:11–18).

Additionally, military members deployed in combat conditions must be in a "combat ready" status including physical and mental fitness. (*See* Doc. 240 (9/18/2024 Trial Tr. (Watt)), 492:9–494:7; 502:4–24). For an individual service member, this requires satisfactory passage of various physical fitness tests, medical screening, and psychological screening to ensure the individual is ready for the rigors of combat. (*See id.*).

Our troops also proceed into harm's way as a trained unit, supported by air cover, reinforcements, medical support, naval support, and reconnaissance and intelligence from human and/or satellite sources, to list a few. They are also supported by medical support, including field medics who are embedded within deployable units. The smallest infantry unit is the "fire team," a group of four infantrymen including a team leader, a rifleman, and automatic rifleman, and a grenadier. *See* INFANTRY RIFLE PLATOON AND SQUAD, DEPT. OF THE ARMY, ATP 3-21.8, at 1-4 (Jan. 2024); https://armypubs.army.mil/epubs/DR_pubs/DR_a/ARN40007-ATP_3-21.8-000-WEB-1.pdf [https://perma.cc/5HM3-3ZHU]. Additionally, the various military branches have produced highly detailed procedures that detail

exactly how infantrymen will respond to various tactical situations. *See generally id.*; WEAPON SYSTEMS HANDBOOK 2020–2021, U.S. ARMY. Such procedures are executed by a highly choreographed chain of command.

In such a situation, the M16 and M4 are designed to fulfill a specific niche; their semiautomatic fire feature permits precise target shooting while their ability to fire in a fully automatic capacity is designed to provide suppression fire in a situation where members of a squad are moving to or from an objective. Fully automatic fire is incredibly inaccurate and impractical, even in a military situation. (*See* Doc. 222, Ex. 2 (Tucker Decl.), ¶¶ 11–12 ("This experience highlights one of the critical challenges associated with riflemen employing automatic fire: it is logistically unsustainable, even when employed judiciously. The M16/M4 is not, primarily, a suppression weapon. For that reason, every unit, including the 4-person rifle team, carries a machine gun specifically designed to provide suppression to allow riflemen to maneuver and close with semi-automatic fire on the enemy."); *see also* Doc. 253, ¶ 240 ("Semiautomatic fire is more accurate and efficient." (citing Doc. 236 (9/17/2024 Trial Tr. (Dempsey)), 606:12-607:1; Doc. 222, Ex. 2 (Tucker Rebuttal Rep.), ¶ 10; Pltfs' Tr. Ex. 140 (Dempsey Dep.), 43:4-7; Doc. 241 (9/19/2024 Trial Tr., State's Closing), 666:17-667:5)).

### 2. Civilian Self-Defense

The purpose of the Second Amendment is not crime reduction. Its focus is self-defense and the ability of each citizen to be able to either repel an attack by one or

more adversaries or to offensively engage an adversary or adversaries to protect oneself and/or others.

The average civilian may be called upon to defend his or her person, family, or property from an armed home invasion. This person is often ambushed and is stuck with the weapons he or she has readily available. (*See* Doc. 240 (9/18/2024 Trial Tr. (Watt)), 497:19–498:13). The civilian may also be called upon to defend others who are not armed and almost certainly will not have time to plan or regroup with other allied defenders. Additionally, combat in the home or property may draw the civilian away from ammunition supplies. (*See id.*). Moreover, firearms and munitions kept in the home are often stored under lock and key so that they are inaccessible to children or those who might self-harm. In an emergent situation, the accuracy, safety, ease-of-use, and magazine capacity of an individual defense weapon may literally be the difference between life or death of the civilian and his or her family members.

Thus, while both members of the military and civilians may be called upon to engage in confrontation, the civilian is often an army of one and has no backup, no support, and no reinforcements in the moment when home confrontation occurs. They will often not have the same physical fitness abilities as trained professional soldiers. Moreover, they may not have the benefit of military training and conditioning on which they can rely in a life-or-death scenario.

The life and death stakes mandate that their firearms have both lethal capabilities and give, at a minimum, our citizens a fighting chance. Therefore, sorting between military use and private use is an exercise in understanding civilian self-

defense. One cannot properly address the scope of the Second Amendment without understanding the complex dynamics of self-defense in which lethal force may be required to repel a rapist, a murderer, a kidnapper, or a stalker.

If one simply considers a self-defense scenario in which one physically fit person confronts one other person in his or her own home while armed with a pistol or pump-action shotgun, then the matter is fairly straightforward. However, if we consider only that scenario, then our search is superficial and woefully inadequate. Considering only that scenario does a great disservice to citizens who face confrontation. Unlike in the military, civilian defenders may be infirm, disabled, or small-statured such that they would not qualify as being "combat ready."

Considering only self-defense scenarios in the home also completely ignores the fact that the right to keep and bear arms applies to any and all lawful purposes, not just self-defense in the home. *See Bruen* at 32 ("Although individuals often 'keep' firearms in their home, at the ready for self-defense, most do not 'bear' (i.e., carry) them in the home beyond moments of actual confrontation. To confine the right to 'bear' arms to the home would nullify half of the Second Amendment's operative protections. Moreover, confining the right to 'bear' arms to the home would make little sense given that self-defense is 'the central component of the [Second Amendment] right itself.' After all, the Second Amendment guarantees an 'individual right to possess and carry weapons in case of confrontation,' and confrontation can surely take place outside the home." (first quoting *Heller* at 599; then quoting *Heller* at 592) (citing *McDonald*, 561 U.S. at 767)).

Consider scenarios in which the choice of a specific weapon would confer a tactical advantage and could mean the difference between survival, death, or serious injury. Consider a scenario involving a stalker and a victim in which a highly prepared and meticulous stalker aims to assault an individual while at her home, or while in transit to her workplace, or at her family's home. Another scenario we judges see in our courts is an individual who is going to testify about gang activity in his or her neighborhood and is in danger of serious harm from the gang members; another version of this scenario is a cooperating witness to a serious or violent crime whose testimony may be the difference between the government proving its case or not. Consider an additional scenario where a citizen is called upon to defend himself or herself at home during a surprise assault by multiple armed aggressors. Or consider an event where an individual has been abandoned by law enforcement for a variety of reasons (e.g., law enforcement officers are engaged elsewhere or there is an impasse on a road preventing them from rendering assistance).

There is another story regarding confrontation and armed self-defense worth serious contemplation. At the conclusion of the bench trial on September 19, 2024, this Court invited the parties to tour the twenty-four sacred sites of the East St. Louis Race Riot of 1917.[25] (*See* Doc. 241 (9/19/2024 Trial Tr.)); Doc. 245). Some of those sites are adjacent to the federal courthouse, either across the street or within a few blocks.

---

[25] *See* EAST ST. LOUIS 1917 CENTENNIAL COMMISSION CULTURAL INITIATIVE, https://estl1917ccci.us/ [https://perma.cc/843R-B5KY] (last visited Nov. 8, 2024). All excerpts are taken from Sacred Sites, a self-guided tour of the East St. Louis Race Riot. *See also* Mary Delach Leonard, *100 years later: Group Is Placing Historical Markers at Sites of 1917 East St. Louis Race Riot*, ST. LOUIS PUBLIC RADIO (June 5, 2017), https://www.stlpr.org/government-politics-issues/2017-06-05/100-years-later-group-is-placing-historical-markers-at-sites-of-1917-east-st-louis-race-riot [https://perma.cc/Y6DP-37DX]).

Heading into the July 4, 1917 celebration of Independence Day, racist impulses ignited a several-day pogrom to kill Blacks. Over one hundred Black men, women, and children were killed, lynched, burned alive, and drowned. Thousands were dispossessed of their homes.[26] The National Guard was present but did not actively suppress the pogrom until the third day.

Within sight of the federal courthouse are a few sacred sits that give important insight to the horrors of that event. One block down from the courthouse was the house of Otto Nelson. He was the highest-ranking Black man in the East St. Louis Police Department. He and his wife, while hiding in some brush, watched as a mob burned their house down. *See Sacred Site #8*, EAST ST. LOUIS 1917 CENTENNIAL COMMISSION CULTURAL INITIATIVE, https://estl1917ccci.us/ [https://perma.cc/843R-B5KY] (last visited Nov. 8, 2024). Fortunately, they were able to escape to St. Louis. One block west was the Broadway Opera House. *See id.* After word got out to the rioting mob that Black families were hiding in the basement, it was set on fire and burned to the ground. There were no known survivors.

Three blocks east of the courthouse is 4th and Broadway. *See Sacred Site #15*, *Sacred Site #16*. Here, a mob stopped a streetcar and attacked the Black passengers while soldiers stood and watched. *See Sacred Site #15*. Six corpses lay in the street and a Black man was lynched at this same spot. When an ambulance arrived to help the injured Blacks, the mob threatened to kill the ambulance driver. *See Sacred Site #14*.

---

[26] *See Introduction to Sacred Sites*, EAST ST. LOUIS 1917 CENTENNIAL COMMISSION CULTURAL INITIATIVE, https://estl1917ccci.us/ [https://perma.cc/843R-B5KY] (last visited Nov. 8, 2024).

The tragic story of Scott and Iva Clark, memorialized at Sacred Site #13, gives one a sense of the brutality. Rioters set fire to their house while they hid in the cellar. *See Sacred Site #13.* As the walls started to collapse, they fled to the next house only to see it set on fire. *Id.* They fled again, this time making it to a National Guardsman whom they assumed would protect them from the mob. *Id.* He did not. *Id.* Mr. Clark was struck in the head with an iron bar and a noose was then looped around his neck. *Id.* He pleaded for mercy. *Id.* Finding the rope not long enough to lynch him, they dragged him through the streets. *Id.* He died from strangulation. *Id.*

A few blocks from the federal courthouse was a house burned down by the mob. *See Sacred Site #15.* The badly burned body of a small child was found having died hiding under his bed from the mob. *See Sacred Site #14.* A few houses down lived Narsis Gurlie., who told W.E.B. DuBois:

> Between five and six o'clock we noticed a house nearby burning and heard the men outside. We were afraid to come outside and remained in the house, which caught fire from the other house. When the house began falling in we ran out, terribly burned, and one white man said, "Let those old women alone." We were allowed to escape. Lost everything, clothing and household goods.

W.E.B. DuBois, THE CRISIS MAG., Sept. 1917, at 235–36.

Worth noting is Sacred Site #5, where white rioters killing and burning houses approached 10th and Trendley Avenue. There, several armed Blacks took up sniper positions. After a few shots were fired, the white mob retreated. *See Sacred Site #5.*

Sacred Site #11 is a place where "over 100 African American barricaded themselves in two homes." *Sacred Site #11.* "They were armed and resisted the white rioters—so much that the rioters complained to the Illinois National Guard standing

nearby." *Id.* "An officer lectured the rioters, 'they are playing the game the way you are.' He arranged a cease-fire and the African Americans were escorted to St. Louis." *Id.*

Pleading for mercy because one is innocent, unarmed, and under-armed is, sadly, too often a losing strategy in confrontation, especially when the confrontation is catalyzed by evil, hatred, or psychosis. Disarming law-abiding citizens does not also bring about happy endings. Disarming law-abiding citizens does not inoculate us from the evil, hatred, and psychosis or from the tyranny of others.

### 3. Choice of Arms

Seneca wrote that "[n]othing happens to the wise man contrary to his expectation, because the wise man has considered every possibility—even the cruel and heartbreaking ones." Self-defense involves strategic decisions to maximize tactical superiority over an adversary. The first strategic decision is fight, flight, or surrender. If one can quickly access a bulletproof safe room, that would establish the tactical advantage of invulnerability. The strategic decisions become more complex the more an adversary has gained a tactical advantage by surprise, size, number, skill sets, close proximity, reducing the defender's response times, and, of course, the availability of specific weapons.

What strategic decisions does one make to gain a tactical advantage, or, at least, a fighting response? The self-defender queries "what are my options?" A frying pan, a Louisville slugger, a stick, pepper spray? The self-defender may choose flight as his or her only possible option to avoid the confrontation.

The Second Amendment *guarantees* that one may keep and bear arms for self-defense. Thus, a civilian defender has the advantage of forethought and the ability to plan and prepare for various "what if" scenarios. We have the right to select arms that may give us tactical advantages against an adversary. Those may include the ability to apply lethal force before an attacker gets within arms' reach or the ability defend against confrontation against multiple attackers. It may include preparing to defend children, the elderly, or the disabled during a confrontation. One should also consider known disadvantages for confrontation, such as lack of mobility, when selecting arms, magazines, attachments, and configurations,

One size, one configuration, one type of ammunition does not fit all. There is a difference between Andre the Giant and Dorothy the gymnast. One may be able to easily handle a weapon with a powerful recoil while the other simply could not. One may conclude that proximity to an adversary is a tactical advantage while the other may understand it likely to result in defeat leading to death, serious injury, rape, or becoming a hostage.

Consider the most famous story of confrontation, the story of David and Goliath. 1 *Samuel* 17. Goliath was the champion warrior of the Philistines. He purportedly was nine-and-a-half feet tall, wore 125 pounds of body armor, and was armed with a sword. Goliath challenges the Israelites to single combat to determine the outcome of the war between them. David, a young shepherd standing five to five-and-a-half feet tall, faced off against Goliath. David used a sling to launch a stone at Goliath, striking him in the head and causing Goliath to fall and be slain by David.

Obviously, the short David had no chance to succeed in hand-to-hand combat with the nine-and-a-half-foot-tall giant. David selected an arm that allowed him to fire a projectile from a safe distance to impose lethal force on his opponent before the giant closed within an adequate distance to slay David with his sword. Not only did David have to deploy a lethal weapon—he had to quickly and successfully neutralize Goliath. David's strategy to use a lethal weapon from a safe distance led to success in confrontation. If either the projectile proved nonlethal or David waited too long and allowed Goliath to come within striking distance, David would have been killed. If David did not aim his first shot on target, David would have been slaughtered.

If one is uncomfortable with a biblical reference and would prefer a less ecclesiastical example to illustrate the point, consider a famous scene in RAIDERS OF THE LOST ARK (Paramount Pictures 1981). Our hero Indiana Jones first bests multiple individual adversaries with his hands and fists, *mano e mano*. As he keeps a few more at bay with his trusty whip, a gathered crowd suddenly parts. Indiana Jones finds himself in confrontation with a grinning giant skillfully swinging around a large, ominous sword. As the crowd awaits the brutal demise of Indiana Jones, he draws a pistol from his holster and fires a lethal shot into the heart of the giant who was still too far enough away to apply his sword to Jones's body.

Considering the above discussion, it is clear that an individual's choice of arms is a critical facet of the concept of self-defense. When facing the possibility of armed confrontation either within one's home or outside of it, specific weapons may confer advantages that would enable a law-abiding citizen to successfully defend oneself and

one's family from armed confrontation. To limit civilians' choice of arms would tip the scale in favor of the aggressors, who already will likely have various tactical advantages, including the element of surprise.

## F. The Parties' Arguments

### 1. Plaintiffs

### a. Plaintiffs' Proposed Findings of Fact and Conclusions of Law (Doc. 253)[27]

After discussing the standing of the individual named plaintiffs in this litigation (which the Court will not belabor here[28]), the Plaintiffs argue that the weapons banned by PICA are those that ordinary citizens keep at home for lawful purposes (including self-defense), that these same weapons are not used exclusively or predominately by the military, and are not exclusively or predominately useful for military service in accordance with *Bevis*'s tripartite precertification. *See* 85 F.4th at 1194.

First, they argue that, based on their experts' reports and on their testimony at trial, the same features that make a weapon an "assault weapon" are also useful for civilian self-defense, including the ability to fire semiautomatically, detachable magazines, pistol grips, forward-protruding grips, thumbhole stocks, adjustable stocks, flash suppressors, barrel shrouds, buffer tubes/braces, and threaded barrels. (*See* Doc. 253, ¶¶ 35–78). They argue that "[s]emi-automatic pistols, shotguns, and .

---

[27] While the Plaintiffs initially filed their Proposed Findings of Fact and Conclusions of Law at Doc. 252, the Court will use the amended version filed at Doc. 253.

[28] The Court has already assessed standing in a previous Order, *see FFL*, 23-cv-00215-SPM (Doc. 75). Additionally, the Defendants do not dispute standing here. The Court will discuss standing as it relates to the Plaintiffs' request for a permanent injunction *infra*.

. . rifles are . . . appropriately and commonly used for typically small game hunting for many of the same reasons they are well-suited for self and home defense—accuracy, reliability and ease of handling." (Doc. 253, ¶ 40 (quoting Doc. 232, Ex. 23 (Lombardo Rep.), p. 2) (citing Doc. 232, Ex. 17 (Eby & Musselman Rep.), p. 11; Doc. 232, Ex. 21 (Little Rep.), ¶¶ 17–22 ("[S]emiautomatic firearms that accept detachable magazines are so well suited for defense of self or others as to render all other types of firearms obsolete for that purpose."); Doc. 232, Ex. 18 (Boone Decl.), ¶¶ 38–42 (explaining utility of AR-type rifles for self-defense, including with the home))); *see* PICA §§ 5/24-1.9(a)(1)(A) (rifles), (a)(1)(B) (pistols), (a)(1)(F) (shotguns).

Similarly, they argue that "[d]etachable magazines 'facilitate efficient loading/reloading,' which is critical in a self-defense situation. (Doc. 253, ¶ 44 (quoting Doc. 232, Ex. 24 (Watt Rep.), ¶ 6) (citing *id.* ("Every instructor and virtually every attendee of the [defensive carbine] course uses detachable magazines that have a capacity exceeding 10 rounds with their carbine."); Doc. 232, Ex. 21 (Little Rep.), ¶ 17 (detailing various "defensive" benefits of "a detachable magazine," including increased "ammunition capacity … when reacting to an attack, especially as fine motor skills deteriorate significantly under stress"; "reliability" due to jam mitigation; safe storage; and safe transportation))); *see* PICA §§ 5/24-1.9(a)(1)(A) (rifles), (a)(1)(C) (pistols), (a)(1)(F)(vi) (shotguns). The Plaintiffs argue that the same is true for "[p]istol grips[, which] have particular ergonomic, self-defense benefits on semiautomatic shotguns (in addition to on pistols and rifles)." (Doc. 253, ¶ 51 (citing Doc. 240 (9/18/2024 Trial Tr. (Watt)), 454:4–25 (noting that the pistol-grip benefits

for a semiautomatic shotgun are "even greater" than those applicable to a semiautomatic rifle "because the recoil from a shotgun is substantially greater than the recoil from a carbine"); Doc. 232, Ex. 22 (Ronkainen Rep.), p. 3 (describing how "new grip . . . designs" led to "performance and reliability advantages for all uses," "including hunting, sport shooting, and for self or home defense"); Doc. 232, Ex. 24 (Watt Rep.), ¶ 15; Doc. 232, Ex. 21 (Little Rep.), ¶ 19)); *see* PICA §§ 5/24-1.9(a)(1)(A)(i) (rifles), (a)(1)(F)(i) (shotguns). Regarding forward grips, they argue that a "forward grip 'on a defensive carbine, shotgun, or pistol can aid self-defense in multiple ways, some of which are: it offers the defender options for grasping the firearm with their forward hand in various ways conducive to effective individual control of the firearm, based on physiology, adverse weather, or other conditions, and, thereby, enhancing safe handling and effective use of the firearm, particularly under the stress of a self-defense situation.'" (Doc. 253, ¶ 53 (citing Doc. 232, Ex. 24 (Watt Rep.), ¶ 16)). They make similar arguments for other features banned by PICA. (*See id.*, ¶¶ 56–78).

Regarding the weapons themselves, the Plaintiffs argue that "[s]emiautomatic AR-platform rifles 'traditionally have been widely accepted as lawful possessions' all across the country," which they argue "remains true now." (Doc. 253, ¶ 84 (citing *Staples v. United States*, 511 U.S. 600, 612 (1994); *Garland v. Cargill*, 602 U.S. 406, 430 (2024) (Sotomayor, J., dissenting) (noting that "semiautomatic rifles" like the AR-15 are "commonly available" to the civilian public))). They argue that "AR-15-type rifles are used for lawful purposes such as self-defense, hunting, and target practice." (*Id.*, ¶ 86 (quoting NICHOLAS J. JOHNSON ET AL., FIREARMS LAW AND THE SECOND

AMENDMENT: REGULATION, RIGHTS, AND POLICY 1996 (3d ed. 2021) (2024 Supp.)) (citing David B. Kopel, *The History of Firearms Magazines and Magazine Prohibitions*, 78 ALBANY L. REV. 849-50, 866, 859 n.88 (2015); (Doc. 232, Ex. 21 (Little Rep.), ¶ 11; Doc. 232, Ex. 24 (Watt Rep.), ¶ 11; Doc. 232, Ex. 13 (Watt Dep.), 117:5-7 ("[I]n the self-defense realm, these are the favorite style of rifles and carbines that people show up [with] for training."); Doc. 240 (9/18/2024 Trial Tr. (Watt)), 411:5-412:24; *id.*, 468:6-24 (discussing how the semiautomatic rifles that HB5471 bans by name "are suitable for self-defense"); Doc. 232, Ex. 18 (Boone Rep.), ¶¶ 38–42; Doc. 232, Ex. 22 (Ronkainen Rep.), p. 2 (describing the design of various AR-15 platform rifles serving "the demand for use of" such weapons "for self and home defense purposes"); Doc. 232, Ex. 22 (Ronkainen Rep.), p. 2 ("I was directly involved in analyzing, designing and manufacturing rifles that were well suited" for the "widely chosen" purpose of "self and home defense"); Pltfs' Tr. Ex. 140 (Dempsey Dep.). 61:5-64:7 (state's expert describing that even he and his friends purchased and use semiautomatic rifles with a detachable thirty-round magazine for recreational purposes because "shooting is not an unfun experience"))). While they disagree with the Government on the exact number of weapons in circulation, the Plaintiffs indicate that "Defendants' own experts endorse similar conclusions." (Doc. 253, ¶ 98 (citing Doc. 185 (Klarevas Rep.), p. 20 (estimating "the number of Americans who own AR-15-platform firearms" at "14.1 million" to "18.2 million adults")))).

The Plaintiffs argue somewhat paradoxically that, because the AR-15 is suited for self-defense, that people *would* keep it at home for this purpose because "[w]hile

handguns are easier to maneuver and store and shotguns have devastating firepower at short distances, the AR-15 carbine offers several advantages as a primary home defense weapon." (Doc. 253, ¶ 107 (citing NICHOLAS J. JOHNSON ET AL., FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY 1997 (3d ed. 2021) (2024 Supp.))). They argue the same for the pistols and shotguns banned by PICA. (*See id.*, ¶¶ 111–129). Regarding large-capacity magazines, the Plaintiffs argue that modern firearms manufacturers often sell weapons with default large-capacity magazines (*see* Doc. 253, ¶¶ 142–43) and that "[i]ndividual retailer data from within the state of Illinois also proves that citizens do in fact buy and sell the detachable magazines that PICA bans." (*Id.*, ¶ 144 (citing Doc. 234 (9/16/2024 Trial Tr. (Pulaski)), 55:9-14 ("Q. Okay. Do you have an idea of how many magazines Piasa – now restricted magazines that Piasa sold prior to PICA taking effect? A. I would estimate several hundred per year. Q. And you base that on the records -- what do you base that on? A. Again, point of sale records and ordering records from our suppliers."))).

The Plaintiffs next argue that the weapons banned by PICA (e.g., AR- and AK-type rifles, specific pistols, and shotguns) are not military weapons because they do not have an automatic fire capability. They argue that "[t]he select-fire rifle is a '[t]otally different build' from the kinds of semiautomatic only rifles that PICA bans." (Doc. 253, ¶ 158 (quoting Doc. 236 (9/17/2024 Trial Tr. (Ronkainen)), 231:16-25)). They also argue that "[n]o military in the world is known to use a semiautomatic-only rifle as its general service infantry weapon." (*Id.*, ¶ 163 (citing Doc. 234 (9/16/2024 Trial Tr. (Eby)), 115:9-11 ("I've served with quite a few different countries, and all of

them will have select fire capabilities."); Doc. 236 (9/17/2024 Trial Tr. (Ronkainen)), 240:5-7 ("Q. Did any foreign military ever come to you and Remington and say, we just want a semiautomatic-only rifle? A. Nobody ever came to us and asked for a semiautomatic rifle. Q. Did all the foreign militaries come to Remington and say, we want a fully automatic M-4-like rifle? A. For the solicitations that I recall, it was always – fully automatic was, you know, key part of the specification."); Doc. 240 (9/18/2024 Trial Tr. (Watt)), 390:1-17 (Q. And were those [foreign military] rifles ever semiautomatic only? A. I don't recall any service weapons that were ever semi-auto only. Q. So they were all select fire? A. Correct."); Doc. 241 (9/19/2024 Trial Tr. (Dempsey)), 623:21-23 ("Q. You're not aware of any military anywhere in the world that issues semiautomatic only rifles to its infantry? A. No, I'm not."); Pltfs' Tr. Ex. 139 (Tucker Dep.), 38:1-4 ("In my experience and observation of other foreign militaries, I have not seen an infantry combat rifle, in other words a large-issue combat rifle, that did not have both semiautomatic and automatic selectors."); E. Gregory Wallace, *"Assault Weapons" Myths*, 43 S. ILL. L.J. 193, 205 (2018) ("No military in the world uses a service rifle that is semiautomatic only."))). They argue that rifles with automatic fire capability "serve important military needs in certain combat settings that semiautomatic-only rifles cannot" (*id.*, ¶ 175) including providing suppressing fire (*id.*, ¶ 178). They also argue that civilian-model AR-15s are functionally distinguishable from military-grade M16s/M4s. (*See id.*, ¶ 195 (citing Doc. 236 (9/17/2024 Trial Tr. (Ronkainen)), 289:13-290:4 ("Q. Are AR-15 semiautomatic fundamentally different from military-grade rifles? A. Yes. Q. Are

they manufactured differently? A. Yes. Q. Are they manufactured in different areas of the company? A. Yes. Q. Are they tested differently? A. Yes. Q. Are the materials different? A. Yes. Q. Do they perform differently? A. Yes. Q. Are AR-15s semiautomatic [rifles] . . . identical copies of military firearms? A. No.”))). They also argue that it is difficult to modify a civilian AR-15 to match the military version's automatic fire capability, which would already violate extant state and federal law. (*See id.*, ¶ 200 (quoting Doc. 236 (9/17/2024 Trial Tr. (Ronkainen)), 249:5–13, 250:8–25, 249:23–250:7) (citing 7/20 ILCS 5/24-1(a)(7); 18 U.S.C. §922(o)(1); 26 U.S.C. §5845(b))).

The Plaintiffs also argue that the firing rate of a semiautomatic AR-15 is nowhere near either the effective cyclic or effective firing rate of fully automatic M16s or M4s. (*See id.*, ¶¶ 203–208). They also argue that characteristics like range, penetration, muzzle velocity, and energy are affected much more by the caliber of the ammunition (which Illinois does not restrict apart from .50 caliber ammunition). (*See id.*, ¶¶ 209–20). They also argue that “[n]one of the pistols and shotguns that PICA bans share what is the most ‘critical’ military feature: select-fire capability.” (*Id.*, ¶ 221 (citing Doc. 234 (9/16/2024 Trial Tr. (Eby)), 187:14–25; Doc. 232, Ex. 3 (Eby Dep.), 61:9–20)). They also argue that the specific features PICA delineates (semiautomatic fire, pistol grips, and the like) have no bearing on the “militaristic” metrics discussed in *Bevis*. (*See id.*, ¶¶ 229–37). Even if the weapons banned by PICA are useful in military service, the Plaintiffs argue that semiautomatic weapons have “dual uses” as discussed in *Bevis*. (*See id.*, ¶¶ 238–49).

The Plaintiffs argue that the Supreme Court "has identified a historical tradition permitting the government to prohibit the *carrying* of arms that are 'highly unusual in society at large,' or 'dangerous and unusual.'" (Doc. 253, p. 73 (quoting *Bruen* at 47)). They emphasize that the "'dangerous and unusual' test is 'conjunctive': 'A weapon may not be banned unless it is *both* dangerous *and* unusual.'" (*Id.* (quoting *Caetano*, 577 U.S. at 417 (Alito, J., concurring in judgment) (citing *Heller*, 554 U.S. at 627; *Bruen* at 47)). They argue that "nothing about any of the firearms or feeding devices that PICA bans makes them unusually or distinctly 'dangerous' in some way that meaningfully differentiates them from common firearms that all agree fall on the civilian or 'dual use' side of the Seventh Circuit's line." (*Id.*, pp. 74–75).

### b. *Langley* **Plaintiffs' Closing Arguments for Trial (Doc. 254)**

While joining the Plaintiffs' primary brief *supra*, the *Langley* Plaintiffs also filed a separate document titled "Closing Arguments for Trial" (Doc. 254), calling it "a short concurring opinion in an appellate decision, but joining with the majority." (*Id.*, p. 2). In this filing, they discuss the East St. Louis race riot mentioned by the Court on September 19, 2024, the fourth day of the Bench Trial (*see* Doc. 241 (9/19/2024 Trial Tr.); Doc. 245). They also argue that "[a]s the evidence shows, while a given make or model of a given banned firearm may well be somewhat rare, overall, the record makes clear that the banned firearms in this case are in common use, as cited in the general Plaintiff brief, common to the point of ubiquity." (Doc. 254, p. 6). They also argue that "this Court need not consider whether or not grenades may be

banned, as such a decision would be expressly advisory, as . . . PICA does not ban grenades, or for that matter flares, and no Plaintiff is arguing any other ban which may or may not exist in this case." (*Id.*, pp. 7–8).

### 2. Defendants

### a. Illinois State Government Defendants

The Government responded in kind, filing 159 pages of Proposed Findings of Fact (Doc. 247); a 119-page Addendum of firearm statutes (*id.*, Ex. 1); almost 3600 pages of other exhibits (*id.*, Exs. 2–63); and 67 pages of Proposed Conclusions of Law (Doc. 248) for this Court to analyze. The Government analyzes the history and development of "assault weapons," tracing their development from the designs of Eugene Stoner in the 1950s (*see* Doc. 247, ¶ 33 (citing Doc. 185, Ex. 1 (Yurgealitis Rep.), ¶¶ 5, 14–25, 100; Doc. 236 (9/17/2024 Trial Tr. (Ronkainen)), 286:10–16, 337:7–16)) to combat field tests of the AR-15 prototype in the 1960s (*see id.*, ¶ 79 (citing Doc. 185, Ex. 1 (Yurgealitis Rep.), ¶ 39; Tr. Ex. 235, M16 Rifle Review Panel Report at C-12)) to its adoption as the U.S. military service weapon thereafter (*see id.*, ¶ 93 (citing Doc. 185, Ex. 1 (Yurgealitis Rep.), ¶ 45)). They argue that "[t]he AR-platform firearms created by Eugene Stoner at Armalite in the 1950s were originally designed as military firearms . . . [,] [b]ut in 1964, shortly after the AR-15 received its military designation as the M16, Colt introduced a semiautomatic version of the AR-15 for the civilian firearms market." (*Id.*, ¶ 98 (citing Doc. 236 (9/17/2024 Trial Tr. (Ronkainen)), 337:7–16); Tr. Ex. 235, M16 Rifle Review Panel Report at C-15; Doc. 185, Ex. 1

(Yurgealitis Rep.). ¶¶ 59–60; Tr. Ex. 245, Alex Horton et al., *Decades of Marketing Reinvented the AR-15 into a Top-Selling Firearm*, WASH. POST (Mar. 27, 2023)).

The Government next discusses the "regulatory scrutiny" of AR- and AK-type weapons in the wake of the 1989 Stockton, California shooting and traces the development of the Federal Assault Weapons Ban. (*See id.*, ¶¶ 102–22). While they trace the increased production of AR-type weapons after the expiration of the Federal Assault Weapons Ban in 2004, the Government argues that it is unknown exactly "[h]ow many of these weapons are personally owned by Americans . . . , because available data sources are problematic." (*Id.*, ¶ 145 (citing Doc. 190, Ex. 1 (Klarevas Rep.), p. 4). Additionally, "[a]nnual data collected by ATF from firearms manufacturers, known as the Annual Firearms Manufacturing and Exporting Report ("AFMER"), is limited to production numbers, not ownership numbers." (*Id.* (citing Doc. 236 (9/17/2024 Trial Tr. (Ronkainen)), 332:11–333:07)). "ATF's AFMER data also does not distinguish between 'modern sporting rifles' and other rifles, and it includes rifles that are ultimately acquired by law enforcement." (*Id.* (citing Doc. 236 (9/17/2024 Trial Tr. (Ronkainen)), 331:11–332:10)).

The primary thrust of the Government argument is that civilian-model AR-type weapons "retain the identical performance capabilities and characteristics as initially intended for use in combat, except for full-automatic capability." (*Id.*, ¶ 154 (citing Doc. 185, Ex. 1 (Yurgealitis Rep.), ¶¶ 45, 52, 118)). They argue that the AR-15 and M16/M4 typically fire the same .223 or 5.56 mm NATO ammunition (*see id.*, ¶ 155 (citing Doc. 230, Ex. 17 (Fatohi Dep.), 33:24–34:19)); have the same wounding

capacity (*see id.*, ¶¶ 163–77); have the same range and penetration capability (*see id.*,
¶¶ 178–93); function identically in the semiautomatic setting (*see id.*, ¶¶ 194–210);
and use the same design features to minimize recoil (*see id.*, ¶¶ 211–19). Moreover,
the Government argues that military M16s and M4s are predominately used and
fired in semiautomatic mode only because "semiautomatic fire is more accurate, less
likely to result in weapon damage or jamming, and more logistically sustainable."
(*Id.*, ¶ 220 (citing (Doc. 222, Ex. 2 (Tucker Rep.), ¶¶ 10–13; Doc. 222, Ex. 3 (Dempsey
Rep.), ¶¶ 17–22)). They argue that "[a]ll four military veterans who testified at trial—
including two witnesses called by Plaintiffs, Watt and Eby—affirmed that M16 and
M4 rifles are most often used in both training and combat in semiautomatic mode by
U.S. troops." (*Id.*, ¶ 221 (citing Doc. 234 (9/16/2024 Trial Tr. (Eby)), 146:7–9, 152:19–
23; Doc. 240 (9/18/2024 Trial Tr. (Watt)), 386:4–7, 465:7–19, 504:9–19; Doc. 240
(9/18/2024 Trial Tr. (Tucker)), 518:13–519:1, 525:13–18, 526:12–527:1, 532:21–24;
Doc. 241 (Trial Tr. (Dempsey)), 560:23–25, 561:5–9, 561:19–25, 604:25–605:13,
606:12–17, 608:14–18, 611:11–612:7)).

The Government also argues that any arguments that the military has selected
a new combat weapon (the XM7) with a fully automatic fire capability (instead of a
three-round burst mode) are dispelled by the fact that semiautomatic fire is still
preferred and because there exists a civilian version of this same weapon (the MCX-
Spear). (*See id.*, ¶¶ 243–65)). They also argue that the existence of AR-type rifles
chambered in other than .223 or 5.56 mm NATO is irrelevant because "none of the
individual plaintiffs has indicated a desire to purchase a Smith & Wesson M&P 15-

22 chambered in .22LR rimfire ammunition" or in any other non-.233/5.56 mm NATO caliber. (*See id.*, ¶ 270 (citing Docs. 198–210, 215, 221)). They also argue that whether or not a civilian version of an AR-type rifle can meet military specifications is irrelevant because the weapons are "functionally equivalent." (Doc. 247 (citing Doc. 241 (9/19/2024 Trial Tr. (Dempsey)), 638:23–639:15, 651:22–652:8)). The Government also disputes the Plaintiffs' contention that it is difficult to convert a semiautomatic AR-15 into a fully automatic weapon because devices like binary triggers, trigger cranks, and bump stocks are easily installable. (*See id.*, ¶¶ 281–90).

Moving from AR-type weapons to AK-model weapons, the Government adopts similar arguments, insisting that the only functional difference between a civilian-model AK-type weapon and a military-grade version is the absence of a fully automatic firing mode in the civilian model. (*See id.*, ¶¶ 291–302). They also argue that the so-called "submachineguns" banned by PICA (e.g., MP5, Uzis, and the like) are also merely semiautomatic versions of military weapons. (*See id.*, ¶¶ 303–321). They also argue that the .50 caliber rifle and ammunition banned by PICA are used by the military in the same configuration. (*See id.*, ¶¶ 322–56). The Government also argues that "[m]any of the semiautomatic pistols that have features listed in the Act's 'assault weapon' definition have been adapted from AR- and AK-type rifle platforms." (*Id.*, ¶ 337 (citing Doc. 185, Ex. 1 (Yurgealitis Rep.), ¶ 152) (footnote omitted)). They argue that these AR- and AK-type "are uncommon within the overall handgun market" (*id.*, ¶ 341 (citing Doc. 185, Ex. 1 (Yurgealitis Rep.), ¶ 162)) and share common features with standard AR- and AK-type weapons. (*See id.*, ¶¶ 349–53).

Regarding magazines, the Government argues that large magazines were designed for rapid fire and that magazines that comply with PICA's restrictions are available for purchase. (*See id.*, ¶¶ 354–61). Additionally, regarding shotguns, the Government paints the weapons PICA restricts as a small subset of semiautomatic shotguns, many of which share AR- and AK-type features. (*See id.*, ¶¶ 367–76).

Moving past the weapons themselves, the Government argues that "[h]ome defense and self-defense situations are rarely, if ever, lengthy shootouts at long ranges with extensive exchanges of gunfire." (*Id.*, ¶ 377 (citing Doc. 185, Ex. 1 (Yurgealitis Rep.), ¶ 180.) "Based on an empirical analysis of almost 1,000 real-life incidents of self-defense with a firearm, it is extremely rare for a person, when using a firearm in self-defense, to fire more than 10 rounds." (*Id.* (citing Doc. 185, Ex. 8 (Allen Rep.), ¶¶ 5, 8); *see also id.*, ¶¶ 378–83). They also argue that "[a]n analysis of a database of defensive gun uses ("DGUs") compiled by the Heritage Foundation indicates that it is rare for any kind of rifle to be used in self-defense." (*Id.*, ¶ 384 (citing Doc. 185, Ex. 8 (Allen Rep.), ¶ 31)). Moreover, the Government argues that "AR-15s, AK-47-platform rifles, .50 caliber rifles, and other assault weapons are a poor choice for self-defense." (*Id.*, ¶ 394 (citing Doc. 185, Ex. 1 (Yurgealitis Rep.), ¶¶ 130, 178; Doc. 234 (9/16/2024 Trial Tr. (Eby)), 175:18–21)). They point to the over-penetration risk associated with rifles. (*See id.*, ¶¶ 398–407). The Government also points to the lack of empirical evidence indicating the weapons restricted by PICA are used for self-defense purposes (*see id.*, ¶¶ 415–27) and also argues that such weapons are poor choices for hunting (*see id.*, ¶¶ 428–36).

The Government concludes its Proposed Findings of Fact with the argument that "assault weapons" and large-capacity magazines prohibited by PICA pose "unprecedented threats to public safety," (*Id.*, p. 125) and are a major factor in the violence associated with mass shootings. (*Id.*, ¶¶ 444–45). They argue that the use of semiautomatic "assault weapons" with large-capacity magazines in mass shootings means the shooter is more lethal and can fire more rounds more quickly. (*Id.*, ¶¶ 446–69). They point to the increased lethality of mass shootings in large cities like Chicago, Philadelphia, and Los Angeles. (*Id.*, ¶¶ 470–78).

### b. McHenry County Defendants

Sheriff Robb Tadelman and State's Attorney Patrick Kenneally, the "McHenry County Defendants" in the *Harrel* case (*see supra* note 9), filed their own Proposed Findings of Fact (Doc. 249). They state that their Answer (Doc. 53) in which they "admitted all of the substantive allegations seeking declaratory relief that the Act is an unconstitutional infringement of Plaintiffs' Second Amendment rights." (Doc. 249, p. 2). They argue that "[t]here is no evidence in the record that McHenry County Defendants took any action to enforce PICA against Plaintiffs" and that "[t]here is no evidence in the discovery record that McHenry County Defendants took any action to challenge or dispute the substantive allegations that Plaintiff made relating to the unconstitutional nature of PICA, as applied to Plaintiffs' Second Amendment rights." (*Id.*). For these reasons, the McHenry County Defendants argue that "Plaintiffs are not entitled to payment of the attorneys fees and/or court costs from McHenry County

Defendants because McHenry County Defendants have not engaged in any action warranting such an award." (*Id.*).

## G. This Court's Determination

As the Seventh Circuit expressly stated in *Bevis* that "this is a preliminary assessment," *Bevis* at 1202, the Court will provide relevant data and analysis so that if (or, rather, *when*) this case is appealed, the Seventh Circuit will have ample information on which to base its opinion. The Court will assess the question of whether the challenged weapons, magazines, and attachments are "Arms" using the three-prong precertification from *Bevis*.

### 1. Is the challenged weapon an item an ordinary person would keep at home for self-defense?

Even though this Court acknowledged the methodological concerns associated with the Plaintiffs' survey evidence regarding the prevalence of semiautomatic rifles and large-capacity magazines (*see* Doc. 257), this Court holds that, when considering *all* of the evidence, the Plaintiffs have provided sufficient evidence to establish that the semiautomatic rifles, shotguns, and some of the large-capacity magazines and attachments proscribed by PICA are in common use. The Plaintiffs have presented testimony from various firearms instructors and self-defense experts (e.g., Little, Lombardo, and Watt) and from military experts like Marine Gunner Eby that indicate that the AR-15 (and similar copycat weapons) are ideally suited for self-defense in the home. Moreover, the owner of Piasa Armory (Scott Pulaski) testified that Illinois citizens come to gun stores to purchase such weapons. (*See* Doc. 234 (9/16/2024 Trial Tr. (Pulaski)).

While the Government is understandably concerned that surveys like those conducted by English and by Fatohi are methodologically unsound (*see* Doc. 257), the Government's own expert indicated that, at minimum, *millions* of Americans own AR-15s at this very moment. (*See* Doc. 253, ¶ 98 (estimating "the number of Americans who own AR-15-platform firearms" at "14.1 million" to "18.2 million adults" (citing Doc. 185 (Klarevas Rep.), p. 20))). While the Government argues that the English Survey does not account for the firearms dealers that possess over a hundred AR-type weapons, as discussed *supra*, this notes that *Heller* does not require an exact estimate. (*See* Doc. 223, p. 10 (arguing that Professor English's exclusion of the 0.3% of respondents who possessed more than one hundred AR-type weapons "account for ownership of 37.1% of all AR-15-style rifles." (quoting Doc. 190, Ex. 1, pp. 10–11)); *see also* Doc. 257). Even if off by an *order of magnitude*, there are still *millions* of weapons in circulation in the United States (and, by definition, in Illinois) that the Illinois Government has rendered illegal.

While this Court is cognizant of *Bevis*'s warning that sales numbers *alone* are not sufficient to prove that an item is in common use, the Court is skeptical of the Government's argument that rigid statistical evidence is not only useful, but *required to prove* that specific weapons, magazines, and attachments are in common use. The Supreme Court in *Heller* certainly did not rely on sociological studies of firearm use or statistics of firearm ownership to rule that handguns were "in common use," stating only that "handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid." 554 U.S.

at 629. Similarly, AR-type weapons are both "commonly available" in the United States and have been called the country's most popular rifle for decades. *Garland v. Cargill*, 602 U.S. 406, 430 (2024) (Sotomayor, J., dissenting) (stating that the perpetrator of the 2017 Las Vegas mass shooting used "commonly available, semiautomatic rifles" to which bump stocks were attached). Thus, it cannot reasonably be said that such weapons are *not* in common use.

The Court is also not convinced that weapons like the AR-15 and its relatives are "dangerous and unusual." Considering the Court's definition of "dangerous," it is clear that a semiautomatic rifle does not suffer from the lack of control as is inherent to machineguns and sawed-off shotguns. Additionally, the AR-15 and other semiautomatic rifles do not appear to be "unusual" like ricin-pellet launchers or directed-energy weapons. While they have features that closely resemble their military counterparts, they do not operate or utilize technology sufficient to call them "unusual" in the sense that they are not widely used in the United States. As discussed above, it appears, instead, that the rifles and other weapons banned by PICA are in common use when considering the volume of sales over the past 20 years and the fact that both *experts* (like Little, Lombardo, and Watt) and *fact witnesses* (like Piasa Armory owner Scott Pulaski) attest to the fact that law-abiding citizens choose them for self-defense.

Moreover, the Court is also skeptical of the Government's argument that the Plaintiffs have not specified that they seek to purchase or sell *each and every* firearm proscribed by PICA. The Seventh Circuit referred to the AR-15 "and its many

cousins," indicating it was comfortable with grouping semiautomatic "assault weapons" or "modern sporting rifles" into broad categories for ease of analysis. Additionally, the Government has argued that AR-type weapons, AK-type weapons, specific semiautomatic shotguns, and associated "submachineguns" share similar features. (Doc. 247, ¶¶ 303–21; Doc. 248, pp. 39–40). Thus, it is apropos for this Court to consider all of these "modern sporting rifles" and their relatives together.

Moreover, as discussed *supra*, the Seventh Circuit has previously indicated that, in a facial challenge such as this, "individual application facts do not matter" because "[o]nce standing is established, the plaintiff's personal situation becomes irrelevant." *Ezell*, 651 F.3d at 697. Like Chicago's Second Amendment-infringing ordinance in *Ezell*, if PICA is unconstitutional now, it was "unconstitutional when enacted and violates their Second Amendment rights every day it remains on the books." *Id.* at 698. Here, clearly, the individual named plaintiffs and the many thousands of individual members of the advocacy organization plaintiffs are injured by PICA's infringement on their Second Amendment rights to choose firearms for their individual use for self-defense.

Thus, even discounting the English Survey and those conducted by the NSSF because of the Government's identified methodological concerns (*see* Docs. 223, 257), it is clearly apparent to this Court that law-abiding citizens choose semiautomatic AR- and AK-type rifles, semiautomatic shotguns, various machine pistols, large-capacity magazines, and assorted firearm attachments for self-defense.

That being said, this Court is not convinced that any law-abiding citizen would keep a .50 caliber sniper rifle at home for self-defense purposes. The Government's testimony indicates that it is large, cumbersome, has significant recoil, and has limited use in close-quarters situations. Such a weapon is clearly unsuited for self-defense and is properly banned for civilian use by PICA. The same is true for the ammunition it fires. This Court also holds that, outside of .50 caliber rifles and ammunition, .50 caliber pistols and any belt-fed weapons have no lawful self-defense purpose.

Regarding thirty-round large-capacity magazines[29] and the various attachments (e.g., pistol grips, flash suppressors, and the like) at issue here, this Court holds that these devices are also in common use and have legitimate self-defense purposes. For magazines, every round matters in a self-defense scenario—reloading takes away significant time during which the defender can be injured or wounded. Moreover, unlike in military combat where soldiers are equipped with pockets, vests, and belts to carry spare ammunition, a defender will only have what he or she can carry. Thus, in a critical self-defense scenario, more rounds equals a higher chance of survival.

---

[29] PICA § 5/24-1.10(a) defines large-capacity magazines as those that hold more than ten rounds for rifles and more than fifteen rounds for handguns. The evidence shows that twenty and thirty-round rifles magazines are in common use; in fact, many semiautomatic rifles are sold by manufacturers with such magazines. Neither the Plaintiffs nor the Government have provided evidence indicating that magazines in excess of thirty rounds are in common use or are dangerous and unusual, so this Court makes no determination on whether magazines in excess of thirty rounds for rifles are dangerous and unusual or in common use. The same is true for extended-round pistol magazines, so this Court will make no determination on those, either.

Similarly, the attachments at issue make a weapon safer, easier to aim, and easier to fire, features that are well-suited for self-defense. This is especially relevant to an individual who is infirm, small-statured, or has limited firearms training. In a self-defense scenario, every second matters and this Court will not fault individuals who are not able-bodied for choosing weapons that enable them to more carefully defend themselves and their families. However, while only discussed by the *Langley* Plaintiffs (*see* Doc. 254, pp. 7–8), the Court holds that grenade launchers are not in common use for lawful self-defense purposes; grenade launchers are listed as attachments that, if attached to a semiautomatic rifle or shotgun, convert it into an "assault weapon." *See* PICA § 5/24-1.9(a)(1)(A)(v); (a)(a)(F)(iv). There, clearly, is no lawful self-defense purpose for grenade launchers and they do not make a semiautomatic rifle or shotgun easier or more comfortable to operate.

Attachments that increase the firing rate of semiautomatic weapons must also be discussed here. This particular provision of PICA refers to external devices that may be attached to semiautomatic weapons to increase their rate of fire (e.g., bump stocks, binary triggers, auto-sear switches, and the like). *See* PICA § 5/24-1(a)(14). PICA states that an individual commits the offense of unlawful use of weapons when he or she knowingly:

> Manufactures, possesses, sells, or offers to sell, purchase, manufacture, import, transfer, or use any device, part, kit, tool, accessory, or combination of parts that is designed to and functions to increase the rate of fire of a semiautomatic firearm above the standard rate of fire for semiautomatic firearms that is not equipped with that device, part, or combination of parts.

*Id.* § (a), (a)(14). In a footnote, the Government argues that "[w]hile the Act added Section 24-1(a)(14) to criminalize conduct regarding accessories that increase the rate of fire for semiautomatic firearms (such as bump stocks and Glock switches), no plaintiff has shown it intends to engage in conduct with devices or parts regulated by this provision." (Doc. 248, p. 9 n.1). The Government argues that "[v]ague assertions by plaintiffs that they seek to acquire everything banned by the Act are insufficient to establish Article III standing." (*Id.* (citing Doc. 209 (Vandermyde Decl.) ¶¶ 5, 8)). They argue that "[i]f the Court finds a plaintiff has standing to challenge Section 24-1(a)(14), then a Second Amendment challenge to that provision would fail for the same textual and historical reasons described in this brief as for other accessories." (*Id.* (citing *United States v. Herriott*, No. 23-cr-37, 2024 WL 3103275 (N.D. Ind. June 24, 2024) (finding Glock conversion devices not protected by the Second Amendment))).

The Plaintiffs have not presented evidence to indicate that such devices are selected by law-abiding citizens for self-defense. However, the Court holds that these devices do not fit within the definition of "dangerous" because, as discussed *supra*, dangerousness is related to *control* of fire, not *rate* of fire. No evidence has been presented indicating that bump stocks, binary triggers, or similar devices result in the operator being unable to control the weapon to which they are attached. Unlike the language in PICA prohibiting certain semiautomatic rifles, pistols, and shotguns as well as magazines and attachments, the language regarding devices that increase rate of fire is vague. Therefore, because this Court lacks data or argument regarding

their prevalence or usage, this Court cannot determine whether or not such devices are in common use for self-defense.

### 2. Is the challenged weapon exclusively or predominantly useful in military service?

Here, the parties' arguments are summarized as follows. The Plaintiffs argue that AR-15s, AK-47, and the like are materially different from military weapons because of (1) the lack of automatic fire capability and (2) because of the vastly different procurement and quality assurance standards. The Government argues that the lack of automatic fire capability is not a material difference because M16s, M4s, and other military versions of the civilian weapons at issue here are rarely, if ever, used in the burst or automatic mode of fire.

Here, the Plaintiffs have provided testimony indicating that the semiautomatic civilian-model AR-15 has *never* been used by any military force on the planet, aside from its external similarities to military-issued weapons like the M16 and M4. (*See* Doc. 253, ¶ 163 (citing Doc. 234 (9/16/2024 Trial Tr. (Eby)), 115:9-11;Doc. 236 (9/17/2024 Trial Tr. (Ronkainen)), 240:5-7; Doc. 240 (9/18/2024 Trial Tr. (Watt)), 390:1-17; Doc. 241 (9/19/2024 Trial Tr. (Dempsey)), 623:21-23; Pltfs' Tr. Ex. 139 (Tucker Dep.), 38:1-4; E. Gregory Wallace, *"Assault Weapons" Myths*, 43 S. ILL. L.J. 193, 205 (2018))). In rebuttal, the Government has introduced evidence that (1) the M16 and AR-15 have the same muzzle velocity, rate of fire, accuracy, and projective penetration when fired in semiautomatic mode (Doc. 247, ¶ 154 (citing Doc. 185, Ex. 1 (Yurgealitis Rep.), ¶¶ 45, 52, 118)); *id.*, ¶ 155 (citing Doc. 230, Ex. 17 (Fatohi Dep.), 33:24–34:19)); *id.*, ¶¶ 163–219))) and (2) the M16/M4 is overwhelmingly fired in

training and in combat in semiautomatic mode; the burst or full automatic fire setting, while available as a tool in an operator's combat toolbox, is rarely used in practice (*see, e.g.*, Doc. 240 (9/18/2024 Trial Tr. (Tucker)).

Regardless of its external appearance, the Court holds that an AR-15 is, frankly, not at all the same weapon as the M16 rifle or M4 carbine used by the United States military. *See Bevis* at 1222 (Brennan, J., dissenting) ("The AR–15 is a civilian, not military, weapon. No army in the world uses a service rifle that is only semiautomatic." (footnote omitted)). First and foremost, the M4 has semiautomatic, fully automatic, and three-round burst modes of fire available; the AR-15 is *only* capable of semiautomatic fire.[30] As discussed *supra*, this critical distinction has been noted by the Supreme Court this past term. *See Garland v. Cargill*, 602 U.S. 406, 415 (2024). The majority held that "a semiautomatic rifle equipped with a bump stock is not a 'machinegun' because it cannot fire more than one shot 'by a single function of the trigger.' And, even if it could, it would not do so 'automatically.'" *Id.* Therefore, by virtue of its lack of a burst or automatic fire setting, an AR-15 categorically *cannot* be a machinegun. *See id.*; *see also id.* at 432–33 (2024) (Sotomayor, J., dissenting) ("Semiautomatic weapons are not 'machineguns' under the statute. Take, for instance, an AR–15-style semiautomatic assault rifle. To rapidly fire an AR–15, a shooter must rapidly pull the trigger himself. It is 'semi' automatic because, although the rifle automatically loads a new cartridge into the chamber after it is fired, it fires

---

[30] The use of a "bump stock" or other device to convert a semiautomatic weapon into a fully automatic one is not a valid reason to prohibit the use of semiautomatic weapons like the AR-15 any more than the fact that a shotgun barrel can be severed to make a sawed-off shotgun must result in all shotguns being banned. *See Garland v. Cargill*, 602 U.S. 406 (2024).

only one shot each time the shooter pulls the trigger." (citing 18 U.S.C. § 921(a)(29) (2018 ed., Supp. IV)); *id.* at 432 ("The archetypal modern 'machinegun' is the military's standard-issue M16 assault rifle. With an M16 in automatic mode, the shooter pulls the trigger once to achieve a fire rate of 700 to 950 rounds per minute. An internal mechanism automates the M16's continuous fire, so that all the shooter has to do is keep backward pressure on the trigger. If the shooter stops putting pressure on the trigger, the gun stops firing." (citing DEPT. OF DEF., DEF. LOGISTICS AGENCY, SMALL ARMS, https://www.dla.mil/Disposition-Services/Offers/Law-Enforcement/Weapons/ [https://perma.cc/AJ64-4AE4]; Brief for Giffords Law Center to Prevent Gun Violence et al. as Amici Curiae 9–11 (Giffords Brief) (discussing internal firing mechanism of M16)). Because of the difference in construction and operation of the M16 and AR-15, "[a] regular person with an AR–15 can achieve a fire rate of around 60 rounds per minute, with one pull of the trigger per second." *Cargill* at 433 (Sotomayor, J., dissenting) (citing Tr. of Oral Arg. 39; Giffords Brief 14).

Even though in dissent, Justice Sotomayor's argument is based on *factual data* obtained from the Defense Logistics agency. Notably, while the Seventh Circuit states in *Bevis* that "[t]he M16 has an automatic firing rate of 700 rounds per minute, while the AR-15 has a semiautomatic rate of 'only' 300 rounds per minute," 85 F.4th at 1196, they do not cite a source for this data. Additionally, the Seventh Circuit explicitly states that this purported rate of fire is standard "unless, as we have just noted, it is modified with, for example, a bump stock or a 'binary' trigger, which can double the rate at which semiautomatic weapons can be fired." *Id.*

Critically, the M16 and M4 are military-issue weapons subject to exact standards of military specificity and rigorous quality-insurance inspections; the AR-15 *by definition* cannot and does not have the same standard of quality assurance.[31] Notably, M16s/M4s are designed for increased wear-and-tear and have a barrel that is capable of sustained firing without overheating. (*See, e.g.*, Doc. 236 (9/17/2024 Trial Tr. (Ronkainen)), 241:24–243:7 (discussing the specifications associated with military-grade weapons). Setting emotional reactions aside, comparing an AR-15 to an M16 is like comparing a military-grade Humvee to the Hummer H3 released to the civilian population. Its resemblance to the military version is not a coincidence— it is a *feature* marketed to appeal to the average, law-abiding consumer of such products.[32] Just like the camouflage print clothing and accessories worn by civilians, the similarly of military accessories to the civilian counterpart does not inherently designate it as being "military-grade." Moreover, stating that military-grade weapons cannot be used by civilians because they need to be reserved for the militia is not a cogent argument. The current version of the militia is the United States Army National Guard and Air National Guard. Both organizations utilize U.S. Army and U.S. Air Force uniforms, accessories, and equipment. These items are not requisitioned from those in civilian use, especially since purported civilian

---

[31] In fact, civilians cannot purchase "military-issue" or "military-grade" M16s or M4s, as they are exclusively issued to members of the United States military, housed on military installations, and stamped as being property of the United States Government. Notably, the three-round burst and automatic modes of fire along with reduced barrel lengths are not available for any commercially sold "M4."

[32] Circuit Judge Roth cites such advertisements for the AR-15 in her concurrence in *Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, No. 23-1633, 2024 WL 3406290, at *15 n.80 (3d Cir. July 15, 2024) (Roth, J., concurring).

counterparts have not met the rigorous quality assurance standards for military use.[33] Put simply, civilian versions of military accessories simply are not tested to the same level of specificity as are those utilized by the military, Plaintiffs' expert Ronkainen has testified. (*See, e.g.*, Doc. 229, Ex. 9 (Ronkainen Rep.), p. 7). Indeed, this is the only one way to square the military-grade exception in *Friedman* with the "common use" requirement in *Bruen*—by a determination that the semiautomatic AR-15 rifle available for purchase by civilians is, by design and by clear definition, *not* a "military-grade" weapon.

Moving back to firearms, the commercially available AR-15's external similarity to the M16 rifle and M4 carbine belies its nature, as its lack of burst or fully automatic fire fundamentally renders it a different weapon. Thus, while they may be similar *externally*, they are not the same weapon and have vastly different functions. The M16 and M4 are designed to be carried by members of the military. Military members utilizing M16 rifles or M4 carbines do so in specific ways, from guarding critical facilities or equipment to advancing on specific targets.

Therefore, the Court holds that "**military use**" **refers to weapons that are selected, procured, tested, and issued to military members for use in combat**. **With this in mind, none of the weapons, magazines, or attachment**

---

[33] As an example, the steel bolts used in the Strategic Weapons System onboard *Ohio*-class ballistic missile submarines strongly resemble those that are on sale at Home Depot, Lowe's, and other hardware stores. That being said, only bolts that have undergone *substantial* and *exhaustive* quality assurance inspections and obtained via the Navy's supply system can be ordered and installed, precisely because these military-grade parts are certified to withstand pressures, temperatures, and wear that civilian-grade items cannot. Such an exegesis is beyond the scope of this Order.

**prohibited by PICA can be called "military-grade" since they were not issued to the military for use in combat.**

However, even if *arguendo* there are *no* material differences between the M16/M4 and AR-15, so-called "dual use" has clearly been established here. Even though only addressed in a footnote, *see Bevis* at 1195 n.8, recall that the Seventh Circuit wrote that:

> Obviously, many weapons are "dual use": private parties have a constitutionally protected right to "keep and bear" them and the military provides them to its forces. In this sense, there is a thumb on the scale in favor of Second Amendment protection. When we refer to "military" weapons here, we mean weapons that may be essentially reserved to the military.

*Id.* In dissent, Judge Brennan wrote that "because the AR-15 is not 'essentially reserved to the military' and shares characteristics with 'private' weapons, such as being semiautomatic, the AR-15 is at most a 'dual use' weapon. So under the majority opinion's categories, the AR-15 should warrant Second Amendment protection." *Id.* at 1224 (Brennan, J., dissenting). Considering the above, the Court holds that "**dual use" refers to weapons that, while predominantly useful in military contexts, are also useful for civilian offensive or defensive use in confrontation such that they would be covered by the Second Amendment's guarantee**. As discussed in section I.B *supra*, a clear example is the semiautomatic handguns that are useful in military service yet are also "the quintessential self-defense weapon." *Heller*, 554 U.S. at 629. Clearly, even though handguns are useful and are used in military service, they are clearly protected by the Second

Amendment. However, as noted above, AR-15s are *distinct* from their military counterparts.

While the Government argues that the *lethality* of AR-type weapons is sufficient reason to restrict them, those same features that increase "lethality" also increase the accuracy, portability, and safety of the weapons for use by variously abled individuals. The Second Amendment clearly cannot imply that those who are elderly, disabled, or small-statured must only choose a handgun or pump-action shotgun for self-dense when other options (like AR-15s) will enable them to defend their homes more easily, safely, and securely. The same is true for operator-friendly features that protect the defender's hearing, vision, and allow for ease of use. As discussed *supra*, large-capacity magazines may also be the difference between life and death for a person defending him or herself in the home. This Court also holds that thirty-round magazines are not predominately useful in military service and, even if they were, dual use has clearly been demonstrated given their usefulness for individual self-defense and their ubiquity.

As discussed above, this Court holds that .50 caliber pistols, rifles, and ammunition as well as all belt-fed weapons are predominantly useful for military service and are not dual-use weapons under *Bevis*. This Court lacks data to make any finding whether or not large-capacity magazines holding more than thirty rounds (e.g., box and drum magazines). As above, the Court lacks data to determine whether or not devices that increase a semiautomatic weapon's rate of fire are predominately useful in military service.

### 3. *Is the challenged weapon possessed for unlawful purposes?*

Here, too, the Plaintiffs have provided testimony that indicates that the vast majority of AR-15-style semiautomatic rifles purchased in Illinois have *never* been used in illegal activity and are likely confined to individuals' homes or firearms ranges. (*See* Doc. 253, p. 92). Even though it is undisputed that AR-15 and AK-47-type weapons have been used in various mass shootings, the use of these weapons in such horrific massacres is the *exception*, not the rule, even if such tragedies are trending upward over time.

Indeed, the parties are concerned with issues at opposite ends of the spectrum of firearms—the Government is concerned about the use of AR-15s and other "assault weapons" in mass shootings and in violent crime while the Plaintiffs are concerned that law-abiding citizens' individual constitutional right to self-defense has been infringed by PICA. Data on firearm homicides show that pistols are overwhelmingly used in incidents of gun violence, yet we do not ban their use by civilians because of these criminal connections. (*See* Doc. 253, p. 92 (citing FBI, 2019 CRIME IN THE UNITED STATES (2019), https://tinyurl.com/2tnwa5yu (further reporting about 1.4% of homicides are committed with a shotgun of any kind); FBI, CRIME DATA EXPLORER: EXPANDED HOMICIDE OFFENSES CHARACTERISTICS IN THE UNITED STATES, https://bit.ly/3IF5A (confirming the same based on updated data); Doc. 185, Ex. 7 (Klarevas Rep.), p. 32 (confirming the low rates of recorded crime committed with "assault weapons," ranging, for example, "from a low of 2.4% in Baltimore, Maryland, to a high of 8.5% in Syracuse, New York," and "5% . . . nationwide"); NICHOLAS J.

JOHNSON, ET AL., FIREARMS LAW AND THE SECOND AMENDMENT 2000–01, 2005 (3d ed.
2021) (2024 Supp.) (discussing FBI Crime statistics and noting that the "[h]andguns"
deemed protected under *Heller* and *Bruen*, not the firearms banned by PICA, "are the
most common firearm used in mass shootings, accounting for over 50 percent"))).
Moreover, as the Plaintiffs argue, even if *every* AR-15 in Illinois was used in a mass
shooting, then 99.99% of AR-15 rifles would never have been used in a homicide. (Doc.
253, p. 92). Clearly, this means that such weapons are not used "for unlawful
purposes." (*Id.*). Such horrific and traffic incidents are clearly *outliers*, not the most
common use for the semiautomatic "assault weapons" PICA purports to ban
wholesale. The Court also notes that the Government has previously stated that
firearm data showing that semiautomatic rifles are both dangerous and unusual is
"unattainable," even though required by 5 ILL. COMP. STAT. 830/10-5. (*See* Doc. 101,
p. 24 n.11 (citing 2022 GUN TRAFFICKING LEGISLATIVE REPORT, ILL. STATE POLICE,
https://isp.illinois.gov/StaticFiles/docs/Gun%20Trafficking/2022%20Gun%20Traffick
ing%20Legislative%20Report.pdf [https://perma.cc/4G7V-CAP3])).

　　　While this Court holds that thirty-round magazines are not possessed for
unlawful purposes, this Court does not make any findings on magazines holding more
than thirty rounds, as neither party has produced sufficient evidence for this Court
to make determinations on whether they are in common use, used for lawful
purposes, or reserved to the military.

　　　Apart from magazines, the Court also holds that the attachments banned by
PICA (including foregrips, flash suppressors, barrel shrouds, and the like) are not

possessed for unlawful purposes but, rather, are legitimate features that enable a semiautomatic rifle or pistol to be fired more safely and accurately and that protect the operator from flash blindness and other conditions that would impede his or her ability to defend himself or herself. This does not include grenade launchers, which do not have a lawful purpose.

Moreover, the Court is not convinced by the Government's argument that AR-type weapons must be banned because it is easy to convert a semiautomatic AR-15 to a fully automatic weapon via the use of a bump stock or the like. Even though the Supreme Court has held sawed-off shotguns to be weapons used *principally* for unlawful purposes, *see Heller* at 623; *Bevis* at 1190 (citing *Heller*; *Friedman* at 408), it is not permissible to ban *all* shotguns by virtue of such an easy conversion, especially since they have been held to be in common use. Attaching a bump stock to an AR-type weapon is certainly more complex than taking a saw to the barrel of a shotgun.

However, as discussed *supra*, the Plaintiffs have not provided any evidence that bump stocks, binary triggers, and other devices that increase rate of fire are selected by law-abiding citizens for self-defense. Therefore, as data is not available regarding these devices, this Court cannot determine whether or not they are used for lawful or unlawful purposes.

While the Court is sympathetic to those who have lost loved ones to gun violence, such tragedies are not an excuse to restrict the rights guaranteed to the Illinois public by the Second Amendment to the United States Constitution.

Regardless of state governments' desire to restrict law-abiding citizens' Second
Amendment rights under the guise of crime control, the Second Amendment
conclusively protects law-abiding citizens' right to defend themselves utilizing
weapons that are in common use.

After serious consideration of the mandate of a multitude of different self-
defense scenarios and the challenging dynamics of such events, it becomes obvious
that the extensive scope of the rights guaranteed the citizens to keep and bear arms
without government infringement is wise and necessary. The AR-15 is easy to
operate, more accurate, and has a larger magazine capacity than a M1 Garand, a
shotgun, or a handgun.

Based on the above, the Court holds that the Plaintiffs have met their burden
to demonstrate that the AR-15 and other AR-style weapons are protected "Arms"
within the definition advanced by the Seventh Circuit in *Friedman* and *Bevis*.
Additionally, the Court holds that the various other "assault weapons" proscribed by
PICA (including AK-type weapons, various semiautomatic shotguns, and what the
Government calls "submachineguns") are also "Arms," as are the thirty-round large-
capacity magazines and various firearm attachments designated by PICA. To
reiterate, all of these weapons, magazines, and attachments are bearable, not
dangerous or unusual, and are in common use. Moreover, they are all possessed for
lawful self-defense purposes, are either not predominately useful for military service
or are dual-use items, and are not possessed for unlawful purposes. However, under
the test articulated in *Bevis*, this Court holds that the .50 caliber ammunition and

weapons restricted by PICA are *not* "Arms" as they are not in common use for self-defense. Additionally, the Court holds that all of the belt-fed weapons and grenade launcher attachments restricted by PICA are not in common use for self-defense and are used for unlawful purposes. Therefore, Illinois can lawfully ban .50 caliber weapons and ammunition, belt-fed weapons, and grenade launchers in accordance with *Bevis*. As stated above, this Court makes no determination on whether or not PICA can constitutionally ban devices that increase a weapon's rate of fire (e.g., bump stocks, binary triggers, and the like).

Considering the above, this Court moves forward to *Bruen*'s primary thrust.

## II. History and Tradition

Before continuing on, we are best served by studying how and why the Second Amendment came to be. This is the most important historical analysis when it comes to the interpretation of the text and reach of the Second Amendment.

On July 4, 1776 came the "Unanimous Declaration of the Thirteen United States of America," the Declaration of Independence. A written proclamation, this document gave us the following:

> We hold these truths to be self-evident: That all men are created equal: that they are endowed by their creator with certain unalienable rights: that among these are life, liberty, and the pursuit of happiness: that to secure these rights, governments are instituted among men, deriving their just powers from the consent of the governed . . . .

THE DECLARATION OF INDEPENDENCE para. 2 (U.S. 1776).

War ensued, one that was hard fought and exacted a heavy toll on the nascent United States. The Americans who survived the War of Independence found

themselves grappling with the practicalities of self-governance. On March 1, 1781,
the thirteen states embraced the Articles of Confederation and Perpetual Union
Between the States, a compact that designated that each state retained its
sovereignty while also creating a federal government. Its focus was not on the
citizens, but rather on the relationship between the states and the powers granted to
the federal government. The new nation struggled to effectively govern.

The shortcomings of the Articles of Confederation quickly manifested
themselves and prompted a formal effort "to form a more perfect Union, establish
justice, insure domestic tranquility, provide for the common defense, promote the
general welfare, and secure the blessings of liberty to ourselves and our
posterity . . . ." U.S. CONST. pmbl. The opening words of the Preamble are, of course,
"We the People of the United States." *Id.*

The United States Constitution began as a plan to formally separate powers
between the federal government and the several states. *See* U.S. Const. It also divided
the powers of government among three separate branches of government. *See id.*
Citizens like George Mason fervently opposed the Constitution. *See* George Mason,
*Objections to the U.S. Constitution*, Va. J. (November 22, 1787),
https://billofrightsinstitute.org/activities/masons-objections-annotated
[https://perma.cc/ZLF8-SCDF] ("There is no Declaration of Rights, and the laws of the
general government being paramount to the laws and constitution of the several
States, the Declarations of Rights in the separate States are no security. Nor are the
people secured even in the enjoyment of the benefit of the common law.").

The Articles of the U.S. Constitution contain only a few clauses that relate directly to the rights of citizens. Most notably, Article I, § 9 directs that the "privilege of the writ of habeas corpus shall not be suspended" (with some exceptions) and that neither bills of attainder nor ex post facto laws may be passed. *See id.* § 9, cl. 2–3. Article III, § 2 guarantees that trial of all crimes shall be by jury and held in the state where committed. Under Article IV, § 2, "[t]he Citizens of each state shall be entitled to all privileges and immunities of Citizens in the several states."

When the Constitution was presented to the people, the people asked, "what about us?" It became clear that the American people would only submit to the new Constitution if it also included an enumeration of the rights held by citizens on which the federal government would neither infringe nor intrude.

On September 25, 1789, Congress proposed twelve amendments (called articles) to the Constitution. On December 15, 1791, ten of them were ratified and became the Bill of Rights.

The Bill of Rights was explained as follows:

> The Conventions of a number of the States, having at the time of their adopting the Constitution, expressed a desire, in order to prevent misconstruction or abuse of its powers, that further declaratory and restrictive clauses should be added: And as extending the ground of public confidence in the Government, will best ensure the beneficent ends of the institution.

Cong. J. Res. Proposing 12 Amendments to the U.S. Constitution, 1st Cong. (1789).

In this stroke of genius, the American people created a limited government with the citizens holding the top spot in the chain of power. All individuals entrusted

with government duties, powers, and functions became public servants, not public

masters.

This was the most important inflection point in American history. Lofty ideas

became written laws. It changed the arc of America's destiny. The supreme law of the

land no longer just spoke of separation of power, i.e., who may make treaties and mint

coins. *See* U.S. Const. art. I, § 9. It now had a much more profound repertoire.

Consider the genius of what was enshrined as a guarantee to each individual citizen,

to wit:

**Under the First Amendment:**
- free exercise of religion,
- freedom of speech,
- freedom of the press,
- the right to peacefully assemble,
- "to petition the Government for a redress of grievances";

**Under the Second Amendment:**
- the right to "keep and bear arms";

**Under the Third Amendment:**
- no quartering of soldiers in peacetime without the consent of the owner;

**Under the Fourth Amendment:**
- "to be secure in their persons houses, papers, and effects against unreasonable searches and seizures,"
- "no warrants shall issue, but upon probable cause, supported by oath and affirmation, and particularly describing the place to be searched, and the person or things to be seized";

**Under the Fifth Amendment:**
- no person shall be held to answer an "infamous crime" unless upon indictment by a grand jury,
- no double jeopardy,
- cannot be compelled to be a witness against oneself,
- cannot "be deprived of life, liberty or property without due process of law,"
- no private property may "be taken for public use without just compensation";

**Under the Sixth Amendment:**
- a right to a speedy criminal trial,
- a right to a public criminal trial,
- must be tried in the state and district where the alleged crime occurred,
- to be informed of the "nature and cause of the accusation,"
- to be "confronted with the witnesses against him,"
- to have "compulsory process for obtaining witnesses in his favor,"
- to have the "assistance of counsel for his defense";

**Under the Seventh Amendment:**
- a right to a jury trial in suits at common law;

**Under the Eighth Amendment:**
- no person can be required to pay an "[e]xcessive bail,"
- no person shall be required to pay an "excessive fine,"
- no person shall suffer the infliction of "cruel and unusual punishments."

The Bill of Rights also proclaims that "the enumeration in the Constitution of certain rights, shall not be construed to deny or disparage other rights retained by the people." *Id.* amend. IX. These inalienable rights are the same that, when so affronted by the last governing power, sparked a Revolution. When searching our history to understand and interpret laws in the present age, this history is the most illuminating.

The Second Amendment is a time-honored civil right that has been enshrined in our Constitution for centuries; it deserves at least the same respect as befitting its status in the Bill of Rights. Even so, it has consistently been treated as a "second-class right." *See McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010) ("Municipal respondents, in effect, ask us to treat the right recognized in *Heller* as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees that we have held to be incorporated into the Due Process Clause." (citing *District of Columbia v. Heller*, 554 U.S. 570 (2008))).

**A. Supreme Court Jurisprudence**

As the Plaintiffs have established that the weapons, attachments, or ammunition-feeding devices proscribed by PICA are "Arms" included within the protective reach of the Second Amendment in line with *Friedman* and *Bevis*, the burden then shifts to the Government, who "must affirmatively prove" that PICA "is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms" via a showing of "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen* at 19, 29.

In *Bruen*, we are instructed to search our history so that we may evaluate efforts to regulate and restrict arms. *See New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 17 (2022). Such a directive has caused courts and litigants to embark on a search of old laws that may serve as some historical analogue that may pair well with a present-day effort to restrict or even criminalize possession or purchase of firearms commonly held and used today. *See, e.g., Rhode v. Becerra*, No. 28-CV-00802-BEN-JLB (S.D. Cal. 2024) (Doc. 79). In *Bruen*, the Supreme Court stated that the critical question in its history and tradition analysis is "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen* at 29. While the *Bruen* Court's history and traditions analysis focused on public carry laws, this analysis is useful for our purposes here.

The *Bruen* Court that "[t]hroughout modern Anglo-American history, the right to keep and bear arms in public has traditionally been subject to well-defined restrictions governing the intent for which one could carry arms, the manner of carry,

or the exceptional circumstances under which one could not carry arms." *Id.* at 38.

The Supreme Court cautioned that "that the English common law 'is not to be taken

in all respects to be that of America,'" even though "the Second Amendment 'codified

a right inherited from our English ancestors.'" *Id.* (quoting *Heller* at 599). Mentioned

in both *Bruen* and *Rahimi* is the Statute of Northampton which

> [P]rovided that, with some exceptions, Englishmen could not "come
> before the King's Justices, or other of the King's Ministers doing their
> office, with force and arms, nor bring no force in affray of the peace, nor
> to go nor ride armed by night nor by day, in Fairs, Markets, nor in the
> presence of the Justices or other Ministers, nor in no part elsewhere,
> upon pain to forfeit their Armour to the King, and their Bodies to Prison
> at the King's pleasure.

*Bruen* at 40 (quoting 2 Edw. 3 c. 3 (1328)); *see Rahimi* at 1899 (citing *Bruen* at 40).

The Supreme Court states, however, that

> The Statute of Northampton was enacted nearly 20 years before the
> Black Death, more than 200 years before the birth of Shakespeare, more
> than 350 years before the Salem Witch Trials, more than 450 years
> before the ratification of the Constitution, and nearly 550 years before
> the adoption of the Fourteenth Amendment.

The Supreme Court notes that "the Statute of Northampton survived both Sir John

Knight's Case and the English Bill of Rights, but it was no obstacle to public carry for

self-defense in the decades leading to the founding." *Bruen* at 45. Indeed, "Serjeant

William Hawkins, in his widely read 1716 treatise, confirmed that 'no wearing of

Arms is within the meaning of [the Statute of Northampton], unless it be

accompanied with such Circumstances as are apt to terrify the People.'" *Id.* (quoting

1 Pleas of the Crown 136). In conclusion, the Supreme Court concluded that "we

cannot conclude from this historical record that, by the time of the founding, English

law would have justified restricting the right to publicly bear arms suited for self-defense only to those who demonstrate some special need for self-protection." *Id.* at 46.

In the colonial era, "Massachusetts and New Hampshire both authorized justices of the peace to arrest 'all Affrayers, Rioters, Disturbers, or Breakers of the Peace, and such as shall ride or go armed Offensively . . . by Night or by Day, in Fear or Affray of Their Majesties Liege People." *Id.* (quoting 1692 Mass. Acts and Laws no. 6, pp. 11–12) (citing 1699 N. H. Acts and Laws ch. 1). The Supreme Court also discusses 18th and 19th-century statutes from Virginia, Massachusetts, and Tennessee which are in this same vein. *See id.* at 49–50 (quoting Collection of All Such Acts of the General Assembly of Virginia ch. 21, p. 33 (1794); 1795 Mass. Acts and Laws ch. 2, p. 436, in Laws of the Commonwealth of Massachusetts; 1801 Tenn. Acts pp. 260–61).

Sweeping such statutes aside, the Supreme Court states that "[f]ar from banning the carrying of any class of firearms, they merely codified the existing common-law offense of bearing arms to terrorize the people, as had the Statute of Northampton itself." *Id.* at 47 (internal citation omitted). *Bruen* also discusses a New Jersey law specifically regulating "pocket pistols," which are not at issue in the instant suit. *Id.* at 47–48 (quoting An Act Against Wearing Swords, &c., ch. 9, in Grants, Concessions, and Original Constitutions of the Province of New Jersey 290 (2d ed. 1881) (Grants and Concessions)).

Decided after *Bevis*, *Rahimi* once more provides a template for historical
analysis. The Supreme Court notes that it "reviewed the history of American gun
laws extensively in *Heller* and *Bruen*" and that "[f]rom the earliest days of the
common law, firearm regulations have included provisions barring people from
misusing weapons to harm or menace others." *Rahimi* at 1899. Indeed, "[t]he act of
'go[ing] armed to terrify the King's subjects' was recognized at common law as a 'great
offence.'" *Id.* (citing Sir John Knight's Case, 3 Mod. 117, 118, 87 Eng. Rep. 75, 76 (K.
B. 1686)). "Parliament began codifying prohibitions against such conduct as early as
the 1200s and 1300s, most notably in the Statute of Northampton of 1328." *Id.* (citing
*Bruen*, 597 U.S., at 40). "In the aftermath of the Reformation and the English Civil
War, Parliament passed further restrictions" including "[t]he Militia Act of 1662
[which] authorized the King's agents to 'seize all Armes in the custody or possession
of any person . . . judge[d] dangerous to the Peace of the Kingdome.'" *Id.* (citing 14
Car. 2 c. 3, § 13 (1662); J. Greenlee, The Historical Justification for Prohibiting
Dangerous Persons From Possessing Arms, 20 WYO. L. REV. 249, 259 (2020)).

Continuing forward, "[t]he Glorious Revolution cut back on the power of the
Crown to disarm its subjects unilaterally." *Id.* "King James II had 'caus[ed] several
good Subjects being Protestants to be disarmed at the same Time when Papists were
. . . armed.'" *Id.* (citing 1 Wm. & Mary c. 2, § 6, in 3 Eng. Stat. at Large 440 (1689)).
"By way of rebuke, Parliament adopted the English Bill of Rights, which guaranteed
'that the Subjects which are Protestants, may have Arms for their Defence suitable
to their Conditions, and as allowed by Law.'" (*Id.* (citing 1 Wm. & Mary c. 2, § 7, in 3

Eng. Stat. at Large 441 (1689)). "But as the document itself memorialized, the
principle that arms-bearing was constrained 'by Law' remained." (*Id.* (citing 1 Wm.
& Mary c. 2, § 7, in 3 Eng. Stat. at Large 441 (1689)). Comparing English with
American law, the Supreme Court notes that while "English law had disarmed not
only brigands and highwaymen but also political opponents and disfavored religious
groups," in the United States at "the time of the founding, . . . state constitutions and
the Second Amendment had largely eliminated governmental authority to disarm
political opponents on this side of the Atlantic." *Id.* (citing *Heller* at 594–595, 600–
603). It is at this point in its analysis that the Supreme Court delves into the history
of surety and frankpledge laws, which are not relevant to the discussion of PICA.

    In his concurrence in *Rahimi*, Justice Kavanaugh provides a blueprint for this
Court's analysis of the Second Amendment. *See* 144 S. Ct. 1889 (2024). Many courts
have used Second Amendment cases to make policy decisions; as he writes:

> Some say that courts should determine exceptions to broadly worded
> individual rights, including the Second Amendment, by looking to
> policy. Uphold a law if it is a good idea; strike it down if it is not. True,
> the proponents of a policy-based approach to interpretation of broadly
> worded or vague constitutional text usually do not say so explicitly
> (although some do). Rather, they support a balancing approach
> variously known as means-end scrutiny, heightened scrutiny, tiers of
> scrutiny, rational basis with bite, or strict or intermediate or
> intermediate-plus or rigorous or skeptical scrutiny. Whatever the label
> of the day, that balancing approach is policy by another name. It
> requires judges to weigh the benefits against the burdens of a law and
> to uphold the law as constitutional if, in the judge's view, the law is
> sufficiently reasonable or important. *See* M. Barnes & E. Chemerinsky,
> *The Once and Future Equal Protection Doctrine?*, 43 CONN. L. REV. 1059,
> 1080 (2011) ("The levels of scrutiny are essentially balancing tests").

*Rahimi* at 1920 (Kavanaugh, J., concurring). He argues that this "kind of balancing approach to constitutional interpretation departs from what Framers such as Madison stated, what jurists such as Marshall and Scalia did, what judges as umpires should strive to do, and what this Court has actually done across the constitutional landscape for the last two centuries." *Id.* at 1921. He writes that "[o]ne major problem with using a balancing approach to determine exceptions to constitutional rights is that it requires highly subjective judicial evaluations of how important a law is—at least unless the balancing test itself incorporates history, in which case judges might as well just continue to rely on history directly." Moreover, "[t]he subjective balancing approach forces judges to act more like legislators who decide what the law should be, rather than judges who 'say what the law is.'" *Id.* (citing *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803)). While "[t]he historical approach is not perfect," Justice Kavanaugh writes that "the historical approach is superior to judicial policymaking." *Id.* at 1922. This approach "depends upon a body of evidence susceptible of reasoned analysis rather than a variety of vague ethico-political First Principles whose combined conclusion can be found to point in any direction the judges favor." *Id.* (citing *McDonald* at 804). "Moreover, the historical approach 'intrudes less upon the democratic process because the rights it acknowledges are those established by a constitutional history formed by democratic decisions; and the rights it fails to acknowledge are left to be democratically adopted or rejected by the people.'" *Id.* (citing *McDonald* at 805). While "Second Amendment jurisprudence is still in the relatively early innings, unlike the First, Fourth, and Sixth Amendments . . . because

the Court did not have occasion to recognize the Second Amendment's individual right until recently," Justice Kavanaugh writes that even though "[d]eciding constitutional cases in a still-developing area of this Court's jurisprudence can sometimes be difficult[,] . . . that is not a permission slip for a judge to let constitutional analysis morph into policy preferences under the guise of a balancing test that churns out the judge's own policy beliefs." *Id.* at 1923–24 (citing *Heller v. District of Columbia*, 670 F.3d 1244, 1269–96 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)).

## B. Seventh Circuit Jurisprudence

In assessing the "how and why" question, the *Bevis* Court wrote that

> For all its disclaiming of balancing approaches, *Bruen* appears to call for just that: a broader restriction burdens the Second Amendment right more, and thus requires a closer analogical fit between the modern regulation and traditional ones; a narrower restriction with less impact on the constitutional right might survive with a looser fit.

*Bevis* at 1799. The Seventh Circuit noted that "[i]t is at this stage that many courts, as well as the state parties here, point to the long-standing tradition of regulating the especially dangerous weapons of the time, whether they were firearms, explosives, Bowie knives, or other like devices." *Id.* The Seventh Circuit states that "[t]he laws before us have one huge carve-out: people who presently own the listed firearms or ammunition are entitled to keep them, subject only to a registration requirement that is no more onerous than many found in history." *Id.* "This," the Court writes "is enough, in our view, to satisfy the 'how' question *Bruen* identified." *Id.* at 1799–1800.

Regarding the "why" question, the *Bevis* Court writes that "*Bruen* makes clear that the question whether a burden is "comparably justified" cannot be answered by pointing to the gravity of the harms the legislation was designed to avert and the appropriateness of the mechanism they adopt. *Bevis* at 1800 (citing *Bruen* at 2133, 2129). The majority writes that the *Bevis* dissent "chooses to take a purposive approach to this question[, asking] what were the reasons motivating the historical regulations, and do they map well onto the reasons behind the modern law?" The majority, because of concerns about differing legislative goals, looks to the introductory language of PICA. *Id.* While "the dissent notes that the bill enacted by the City of Naperville recites a few of the many mass shootings that have occurred during the last decade, *id.* (citing *id.* at 1217 n.13), the Bevis Court writes that "the bill also expressly states that the purpose of the ordinance is to protect public health, safety, and welfare." *Id.* (citing City of Naperville, Ill., Ordinance No. 22-099, at 4 (Aug. 16, 2022)). The Seventh Circuit also lists the following historical examples which it argues support PICA's regulation of firearms:

> • In 1746, Boston outlawed the discharging of any cannon, gun, or pistol within city limits, but it explained that soldiers were still permitted to discharge weaponry on their training days. *See* Chapter 11—An Act to Prevent the Firing of Guns Charged with Shot[t] or Ball in the Town of Boston, §§ 1–3, in 3 The Acts and Resolves of the Province of the Massachusetts Bay 1742-1756, at 309 (1878).
>
> • Other cities, such as Cleveland, Ohio, implemented similar ordinances throughout the 19th century, again exempting military companies during drills. *See* Chapter 33—Fire Arms, §§ 417–423, in Ordinances of the City of Cleveland 136–37 (H.L. Vail & L.M. Snyder, eds., 1890).
>
> • There are dozens of examples of Bowie knife regulations, forbidding or limiting the use of these dangerous weapons. Several of those featured

military exceptions. In 1884, for example, Arkansas outlawed the sale of all dirks, Bowie knives, cane-swords, metal knuckles, and pistols, except as for use in the army or navy of the United States. *See* Chapter 53—Carrying Weapons, §§ 1907–1909, in A Digest of the Statutes of Arkansas 490 (W.W. Mansfield, ed., 1884).

• Several city ordinances in the late 1800s followed suit, restricting the carry of a wide array of dangerous and concealable weapons (slingshots, metal knuckles, Bowie knives, daggers, pistols, and clubs), but exempting "peace officers" and "conservator[s] of the peace." *See* Chapter 6—Offenses Against the Peace of the City, § 182, in The Revised Ordinances of Provo City 106–07 (1877); Chapter 534—Ordinances of Baltimore, § 742A, in The Baltimore City *1202 Code 297–98 (John Prentiss Poe, ed., 1893).

• The federal government continued this tradition when it began passing gun control laws. The National Firearms Act of 1934 imposed taxation and registration requirements on all guns, but it exempted transfers to the U.S. government, states, territories, political subdivisions, and peace officers. *See* Pub. L. No. 73-474, §§ 1-12, § 13, 48 Stat. 1236, 1236-40, 1240 (1934).

• Federal restrictions expanded in 1968, when sale and delivery of destructive devices (defined as an "explosive, incendiary, or poison gas bomb, grenade, mine, rocket, missile, or similar device") and machineguns were severely restricted. *See* Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, § 921(a)(4), § 922(b), 82 Stat. 197, 227, 230 (1968). Once again, these provisions did not apply to items sold to the United States or to any individual state. *Id.* § 925(a), 82 Stat. at 233.

• Machineguns were banned by the Firearm Owners' Protection Act of 1986. Since then, civilian ownership has been capped at pre1986 levels and only military and law enforcement have access to these weapons. *See* Pub. L. No. 99-308, § 102(9), 100 Stat. 449, 453 (1986).

*Bevis* at 1201–02.

## C. The Parties' Arguments

As the burden is on the Government to prove that PICA fits within the history and regulation of firearms in this nation, the Court will consider their arguments before moving to the Plaintiffs' rebuttal.

### 1. Items Restricted by PICA

The Government argues that "Illinois's Act, like the numerous historical regulations before it, continues a historical tradition of regulating dangerous and unusual weapons in the interest of public safety that has existed throughout American history." (Doc. 247, ¶ 485 (citing Doc. 190, Ex. 2, (Delay Rep.), ¶ 79; Doc. 185, Ex. 5 (Spitzer), ¶ 89)). They argue that "Illinois is not alone in regulating these weapons: thirteen other states, plus Washington D.C., regulate assault weapons, large capacity magazines, or both." (*Id.*; *see also id.* n.15 (collecting statutes including: California (Cal. Penal Code §§ 16350, 16790, 16890, 30500-31115); Colorado (Colo. Rev. Stat. § 18-12-302; Connecticut (Conn. Gen. Stat. §§ 53-202a – 53-202o); Delaware (Del. Code tit. 11, § 1466(a); District of Columbia (DC Code Ann. §§ 7-2501.01(3A), 7-2502.02(a)(6), 7-2505.01, 7-2505.02(a), (c)); Hawaii (Haw. Rev. Stat. Ann. §§ 134-1, 134-4, 134-8); Maryland (Md. Code Ann., Crim. Law §§ 4-301 – 4-306; Md. Code Ann., Pub. Safety § 5-101(r)); Massachusetts (Mass. Gen. Laws ch. 140, §§ 121, 122, 123, 131M); New Jersey (N.J. Stat. Ann. §§ 2C:39-1w, 2C:39-5, 2C:58-5, 2C:58-12, 2C:58-13); New York (N.Y. Penal Law §§ 265.00(22), 265.02(7), 265.10, 400.00(16-a)); Oregon (2022 Oregon Ballot Measure 114, SEC. 11); Rhode Island (R.I. Gen. Laws. §§ 11-47.1-2, 11-47.1-3); Vermont (13 V.S.A. § 4021(a)); Washington (Rev. Code Wash. (ARCW) Chp. 9.41 as amended by 2023 HB 1240))).

The Government insists that "[h]istorical regulations show that since the Founding there has been an unbroken tradition of regulating weapons when technological advances generate unprecedented social consequences." (*Id.*, ¶ 486 (citing Doc. 185, Ex. 5 (Spitzer Rep.), ¶¶ 63–89; Doc. 190, Ex. 2 (DeLay Rep.), ¶¶ 51, 64–65, 77–78; Doc. 185, Ex. 6 (Roth Rep.), ¶ 47; *Bevis v. Naperville*, 85 F.4th 1175, 1200 (7th Cir. 2023))). The Government specifically refers to laws from New Jersey, Virginia, and Massachusetts restricting concealed carry and riding armed with certain weapons, (*id.*, ¶¶ 488–90 (citing *id.*, appx. 1, Nos. 1, 6, 10) as well as to the Statute of Northampton mentioned above (*id.*, ¶ 489 (quoting 4 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND, 148–49 (1769))). They posit that legislatures restricted various weapons when they threatened public safety, including bowie knives (*id.*, ¶¶ 494–502); percussion cap pistols (*id.*, ¶¶ 503–07); revolvers when they appeared in the 19th century (*id.*, ¶¶ 508–30); and automatic and semiautomatic weapons when they appeared in the early 20th century (*id.*, ¶¶ 531–45). They also argue that military weapons have been restricted, pointing to Boston's 1746 cannon discharge law (*see id.*, ¶ 547 (citing *id.*, appx. tbl. 6, No. 1; *Bevis*, 85 F. 4th at 1201)) and to the fact that an 1837 weapons restriction in Georgia was stated to "not extend to Sheriffs, Deputy Sheriffs, Marshals, Constables, Overseers or Patrols, in actual discharge of their respective duties, but not otherwise." (*Id.*, ¶ 548 (quoting Doc. 190, Ex. 2 (DeLay Rep.), ¶ 88)). The Government insists that "[a] number of 19th century restrictions on carrying handheld firearms included exceptions for military firearms" including "Tennessee's 1879 law [which] prohibited

the carrying of 'any dirk, razor concealed about his person, sword cane, loaded cane, slung-shot or brass knucks, Spanish stiletto, belt or pocket pistol, revolver, or any kind of pistol,' but made an exception for 'the army or navy pistol used in warfare, which shall be carried openly in hand.'" (*Id.*, ¶ 550 (quoting *id.*, appx. tbl. 4, No. 7) (citing *id.*, appx. tbl. 6, Nos. 3, 4, 6, 7, 17, 18, 23, 33)).

Continuing on, the Government states that "[b]etween 1864 and 1892, at least eighteen states and three territories incorporated explicit exemptions for law enforcement and/or military personnel into laws regulating firearms" including Georgia, Missouri, Idaho, New Mexico, and Arizona. (*Id.*, ¶ 557 (citing Doc. 190, Ex. 2 (DeLay Rep.), ¶ 92 nn.127, 128; Doc. 247, appx. tbl. 6.)). They argue that cities continued this trend, "restricting the carry of a wide array of dangerous and concealable weapons (slingshots, metal knuckles, Bowie knives, daggers, pistols, and clubs), but exempting 'peace officers' and 'conservator[s] of the peace.'" (*Id.*, ¶ 558 (citing (*See* Doc. 190, Ex. 2 (DeLay Rep.), ¶ 93; Doc. 247, appx. tbl. 6). "Municipalities adopting these types of ordinances included: Memphis, Tennessee (1869); Jersey City, New Jersey (1868); Washington, D.C. (1871); Omaha, Nebraska (1872); Fayetteville, Tennessee (1876); Mexico, Missouri (1877); Provo City, Utah (1877); Kansas City, Missouri (1880); Albany, New York (1887); and Milwaukee, Wisconsin (1888)." (*Id.*, ¶ 558 (citing (See Doc. 190, Ex. 2 (DeLay Rep.), ¶ 93; Doc. 247, appx. tbl. 6). They argue this same tradition includes the National Firearms Act of 1934 (*see id.*, ¶ 560 (citing Pub. L. No. 73-474, §§ 1-13, 48 Stat. 1236-40 (1934))); the Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, §§ 921(a) (4), 922(b), 925(a), 82

Stat. 197, 227, 230 (1968) (*see id.*, ¶ 561 (citing the same)); and the federal Firearm Owners' Protection Act of 1986 (*see id.*, ¶ 562 (citing Pub. L. No. 99-308, § 102(9), 100 Stat. 449, 453 (1986))).

The Government posits that "[a]ssault weapons and large capacity magazines represent dramatic technological changes from the weaponry of the ratifying eras. Compared to the muskets of 1791 or the Colt revolvers or Winchester repeating rifles of 1868, the weapons and magazines regulated by the Act are terrifyingly efficient killing machines." (Doc. 248, p. 52). They argue that "[i]n Colonial times, the firearms owned by Americans—muskets and fowling pieces—were infrequently associated with criminal violence" and "were not typically stored ready to fire because of the risk of corrosion, and this reduced the likelihood of impulsive use." (*Id.*, pp. 52–53 (citing Doc. 247, ¶ 492)). They also insist that "in the last two decades, mass shootings have come to threaten Americans' everyday lives at school, places of worship, work, and everywhere in between," and that "[a]t the same time, the proliferation of assault weapons and large capacity magazines has hampered law enforcement's ability to prevent and respond to active shooters." (*Id.*, p. 53). The Government argues that "[t]his Court should join other courts in concluding that mass shootings using assault weapons and large capacity magazines are an unprecedented societal concern." (*Id.*, p. 55 (citing *Bianchi*, 111 F.4th at 463; *Rupp v. Bonta*, No. 17-cv-746, 2024 WL 1142061, at *33 (C.D. Cal. Mar. 15, 2024); *Or. Firearms Fed'n v. Kotek*, 682 F. Supp. 3d 874, 924 (D. Or. 2023); *Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*, 664 F. Supp. 3d 584, 599 (D. Del. 2023); *Nat'l Ass'n for Gun Rights v.*

*Lamont*, 685 F. Supp. 3d 63, 107 (D. Conn. 2023); *Hartford v. Ferguson*, 676 F. Supp.
3d 897, 907 (W.D. Wash. 2023))).

Thus, the Government posits that, because assault weapons pose such a risk
to society, they must be categorized and regulated as being "dangerous and unusual"
like similar weapons in the past. (*See id.*, p. 55 (citing *Heller*, 554 U.S. at 627; 4 W.
BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 148–49 (1769)); *Bruen*, 597
U.S. at 21; *id.* at 81 (Kavanaugh, J., concurring) ("[N]othing . . . should be taken to
cast doubt on . . . the historical tradition of prohibiting the carrying of dangerous and
unusual weapons."); *Rahimi*, 144 S. Ct. at 1897 (discussing tradition of "bann[ing]
the carrying of 'dangerous and unusual weapons'"); *Bevis*, 85 F.4th at 1190
(recognizing the "long-standing tradition of regulating the especially dangerous
weapons of the time, whether they were firearms, explosives, Bowie knives, or other
like devices"))). They argue that PICA "continues the through line from regulations
of 'fighting knives' and pistols in the 18th and 19th centuries, to revolvers in the latter
half of the 19th century, to machine guns and large capacity semiautomatic guns in
the early 20th century, to assault weapons and large capacity magazines in the late
20th and early 21st centuries." (*Id.*, pp. 59–60). They argue that PICA imposes a
"comparable burden on the right of armed self-defense," (*id.*, p. 60 (quoting *Bruen* at
3)) and that Illinois citizens may still choose from a variety of weapons for self-defense
and because Illinois does not limit the number of magazines one may possess, but
rather the size of the magazines themselves (*id.*, pp. 61–62).

The Plaintiffs tell a different story, arguing that "PICA's broad prohibition of
those firearms and feeding devices does not fall within that historical tradition." (Doc.
253, p. 69). They argue that "[t]o the extent *Heller*, *Bruen*, and *Bevis* leave room for
any other historical tradition that might justify banning common arms that are not
exclusively or predominantly useful in military service, Defendants have not
identified one," and "[t]o the contrary, the historical record reveals a long tradition of
welcoming technological advancements aimed at enhancing law-abiding citizens'
ability to safely possess and accurately fire repeatedly." (*Id.*, p. 76). In opposition to
the Government's arguments, they insist that "[b]road bans on the ownership and
use of firearms by colonists and early Americans were exceedingly rare in the early
Republic." (*Id.* (citing Doc. 185, Ex. 6 (Roth Rep.), ¶¶ 22–23 (confirming that "there
was little interest among public officials in the North in restricting the use of firearms
during the Early National period, except in duels," but [sic] some such laws "in a
number of slave states"))). Instead, they argue that "disarmament laws directed
toward unfavored groups . . . were plentiful" (*id.* (citing Doc. 185, Ex. 6 (Roth Rep.), ¶
14)), but that "to the extent such invidious laws could even evince a constitutionally
valid historical tradition of firearm regulation, they do not begin to justify a blanket
ban on common firearms." (*Id.* (citing *Range v. Att'y Gen.*, 69 F.4th 96, 104 (3d Cir.
2023) (en banc), *judgment vacated*, *Garland v. Range*, 144 S. Ct. 2706 (2024) (Mem.)
(doubting that proposition); Tr. of Oral Argument 53:16-19, *United States v. Rahimi*,
No. 22-915 (U.S. Nov. 7, 2023) (Solicitor General Prelogar: Those laws "were [a]n
application[] of a separate principle under the Second Amendment, which is that

those who are not considered among the people can be disarmed.")). "The near-total absence of broad bans on the ownership and use of common firearms with the kinds of features PICA singles out extended through nearly all of America's history" because "[a]ll the way until 'the 1990's, there was no national history of banning weapons because they were equipped with furniture like pistol grips, collapsible stocks, flash hiders, . . . or barrel shrouds.'" (*Id.*, p. 77 (quoting *Miller v. Bonta*, 542 F.Supp.3d 1009, 1024 (S.D. Cal. 2021), *vacated and remanded*, 2022 WL 3095986 (9th Cir. Aug. 1, 2022); *Rhode v. Bonta*, No. 3:18-cv-00802-BEN-JLB (S.D. Cal. Jan. 11, 2023), Dkt.79-3 (cataloging gun restrictions from before the Founding to the mid-1900s, none of which restricted firearm possession because they were multi-shot arms or because they were equipped with larger capacity magazines or certain other accessories); Doc. 69, Ex. 2 (Hlebinsky Rep.), ¶ 36 ("Pistol grips appear on long arms dating to at least the 1700s."))). The Plaintiffs argue that "[n]o state banned so-called 'assault weapons' until 1989." (*Id.* (quoting Doc. 185, Ex. 5 (Spitzer Rep.), ¶ 10) (citing *Miller v. Bonta*, 542 F.Supp.3d at 1024 (highlighting California's "1989 ban"))). They argue the same is true for "restrictions on ammunition feeding devices and magazine capacity. (*Id.*, pp. 77–78 (citing Maxine Bernstein, *From Bowie Knives to Muskets and Machine Guns, Historians Testify in Measure 114 Trial about America's Gun History, Regulations*, THE OREGONIAN (June 8, 2023), bit.ly/3p4qvdi (noting that one of the state's historians conceded that "he knew of no law" pre-1990 "that prohibited someone from acquiring an ammunition-feeding device"); David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 ALBANY L. REV. 849, 864 (2015)

(noting that, when the Second Amendment and the Fourteenth Amendment were adopted, "there were no laws restricting ammunition capacity"))).

Moving to specific laws, the Plaintiffs argue that they "are not aware of *any* antebellum statute that completely banned the sale or possession of Bowie knives" and that "[n]early all nineteenth-century Bowie-knife laws were instead limited to restricting *concealed carry*." (*Id.*, p. 78 (citing Doc. 185, Ex. 2 (Spitzer Rep.) ¶¶ 66–69, 72–73)). They also argue that such laws were "short-lived" and that "the most onerous laws were contemporaneously deemed *unconstitutional* unless they were construed more narrowly." (*Id.*, pp. 78–79 (citing David Kopel, *Bowie Knife Statutes 1837-1899*, REASON.COM (Nov. 20, 2022), bit.ly/3RNRpQD; *Nunn v. State*, 1 Ga. 243 (1846); *Bruen*, 597 U.S. at 54 (singling out Nunn as "particularly instructive" regarding the Second Amendment's meaning); Doc. 185, Ex. 2 (Spitzer Rep.), ¶ 69 (discussing *Nunn*))). They similarly argue that the restrictions on clubs, blunt weapons, and pistols were directed at specific racial groups and were "anti-carry laws," which "flunk the 'relevantly similar' test for yet another reason: Laws that restrict only the carrying of certain types of arms (and primarily concealed carrying at that) are not remotely similar in how they regulate to a law that bans possession." (*Id.*, p. 79 (citing Doc. 185, Ex. 2 (Spitzer Rep.), ¶ 75; *Bruen* at 29)). Thus, "[e]arly regulations either prohibited concealed carry while allowing open carry or merely 'prohibit[ed] bearing arms in a way that spreads "fear" or "terror" among the people.'" (*Id.*, p. 81 (quoting *Bruen* at 50)). The Plaintiffs also discuss the statutes regulating trap guns and regulating automatic weapons. (*Id.*, pp. 81–82).

Regarding semiautomatic weapons, the Plaintiffs argue that "*at most* only seven to ten states and the District of Columbia restricted semiautomatic firearms at all during [the Prohibition Era]" and that "Defendants' efforts to inflate those numbers are misleading in the extreme." (*Id.*, p. 82). They argue that the laws cited by the Government's expert are ambiguous about whether they actually applied to semiautomatic weapons. (*Id.*). They argue that "[n]o state prohibits semiautomatic firearms entirely, and the semiautomatic firearms Illinois has banned are legal in (at least) 40 states." (*Id.*, pp. 83–84; *see id.*, p. 84 n.14 ("Illinois' ban is so aggressive that it reaches many arms that even some of the states that do have "assault weapon" bans do not prohibit."); *see also* HAW. REV. STAT. §134-1 (defining "assault pistol" as a semiautomatic firearm that "accepts a detachable magazine and has two or more additional features))).

In a similar fashion, the Plaintiffs argue that "[t]he first state law actually restricting magazine capacity did not come until 1990—two centuries after the founding and well over a century after the ratification of the Fourteenth Amendment." (*Id.* (citing 1990 N.J. Laws 217, 221, 235 (codified at N.J. Stat. Ann. §2C:39-1(y), -3(j)); Maxine Bernstein, F*rom Bowie Knives to Muskets and Machine Guns, Historians Testify in Measure 114 Trial about America's Gun History, Regulations*, THE OREGONIAN (June 8, 2023) (one of the state's historians conceded that "he knew of no law" pre-1990 "that prohibited someone from acquiring an ammunition-feeding device"); Doc. 69, Ex. 2 (Hlebinsky Rep.) ¶ 54)). They argue that

only the District of Columbia regulated magazines (and only since 1975, *see id.*, p. 85 (citing Act of July 8, 1932, Pub. L. No. 72-275, §§1, 14, 47 Stat. 650, 650, 654 (1932), (repealed 1934) (codified as amended at 26 U.S.C. §§5801-72)) and that the federal government did not regulate magazines until 1994. (*See id.* (citing Pub. L. No. 103-322, 108 Stat. 1796 (1994) (formerly codified at 18 U.S.C. §922(w)); Doc. 96, Ex. 2 (Hlebinsky Rep.) ¶ 54)).

The Plaintiffs also argue that "historical laws that regulated weapons use but provided for military and/or law enforcement exemptions do not demonstrate any tradition of prohibiting law-abiding citizens from possessing common arms." (*Id.*, p. 86). "Illinois and its experts point to 'nineteen states and three territories that incorporated explicit exemptions for law enforcement and/or military personnel into laws regulating firearms,'" but "by the state expert's own admission, none of those laws imposed a ban on the sale and possession of common arms. One regulated only 'brandishing,' three 'concerned' only 'sensitive places,' and 'all the other laws concerned concealed carry,' not sale, possession, or even open carry." (*Id.* (citing Doc. 185, Ex. 4 (Delay Rep.) ¶ 92; n.127)).

The Plaintiffs also argue that none of the examples cited by the Seventh Circuit in *Bevis* are sufficiently analogous to PICA as to support there being a history and tradition of regulation of semiautomatic rifles, magazines, and attachments. (*See id.*, pp. 86–88 (citations omitted)). Moreover, they disagree with the Government's contention that mass shootings are a recent phenomenon. (*See id.*, p. 89 (citing Doc. 234 (9/16/2024 Trial Tr., State's Opening), 15:2-8 (highlighting unlawful gun violence

with very first statements at trial); Doc. 185, Ex. 8 (Allen Rep.), ¶ 37 ("It is my understanding that the State of Illinois was concerned about public mass shootings and enacted the challenged law, in part, to address the problem of public mass shootings."); Doc. 185, Ex., 2 (Andrew Rep.), ¶¶ 42–53 (similar); Doc. 185, Ex. 9 (Ludwig Rep.), ¶ 6 (devoting entire expert report to issues of gun violence and magazines))). Instead, the Plaintiffs argue that "gun violence and mass shootings have unfortunately been an ugly part of life in the United States for a very long time. (*Id.* (citing STEPHEN P. HALBROOK, THE FOUNDERS' SECOND AMENDMENT: ORIGINS OF THE RIGHT TO BEAR ARMS 105–06 (2008); *Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1319 (11th Cir. 2023))). "As Dr. Roth explained, '[m]ass murder has been a fact of life in the United States since the mid-nineteenth century.'" (*Id.* (quoting Doc. 185, Ex. 6 (Roth Rep.), ¶ 41–43 (highlighting examples of mass murders in the early to mid-to-late 1800s, one taking "sixty-nine lives," another "twenty-two" and another "nineteen"))). They argue that "[g]un violence likewise was 'common' even in the 'mid-seventeenth century,' and 'homicides committed with firearms was at that time 40 percent and rose even higher in contested areas of the frontier.'" (*Id.* (quoting Doc. 185, Ex. 6 (Roth Rep.), ¶¶ 18, 28–29 (noting "explo[sion]" of homicide rates in Revolutionary and Civil War eras, through the Mexican War and Reconstruction))). They argue that "Illinois tries to paint this Nation's history as one in which gun violence and mass shootings were 'rare' until the innovation of the arms it bans, but it does so only by discounting the atrocities committed against unfavored groups." (*Id.*, pp. 89–90 (citing Doc. 185, Ex. 6 (Roth Rep.), ¶ 41 ("Mass killings of this type

were rare in the colonial, Revolutionary, and [e]arly National eras, *outside of massacres of Native Americans*, irregular warfare among citizens seeking political power, or public demonstrations that turned deadly." (emphasis added)); Doc. 185, Ex. 6 (Roth Rep.), ¶ 11 (arguing that "*apart from the slave South*," the United States "was perhaps the least homicidal society in the Western world in the early nineteenth century" (emphasis added)); Doc. 185, Ex. 6 (Roth Rep.), ¶ 18 (contending that "firearms had a modest impact on homicide rates" after discounting "hostile encounters with Native Americans," or "slaves"); Doc. 185, Ex. 7 (Klarevas Rep.), pp. 34, 37 (overlooking all atrocities against disfavored groups in claiming that "there is no known occurrence of a mass shooting resulting in double-digit fatalities at any point in time during the 173-year period between the nation's founding in 1776 and 1948" and that mass killings occur more often now than ever before))).

The Plaintiffs argue that "even assuming the state identified some 'unprecedented social concern,' it fails to connect that concern to the firearms that PICA bans" because "[t]he firearms that Illinois has chosen to ban are used in only a small minority (not a majority) of mass shootings." (*Id.*, p. 91 (citing Doc. 185, Ex. 8 (Allen Rep.), ¶¶ 42–43 (noting that 20% of mass shootings selected and reviewed involved "[a]ssault [w]eapons" and 41% involved "large capacity magazines"))). Moreover, "public data from the FBI shows that the numbers are even lower for some of those firearms when it comes to homicide in general—lower even than the handguns *Heller* deemed to be the country's 'quintessential self-defense weapon." (*Id.*, p. 92 (quoting 554 U.S. at 629)). "Nationally, in 2019 (the latest complete data

available from the FBI's Uniform Crime Reporting Program) only about 2.6% of murders (364 out of 13,927) were confirmed to have been committed with any type of rifle, which is below murders using knives (1,476), blunt objects (397), and 'hands, fists, and feet' (600), and far below murders using the very handguns that *Heller* and *Bruen* have already deemed protected (6,368). (*Id.* (citing FBI, 2019 CRIME IN THE UNITED STATES (2019), https://tinyurl.com/2tnwa5yu (further reporting about 1.4% of homicides are committed with a shotgun of any kind); FBI, CRIME DATA EXPLORER: EXPANDED HOMICIDE OFFENSES CHARACTERISTICS IN THE UNITED STATES, https://bit.ly/3IF5A (confirming the same based on updated data); Doc. 185, Ex. 7 (Klarevas Rep.), p. 32 (confirming the low rates of recorded crime committed with "assault weapons," ranging, for example, "from a low of 2.4% in Baltimore, Maryland, to a high of 8.5% in Syracuse, New York," and "5% . . . nationwide"); NICHOLAS J. JOHNSON, ET AL., FIREARMS LAW AND THE SECOND AMENDMENT 2000–01, 2005 (3d ed. 2021) (2024 Supp.) (discussing FBI Crime statistics and noting that the "[h]andguns" deemed protected under *Heller* and *Bruen*, not the firearms banned by PICA, "are the most common firearm used in mass shootings, accounting for over 50 percent"))). Additionally, they argue that "Illinois has provided little to no support for the proposition that there is a causal link between any recent rise in mass shootings and the availability of arms that have been lawfully possessed by civilians for the better part of a century." (*Id.*, pp. 92–93 (citing Doc. 185, Ex. 8 (Allen Rep.), ¶¶ 37–38)). "The state's inability to demonstrate a causal link between its weapons ban and reducing

gun violence is striking given that PICA 'defines 'assault weapon' using language that is largely borrowed from the expired Federal Assault Weapons Ban.'" (*Id.*, p. 93 (citing *Bevis*, 85 F.4th at 1183)). "Yet, as noted, Congress declined to renew that federal ban in 2004 after the Department of Justice found that it led to 'no discernible reduction' in firearms violence nationally." (*Id.* (citing CHRISTOPHER S. KOPER ET AL., AN UPDATED ASSESSMENT OF THE FEDERAL ASSAULT WEAPONS BAN: IMPACTS ON GUN MARKETS AND GUN VIOLENCE, 1994–2003, at 96 (2004), https://bit.ly/3wUdGRE [https://perma.cc/PD4F-YE8R])).

In summary, they argue that "[f]irearms technology is constantly evolving, but one thing has never changed: Law-abiding citizens who wish to possess and carry firearms for self-defense have consistently welcomed features that enhance the accuracy, efficiency, and speed with which they can fire them." (*Id.*, p. 94 (citing *id.* 35–78; David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. CONTEMP. L. 381, 395–96 (1994); Factoring Criteria for Firearms with Attached "Stabilizing Braces", 86 Fed. Reg. 30,826, 30,827 (June 10, 2021))).

### 2. PICA's Registration Requirement

The Government latches onto the Seventh Circuit's preliminary assessment in Bevis that the PICA registration requirement "is no more onerous than that found throughout history." *Bevis* at 1202, 1219. "Like the 'shall-issue' licensing schemes that the Supreme Court approved in *Bruen*, the Act's optional registration process is

automatic and not subject to official discretion." (Doc. 248, p. 63 (citing *Bruen*, 597 U.S. at 38 n.9; *Heller*, 554 U.S. at 635)). They argue that this means that "[t]his requirement is therefore subject only to rational basis review—a standard it easily surpasses." (*Id.* (citing *Bevis*, 85 F.4th at 1202); *see id.* n.43 (arguing that, even if a separate history and tradition analysis were required for the registration provision, the registration provision is valid under such an analysis))). They argue that "the affidavit effectuates the rational legislative purpose to 'balance' the public safety interest in 'limiting the number of firearms [ ] most likely to result in a mass shooting' against Illinois residents' 'reliance interest in retaining possession of items legally acquired before such acquisition was prohibited.'" (*Id.*, pp. 64–65 (quoting *Caulkins v. Pritzker*, 2023 IL 129453, ¶¶ 62–63; *Minerva Dairy v. Harsdorf*, 905 F.3d 1047, 1055 (7th Cir. 2018) ("[O]n rational-basis review the state does not need to present actual evidence to support its proffered rationale for the law, which can be based on rational speculation unsupported by evidence or empirical data.") (cleaned up))).

While the Plaintiffs' primary brief does not discuss the registration requirement (*see* Doc. 253), the *FFL* Plaintiffs submitted a separate brief (Doc. 255) in which they address arguments not asserted by the other Plaintiffs—"their challenges to the constitutionality of provisions of [PICA] (1) requiring registration to maintain lawful possession of the firearms, ammunition, and parts it restricts; and (2) restricting the right to keep firearms in working order and suitable for the specific user by banning certain parts." (*Id.*, p. 2).

They argue that named Plaintiff Chris Moore "possessed, kept, and bore in Illinois at least one firearm that is now classified as an 'assault weapon' under PICA (a semiautomatic rifle with a detachable magazine and pistol grip, adjustable stock, barrel shroud, and flash suppressor), which he could no longer lawfully possess in Illinois" and that he refused to register this weapon prior to the January 1, 2024 deadline. (*Id.*, p. 3 (citing Moore Decl. ¶¶ 5,7)). They argue "[b]ut for PICA, Mr. Moore would lawfully possess that rifle in Illinois, which he is currently prohibited from doing." (*Id.* (citing Moore Decl. ¶ 8(a))). They argue that the organizational Plaintiffs (e.g., Gun Owners of America, Inc. ("GOA"), Guns Save Life ("GSL"), and Gun Owners Foundation ("GOF")) also have various members similarly suffering a constitutional injury in fact. (*See id.*, pp. 3–4).

The *FFL* Plaintiffs argue that "[t]here can be no historical tradition of registering arms with the government when one of the Second Amendment's main purposes was to be a 'doomsday provision' for the People to protect themselves from a tyrannical government." (*Id.*, p. 6 (citing *Silveira v. Lockyer*, 328 F.3d 567, 570 (9th Cir. 2003) (Kozinski, J., dissenting from denial of rehearing en banc))). They argue that "[t]he Second Amendment was written by people who had just revolted against a tyrannical government" and that the writings of Tench Coxe, a Constitutional Convention delegate, typified the views of the time. (*Id.*, p. 5). They argue that the Government's citation of militia muster laws "appear to have merit at first glance but fail upon closer scrutiny" for failure to adequately answer the "how" and why" questions required by the Supreme Court in *Bruen*. (*Id.*, p. 7 (citing Doc. 131 (State's

Opp. to Second MPI), at 39–40; 1631 Va. Acts 174, Acts of Feb. 24, 1631, Act LVI;
*Bruen*, 597 U.S. at 29)). They argue that these laws were narrowly confined to militia
members (the "how") and that these "laws were not an exception to a categorical ban
of common arms, ammunition, and parts like PICA's registration is" but instead
"sought the opposite—to guarantee that enough fighting-age males were *sufficiently
armed*." (*Id.*, pp. 7–8). They argue that such laws are insufficiently analogous to PICA
in accordance with *Bruen*'s test. (*See id.*, pp. 7–10). The *FFL* Plaintiffs also indicate
that "none of these few historical laws that the state posits actually banned any
weapons at all" (*id.*, p. 9 (footnote omitted)) and argue that "[r]egistration laws did
not even first appear until the 20th century" (*id.*, p. 10). In summary, they argue that
"no historical tradition supports requiring registration with the government classes
of commonly owned firearms, ammunition, or firearm parts merely to maintain their
lawful possession." (*Id.*, p. 11).

Regarding firearms parts, the *FFL* Plaintiffs argue that "without certain parts,
so too could firearms be rendered useless or significantly neutered. (*Id.*, p. 13 (citing
*Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014))). They
analogize the possession and use of certain firearms parts to established Seventh
Circuit precedent, arguing that "[t]he right to possess firearms for protection implies
a corresponding right to acquire and maintain proficiency in their use; the core right
wouldn't mean much without the training and practice that make it effective." (*Id.*
(citing *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011))). They also cite to
the Fifth Circuit's idiosyncratic "right to personal gunsmithing." (*Id.* (citing

*VanDerStok v. Garland*, 2023 WL 7403413, at *4 (5th Cir. Nov. 9, 2023); *Mock v. Garland*, No. 23-cv-00095-O, 2023 WL 6457920, at *11 (N.D. Tex. Oct. 2, 2023))). They argue that PICA's prohibition of "various common parts, including ones that are designed to accommodate people of different statures or who have different physical needs to properly use their firearms and/or the self-defense use of the firearm to which they are affixed (e.g., pistol grips, adjustable stocks, flash suppressors, barrel shrouds, etc.) . . . precludes Illinoisans . . . from being able to keep their firearms in working order or suited to their needs." (*Id.*, pp. 13–14 (citing *Ezell* at 704)).

### D. This Court's Determination

While *Bevis* offers several historical examples as evidence of PICA's congruence with the nation's history and tradition of firearms regulation, none of these examples are as dispositive as the Seventh Circuit argues, even in light of *Rahimi*'s interpretation of *Bruen*'s command. *See Bevis* at 1201–02. The 1746 Massachusetts Bay Colony statute is not a ban on possession of firearms; rather, it is a ban on the *discharge* of firearms. *See* Chapter 11—An Act to Prevent the Firing of Guns Charged with Shot[t] or Ball in the Town of Boston, §§ 1–3, *in* 3 The Acts and Resolves of the Province of the Massachusetts Bay 1742-1756, at 305–06 (1878). As Judge Brennan stated in his dissent in *Bevis*, "[r]egulations against the discharge of weapons compare better to modern criminal statutes prohibiting, for example, the reckless discharge of a firearm. And prohibitions on the carrying of certain weapons do not amount to a categorical ban of whole classes of firearms. These examples thus fail the 'how' question in *Bruen*." *Bevis* at 1227 (Brennan, J., dissenting) (citing 720

ILL. COMP. STAT. § 5/241.5(a). The statute from Arkansas also fails *Bruen*'s "how and why" test. *See* Chapter 53—Carrying Weapons, §§ 1907–1909, *in* A Digest of the Statutes of Arkansas 490 (W.W. Mansfield, ed., 1884); *see Bevis* at 1227 (Brennan, J., dissenting) ("This law was passed after ratification of the Fourteenth Amendment and banned the sale of these knives. It did not categorically ban their possession. This example fails the 'how' and the 'why' test of *Bruen* for the reasons given previously."). The Provo City ordinance is also akin to a concealed carry prohibition, not an outright prohibition. *See* Chapter 6—Offenses Against the Peace of the City, § 182, *in* The Revised Ordinances of Provo City 106–07 (1877).

Moving to the National Firearms Act examples cited by the Seventh Circuit in *Bevis*, these statutes are far removed from ratification and the Fourteenth Amendment. That being said, even when considering the original 1934 National Firearms Act, the Supreme Court rendered the 1934 Act virtually unenforceable because of the possessor or an unregistered firearm's privilege from self-incrimination under the Fifth Amendment of the U.S. Constitution. *See Haynes v. United States*, 390 U.S. 85 (1968). While the 1968 amendment is admittedly similar to PICA, even this statute was challenged in *United States v. Freed*, 401 U.S. 601 (1971). The 1986 amendment prohibited the transfer or possession of machine guns (with a broad exception for those lawfully possessed before the effective date). Judge Wood concludes this section in *Bevis* by saying, "[i]n short, there is a long tradition, unchanged from the time when the Second Amendment was added to the Constitution, supporting a distinction between weapons and accessories designed for

military or law-enforcement use, and weapons designed for personal use. The legislation now before us respects and relies on that distinction." *Bevis* at 1202. With the utmost respect for the Seventh Circuit's determinations, this Court is concerned that the statutes described above do not adequately evince a history and tradition of the regulation of specific semiautomatic rifles, shotguns, and attachments. The Court must also emphasize that the rights of Illinois citizens to keep and bear arms in the 21st century are not vexed in the least by the Statute of Northampton and similar laws passed centuries before the foundation of our nation. While such historical exegeses have value in tracing the origins of the right codified by the Second Amendment, such laws are not directly on point when it comes to the exercise of Second Amendment rights by Illinois's law-abiding citizens.

Considering the above, the Court turns to the parties' arguments in order to determine where PICA fits in the history and tradition of laws restricting firearms. After an exhaustive review of the statutes and arguments provided by the Government, the Court holds that the nation's history and tradition of firearms regulation does *not* support a statute as far-reaching as PICA. Put another way, the Government's arguments do not satisfactorily answer the "how" and "why" questions required by *Bruen*—most of the statutes it cites were prohibitions on *concealed carry* or on *discharging* weapons, *not* the outright prohibition of such weapons entirely. Of the statutes cited in the Government's Appendix to their Proposed Findings of Fact (Doc. 247, Ex. 1), only 4% (9 out of 225[34]) of the cited statutes *entirely* restricted the

---

[34] Because this Court categorically determined that semiautomatic weapons are not "machineguns," this Court excluded the statutes cited in Table 5. (*See* Doc. 247, Ex. 1, tbl. 5). While the Government

sale and/or possession of entire classes of weapons. (*See id.*, Ex. 1, tbl. 1, No. 39; *id.*, tbl. 3, Nos. 32, 33; *id.*, tbl. 4, Nos. 32, 40–42, 44; *id.*, tbl. 6, No. 2); *see also* 1881 Ark. Acts 191–92, An Act to Preserve the Public Peace and Prevent Crime, ch. XCVI, §§ 1–3; 1879 Tenn. Pub. Acts 135-36, An Act to Prevent the Sale of Pistols, chap. 96, § 1; 1927 Haw. Sess. Laws 209–17, AN ACT Regulating the Sale, Transfer and Possession of Certain Firearms and Ammunitions, and Amending Sections 2136, 2137, 2138, 2139, 2140, 2141, 2142, 2143, 2146 and 2147 of the Revised Laws of Hawaii 1925 (the "Small Arms Act"), § 5; 1927 Ind. Acts 469, ch. 156, § 12; 1927 R.I. Pub. Laws 256, An Act to Regulate the Possession of Firearms: §§ 1, 4; 1933 Or. Laws 489, An Act to Amend Sections 72-201, 72-202, 72-207, Oregon Code 1930, ch. 315, §§ 3–4; A. McMicken, City Attorney, The Revised Ordinances of the City of Rawlins, Carbon County, Wyoming, 131–32 (1893), Article VII, Carrying Firearms and Lethal Weapons, § 1; 1837 Ga. Acts. 90, An Act to Guard and Protect the Citizens of this State, Against the Unwarrantable and too Prevalent use of Deadly Weapons, §§ 1–4. Moreover, of these 9 statutes, 5 of them were related to revolvers—weapons the *Heller* Court deemed to be presumptively lawful. *See* 554 U.S. at 629 ("Whatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid.").

Like the statutes cited in *Bevis*, the Government relies predominantly and overwhelmingly on concealed carry statutes, statutes restricting the discharge of firearms, and statutes proscribing brandishing or causing terror. (*See* Doc. 247, Ex.

_____

states that this table relates to "machine guns" and "semi-automatic weapons," the cited statutes are universally related to machineguns, not to the semiautomatic rifles at issue in this case. (*See id.*).

1). While these statutes may answer the "why" question in *Bruen* because they were clearly preventing death or injury from firearms, they cannot answer the "how" question. Moreover, the Government clearly cannot demonstrate that PICA follows any historical tradition of sweeping prohibitions on the sale, transfer, and possession of vast swaths of firearms.

Moreover, while the Court has the utmost empathy for those who have lost loved ones to grisly mass shootings, the data simply does not show what the Government claims. Handguns are predominately used both in gun-related homicides and in mass shootings and yet the *Heller* Court held the following:

> We are aware of the problem of handgun violence in this country, and we take seriously the concerns raised by the many *amici* who believe that prohibition of handgun ownership is a solution. The Constitution leaves the District of Columbia a variety of tools for combating that problem, including some measures regulating handguns. But the enshrinement of constitutional rights necessarily takes certain policy choices off the table. These include the absolute prohibition of handguns held and used for self-defense in the home. Undoubtedly some think that the Second Amendment is outmoded in a society where our standing army is the pride of our Nation, where well-trained police forces provide personal security, and where gun violence is a serious problem. That is perhaps debatable, but what is not debatable is that it is not the role of this Court to pronounce the Second Amendment extinct.

554 U.S. at 636 (citing *id.*, 625–29; *id.* at 627 n.26). Just as in *Heller*, the Government has raised concerns about public safety and about mass shootings that are worthy of careful thought and consideration. However, such concerns do not rise to the level of eliminating constitutional rights present since the time of the founding.

The D.C. Circuit also addressed *Bruen*'s history and tradition analysis in its recent opinion. *See Hanson v. District of Columbia*, No. 23-7061 (D.C. Cir. Oct. 29,

2024). In holding that the Government had met their burden to demonstrate that there was a history and tradition sufficiently analogous to the challenged D.C. statute, the D.C. Circuit wrote that "[t]he broader regulation of weapons that are particularly capable of unprecedented lethality includes other prominent examples, such as the ban on sawed-off shotguns held constitutional by the Supreme Court in *Miller* and implicitly approved in *Heller*." *Hanson* at *22 (citing *Heller* at 627*; Ocean State Tactical v. Rhode Island*, 95 F.4th 38, 47 (1st Cir. 2024) (The "Congress began regulating sawed-off shotguns in 1934, after they became popular with the mass shooters of their day — notorious Prohibition-era gangsters like Bonnie Parker and Clyde Barrow." (quotations omitted))). They write that "[t]he examples above regarding Prohibition-era bans on machine guns, although insufficient to support a tradition of regulating magazines in and of themselves, fit nicely into the tradition of regulating weapons particularly capable of unprecedented lethality." *Id.*

The D.C. Circuit also argues that "[l]arge capacity magazines have given rise to an unprecedented societal concern: mass shootings," *id.* at *26, and state that "[a] nuanced approach is also appropriate for the analysis of historical analogues to the District's magazine cap because large-capacity, detachable magazines for semiautomatic handguns are a relatively modern invention." *Id.* at *28. The First Circuit made a similar argument in *Ocean State Tactical*, arguing that "we find in the record no direct precedent for the contemporary and growing societal concern that such weapons have become the preferred tool for murderous individuals intent on killing as many people as possible, as quickly as possible," noting that "[t]his is

unsurprising, given evidence that 'the first known mass shooting resulting in ten or more deaths' did not occur in this country until 1949." 95 F.4th at 44 (citing *Oregon Firearms Fed'n, Inc. v. Brown*, 644 F. Supp. 3d 782, 803 (D. Or. 2022)) (footnote omitted). The Fourth Circuit stated in *Bianchi* that:

> This case calls for such a nuanced approach. The ripples of fear reverberating throughout our nation in the wake of the horrific mass shootings in, for example, Las Vegas, Orlando, Blacksburg, Sandy Hook, Sutherland Springs, El Paso, Uvalde, Lewiston, Parkland, San Bernardino, Binghamton, Fort Hood, Thousand Oaks, Virginia Beach, Washington, D.C., Aurora, Monterey Park, Pittsburgh, Geneva County, Boulder, Buffalo, Covina, Dayton, Red Lake, Roseburg, San Jose, Santa Fe, Allen, Charleston, Indianapolis, Manchester, Omaha, and Plano— each of which occurred in the 21st century and resulted in at least nine fatalities—stem from a crisis unheard of and likely unimaginable at the founding.

111 F.4th at 463 (citation omitted).

In line with the First, Fourth, Seventh, and D.C. Circuits, the Government points to language in *Bruen* in which the Supreme Court states that "[w]hile the historical analogies here and in *Heller* are relatively simple to draw, other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach" because "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Bruen* at 27. That being said, the Court notes that the "unprecedented societal concerns" argument was made and *rejected* by the majority in both *Heller* and in *Bruen*. Justice Breyer wrote in great detail in both dissents about the increasing prevalence of firearm crimes in the United States, including mass shootings, yet his arguments were in *dissent. See supra*

section I.A. While paying lip service to *Bruen*'s command, these are the same arguments used by the First Circuit in *Ocean State Tactical*, by the Fourth Circuit in *Bianchi*, by the D.C. Circuit in *Hanson*, and by the Government in this case. This Court looks to *Heller*, which explicitly held that "the fact that modern developments have limited the degree of fit between the prefatory clause and the protected right cannot change our interpretation of the right." *Id.* at 627–28. The *Heller* Court was aware of the grisly criminal reputation of handguns, yet still held them to be in common use, not dangerous and unusual, and held that the District of Columbia could not restrict them. Semiautomatic rifles are not a "new" invention—their current form is the result of the plodding pace of technological development.

Moreover, the assertions of the Government and the Seventh Circuit that mass shootings are a new phenomenon are clearly inaccurate. As the Plaintiffs indicate, Native Americans, slaves and freedpeople, and various other "undesirable" groups were frequently victims of mass killings. (*See* Doc. 253, pp. 89–90 (citing STEPHEN P. HALBROOK, THE FOUNDERS' SECOND AMENDMENT: ORIGINS OF THE RIGHT TO BEAR ARMS 105–06 (2008); *Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1319 (11th Cir. 2023); Doc. 185, Ex. 6 (Roth Rep.), ¶¶ 11, 18, 28–29; 41–43; Doc. 185, Ex. 7 (Klarevas Rep.), pp. 34, 37)). Mass killings are, unfortunately, an American tradition.

In summary, while mass shootings and firearm-related deaths are universally tragic and senseless, the Government has not met its burden to prove that the history and tradition of firearm regulations supports PICA's expansive sweep, covering hundreds of models of weapons, magazines, and attachments used by tens of millions

of law-abiding United States citizens. The Court notes that it has taken care to analyze *each* facet of this case in exacting, excruciating detail in order to generate an Order that is *not* simply a policy decision in disguise.

### III. Motion for Partial Summary Judgment on the *Langley* Plaintiffs' Counts IV and VI (Doc. 220)

The Court first assesses the Government's pending Motion for Partial Summary Judgment on the *Langley* Plaintiffs' Counts IV and VI (Doc. 220). The Court notes that this Motion addresses the same subject matter (a facial challenge to PICA's constitutionality based on vagueness) as the Court assessed when it denied the *Langley* Plaintiffs' Motion for Partial Summary Judgment (Doc. 111) on December 14, 2023 (Doc. 132). In its Motion, the Government argues that "the *Langley* plaintiffs' vagueness claims fail as a matter of law, and Director Kelly is entitled to summary judgment in his favor" because "[a]s the Court correctly found, the *Langley* plaintiffs' vagueness claims present a 'question of law,' and as such there are no relevant, material facts at issue with this motion." (Doc. 220, p. 3 (citing Doc. 132, p. 5); *Little Arm Inc. v. Adams*, 13 F.Supp.3d 914, 920 (S.D. Ind. 2014) ("The interpretation of a statute is a question of law, and such questions are particularly appropriate for summary judgment.") (citing *Masters v. Hesston Corp.*, 291 F.3d 985, 989 (7th Cir. 2002))). As the *Langley* Plaintiffs have not advanced any other facts with respect to an argument that has been thoroughly analyzed and briefed, the Government argues that summary judgment should be granted.

While the *Langley* Plaintiffs did respond to the Government's Motion (*see* Doc. 254), it is in the form of a single paragraph in which they state that "[i]t is noted that Plaintiff previously moved for summary judgment on these grounds which was denied. Plaintiff stands on their previously vagueness arguments made, and request this Court Deny those summary judgment arguments on vagueness made by Defendant." (*Id.*, p. 8).

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014) (quoting FED. R. CIV. P. 56(a)). Once the moving party has set forth the basis for summary judgment, the burden then shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue of fact for trial. FED. R. CIV. P. 56(e); s*ee Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Stated another way, the nonmoving party must offer more than "[c]onclusory allegations, unsupported by specific facts," to establish a genuine issue of material fact. *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) *(*citing *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888 (1990)).

In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.,* 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to

return a verdict for that party." *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 640–41 (7th Cir. 2008) (quoting *Springer v. Durflinger*, 518 F.3d 479, 483 (7th Cir. 2008)). The non-movant cannot simply rely on its pleadings; the non-movant must present admissible evidence that sufficiently shows the existence of each element of its case on which it will bear the burden of proof at trial. *Midwest Imps., Ltd. v. Coval*, 71 F.3d 1311, 1317 (7th Cir. 1995) (citing *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 596 (7th Cir. 1995); *Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.,* 998 F.2d 391, 394 (7th Cir. 1993), *cert. denied*, 510 U.S. 1111 (1994); *Celotex*, 477 U.S. at 323–24).

Here, the Government is correct—besides the *Langley* Plaintiffs' previous filings on this matter (*see* Docs. 111, 117, 129) and their argument presented live to the Court (*see* Doc. 125), they have neither advanced any arguments nor presented any admissible evidence to prove their claims regarding the *facial* unconstitutionality of PICA on *vagueness* grounds. The Government noted in its Motion to Supplement (Doc. 124) that Langley Plaintiffs' Declarants indicate that they understand how to interpret and apply PICA's definitions, whether they agree with them or not. (*See id.*, pp. 5–15). Indeed, the *Langley* Plaintiffs' response explicitly states that they offer no new arguments and do not dispute any of the Government's facts. (*See* Doc. 254, p. 8). As the Government notes, this Court previously assessed the *Langley* Plaintiffs' vagueness arguments in its December 14, 2023 Order (Doc. 132) in which this Court stated that their arguments were better suited for an as-applied constitutional challenge. (*See id.*, pp. 15–16).

Because the facts are not in dispute and because the *Langley* Plaintiffs have not presented any additional argument regarding their vagueness challenge either in briefing or at trial, the Court holds that summary judgment on Counts IV and VI of the *Langley* Plaintiffs' Complaint is appropriate. The Court's holding in its previous Order that "the *Langley* Plaintiffs' facial challenge has not met constitutional muster" carries forward to the instant motion. (Doc. 132, p. 16). Because of this, the Government's Motion for Partial Summary Judgment (Doc. 220) must be granted.

## IV. Permanent Injunction

Permanent injunctions are "not available as a matter of course." *Liebhart v. SPX Corp.*, 998 F.3d 772, 774 (7th Cir. 2021). Rather, as a "creature of equity, . . . the district court has discretion to decide whether that relief is warranted, even if it has found liability." *Id.* Relief via a permanent injunction is appropriate if the applicant proves the following: "(1) that it has suffered an irreparable injury; (2) that remedies available at law . . . are inadequate . . . ; (3) that, considering the balance of hardships . . . , a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Id.* at 779 (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)). "The ultimate decision whether to issue such an injunction lies within the discretion of the district court." *Id.* (citing *EEOC v. AutoZone, Inc.*, 707 F.3d 824, 840 (7th Cir. 2013)). The Seventh Circuit has made it clear that "an injunction issues 'only as necessary to protect against otherwise irremediable harm'" and that they "give great deference to the court's decision either to issue or to deny an injunction." *Id.* (quoting *LAJIM, LLC v. Gen. Elec. Co.*, 917 F.3d

933. 944 (7th Cir. 2019)) (citing *United States v. Bethlehem Steel Corp.*, 38 F.3d 862,

867 (7th Cir. 1994); *Bowes v. Ind. Sec'y of State*, 837 F.3d 813, 817 (7th Cir. 2016)).

"A permanent injunction (as opposed to a preliminary injunction or a

temporary restraining order) is not provisional in nature, but rather is a final

judgment." *Plummer v. Am. Inst. of Certified Pub. Accts.*, 97 F.3d 220, 229 (7th Cir.

1996) (citing *Walgreen Co. v. Sara Creek Property Co.*, 966 F.2d 273, 275 (7th Cir.

1992)). Thus, while the applicant for a preliminary injunction "must establish that he

is likely to succeed on the merits," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7,

20 (2008), "when the plaintiff is seeking a permanent injunction, the first of the four

traditional factors is slightly modified, for the issue is not whether the plaintiff has

demonstrated a reasonable likelihood of success on the merits, but whether he has in

fact succeeded on the merits." *Plummer*, 97 F.3d at 229 (citing *Amoco v. Village of

Gambell*, 480 U.S. 531, 546 n.12 (1987)).

Additionally, the Supreme Court has stated that "[f]acial challenges are

disfavored for several reasons." *Wash. State Grange v. Wash. State Republican Party*,

552 U.S. 442, 450 (2008). Because "[c]laims of facial invalidity often rest on

speculation . . . , they raise the risk of 'premature interpretation of statutes on the

basis of factually barebones records.'" *Id.* (quoting *Sabri v. United States*, 541 U.S.

600, 609 (2004) (internal quotation marks and brackets omitted). "Facial challenges

also run contrary to the fundamental principle of judicial restraint that courts should

neither 'anticipate a question of constitutional law in advance of the necessity of

deciding it 'nor 'formulate a rule of constitutional law broader than is required by the

precise facts to which it is to be applied.'" *Id.* (quoting *Ashwander v. TVA*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring)). "Finally, facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Id.*

The Seventh Circuit has states that "[i]n a facial constitutional challenge, individual application facts do not matter" and that "[o]nce standing is established, the plaintiff's personal situation becomes irrelevant." *Ezell v. City of Chicago*, 651 F.3d 684, 697 (7th Cir. 2011). "It is enough that '[w]e have only the [statute] itself' and the 'statement of basis and purpose that accompanied its promulgation.'" *Id.* at 697–98 (quoting *Reno v. Flores*, 507 U.S. 292, 300–01 (1993); Nicholas Quinn Rosenkranz, *The Subjects of the Constitution*, 62 STAN. L. REV. 1209, 1238 (2010); David L. Franklin, *Facial Challenges, Legislative Purpose, and the Commerce Clause*, 92 IOWA L. REV. 41, 58 (2006); Mark E. Isserles, *Overcoming Overbreadth: Facial Challenges and the Valid Rule Requirement*, 48 AM. U. L. REV. 359, 387 (1998)). Additionally, according to the *Salerno* principle, "a law is not facially unconstitutional unless it 'is unconstitutional in all of its applications.'" *Id.* at 698 (quoting *Wash. State Grange*, 552 U.S. at 449); *see United States v. Salerno*, 481 U.S. 739, 745 (1987). The Seventh Circuit continues, stating that "[i]n a facial challenge . . . , the claimed constitutional violation inheres in the terms of the statute, not its application." *Ezell* at 698 (citing Rosenkranz, *The Subjects of the Constitution*, 62 STAN. L. REV. at 1229–38). "The remedy is necessarily directed at the statute itself and must be injunctive

and declaratory; a successful facial attack means the statute is wholly invalid and
cannot be applied to *anyone*." *Id.*

"Whether invalid provisions in a state law can be severed from the whole to
preserve the rest is a question of state law." *Burlington N. & Santa Fe Ry. Co. v.
Doyle*, 186 F.3d 790, 804 (7th Cir. 1999) (citing *Leavitt v. Jane L.*, 116 S. Ct. 2068,
2069 (1996); *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 506 (1985)). The Illinois
Supreme Court has stated "the general test in determining whether an invalid part
of a statute is severable" is the following:

> If what remains after the invalid portion is stricken is complete in itself
> and capable of being executed wholly independently of that which is
> rejected, the invalid portion does not render the entire section
> unconstitutional unless it can be said that the General Assembly would
> not have passed the statute with the invalid portion eliminated.

*Com. Nat. Bank of Chi. v. City of Chicago*, 432 N.E.2d 227, 240 (Ill. 1982) (citing
*Livingston v. Ogilvie*, 250 N.E.2d 138 (Ill. 1969); *City of Carbondale v. Van Natta*, 338
N.E.2d 19 (Ill. 1975); *Village of Oak Lawn v. Marcowitz*, 427 N.E.2d 36 (Ill. 1981)).

The Plaintiffs seek to enjoin the application of PICA in the *entirety*, including
the registration requirement and endorsement affidavit process and the criminal
penalties associated with the knowing possession of weapons proscribed by PICA. *See*
PICA §§ 5/24-1(14) (bump stocks); 5/24-1.9 (assault weapons and attachments); 5/24-
1.10 (large-capacity magazines). The Court has previously addressed the Plaintiffs'
arguments that the statute is unconstitutionally vague via a Motion for Partial
Summary Judgment filed by the *Langley* Plaintiffs. (*See* Doc. 132).

While the Plaintiffs are vague about their requested remedy, the Government insists that this Court is limited to enjoining the enforcement of PICA against the specific named Plaintiffs. Not so. In *Ezell*, the Seventh Circuit was clear that, if a statute is found to be facially unconstitutional under the Second Amendment, that it is unconstitutional in all applications. Full stop. Additionally, the Government has argued that the offending portions of PICA should be severed from the whole, as the Illinois Statute on Statutes applies to PICA. (*See* Doc. 116, pp. 21–22 (quoting 5 ILL. COMP. STAT. 70/1.31)); *see also* 720 ILL. COMP. STAT. § 97 ("Severability. The provisions of this Act are severable under Section 1.31 of the Statute on Statutes."). The Seventh Circuit also indicated in *Bevis* that specificity was required in determining whether portions of PICA should be stricken for their unconstitutionality, namely §§ 5/24-1(a)(14)–(16) (bump stocks and assault weapons); 5/24-1.9(a)–(h) (assault weapons and attachments); and 5/24-1.10(a)–(h) (large-capacity magazines). This does not include the in-line modifications made by PICA to extant statutes.

While neither side has briefed the issue of severability in detail, the Court holds that the Statute on Statutes covers PICA such that, should the Plaintiffs meet their burden, the Court is empowered to enjoin the constitutionally offensive portions of PICA "[u]nless it is evident that the legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law." *Champlin Refining Co. v. Corp. Comm'n of Okla.*, 286 U.S. 210, 234 (1932). Reviewing the challenged

provisions of PICA, this Court is concerned that the Illinois Legislature would not
have enacted the provisions of PICA related to the definition of assault weapons only
without including any operative provisions. *See* PICA §§ 5/24-1(14) (bump stocks);
5/24-1.9(a) (assault weapons and attachments); 5/24-1.10(a) (large-capacity
magazines). This Court also recognizes that Illinois's definition of "assault weapons"
may be referenced elsewhere in the statutory scheme and that future legislation may
be passed that does not offend the Second Amendment. However, this Court is unable
to determine a reasonable way to sever the offensive portions of PICA such that what
remains would have been enacted by the legislature or is operative as a law.
Therefore, this Court holds that the operative provisions of PICA cannot be severed
from the whole and must be stricken in the entirety.

Considering the four factors discussed *supra*, the Plaintiffs have successfully
proven the merits of their case. Clearly, remedies at law are insufficient to remedy
an injury of constitutional magnitude such as PICA's infringement on Illinois citizens'
time-honored right to bear arms guaranteed by the Second Amendment. Considering
the balance of hardships here, it is clear that a remedy in equity is warranted—the
constitutional injury here demands action from this Court in accordance with the
Second Amendment's "unqualified command." *Bruen*, 597 U.S. at 17 (quoting
*Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50, n.10 (1961)).

While the Plaintiffs' vagueness concerns about PICA's text have been
previously addressed (*see* Doc. 132), the Court is deeply concerned about arbitrary
enforcement. Various Sheriffs' Departments in Illinois have expressly indicated that

they will decline to enforce PICA in their counties. *See, e.g.*, Sarah Schulte, *New Gun Law: Over 2 Dozen Sheriffs Refuse to Enforce Illinois Assault Weapons Ban*, ABC7 Chi. (Jan. 12, 2023), https://abc7chicago.com/illinois-assault-weapon-ban-gun-laws-2023-mchenry-county    -sheriff-kane/12694745/    [https://perma.cc/5VQX-NYSZ]. Indeed, the McHenry County Sheriffs' Department (one of the Defendants in *Barnett*) filed a Response (Doc. 39) to the Motion for Preliminary Injunction (Doc. 10) expressing that they believe that PICA is unconstitutional.[35] The Illinois Sheriffs' Association also filed an amicus brief arguing that PICA is unconstitutional. (*See* Doc. 50). Therefore, it stands to reason that PICA can and will be enforced arbitrarily.

The data also indicate that property crimes are increasing across the country. *See* Associated Press*, FBI Report: Violent Crime Decreases to Pre-Pandemic Levels, but Property Crime Is on the Rise*, U.S News & World Report (Oct. 16, 2023, 11:43 a.m.), https://www.usnews.com/news/us/articles/2023-10-16/fbi-report-violent-crime-decreases-to-pre-pandemic-levels-but-property-crime-is-on-the-rise.    What    is particularly disturbing is that the prohibition of weapons that are commonly owned and used by citizens are now banned, depriving citizens of a principal means to defend themselves and their property in situations where a handgun or shotgun alone would not be the citizen's preferred arm.

Therefore, the Court must take action as justice demands. PICA is an unconstitutional affront to the Second Amendment and must be enjoined. The

---

[35] The Sheriffs of St. Clair County and Randolph County both filed similarly worded Responses (*see* Docs. 40 & 41) indicating that they did not adopt the arguments of either the Plaintiffs or Defendants and that they "request clarity of the current state of the law so that they may perform their duties under the Constitution and laws of the State of Illinois." (Doc. 40, p. 3; Doc. 41, p. 4).

Government may not deprive law-abiding citizens of their guaranteed right to self-defense as a means of offense. The Court will stay enforcement of the permanent injunction for a period of thirty (30) days from the date of this Order.

## V. Concluding Observations

Sadly, there are those who seek to usher in a sort of post-Constitution era where the citizens' individual rights are only as important as they are convenient to a ruling class. Seeking ancient laws that may partner well with a present-day infringement on a right proclaimed in the Bill of Rights without reading it in conjunction with the aforementioned history is nonsense. The Statute of Northampton cannot in the least bit be used to vex the rights of Illinois citizens in the 21st century to keep and bear arms. The oft-quoted phrase that "no right is absolute" does not mean that fundamental rights precariously subsist subject to the whims, caprice, or appetite of government officials or judges.

## CONCLUSION

For the reasons set forth above, the Government's Motion for Partial Summary Judgment on the *Langley* Plaintiffs' Counts IV and VI (Doc. 220) is **GRANTED**.

Most importantly, considering all of the evidence presented, the Court holds that the provisions of PICA criminalizing the knowing possession of specific semiautomatic rifles, shotguns, magazines, and attachments are unconstitutional under the Second Amendment to the United States Constitution as applied to the states by the Fourteenth Amendment. Therefore, the Plaintiffs' request for a permanent injunction is **GRANTED**. The State of Illinois is hereby **ENJOINED**

from the enforcement of PICA's criminal penalties in accordance with 720 ILL. COMP. STAT. §§ 5/24-1(a)(14)–(16) (bump stocks and assault weapons); 5/24-1.9(a)–(h) (assault weapons and attachments); and 5/24-1.10(a)–(h) (large-capacity magazines) against all Illinois citizens, effective immediately. As the prohibition of firearms is unconstitutional, so is the registration scheme for assault weapons, attachments, and large-capacity magazines. Therefore, the State of Illinois is **ENJOINED** from enforcing the firearm registration requirements and penalties associated with entering false information on the endorsement affidavit for non-exempt weapons, magazines, and attachments previously required to be registered in accordance with 430 ILL. COMP. STAT. 65/4.1. This permanent injunction is **STAYED for thirty (30) days**. The Clerk of Court is **DIRECTED** to enter judgment in favor of the Plaintiffs. **IT IS SO ORDERED.**

**DATED: November 8, 2024**

> **/s/ Stephen P. McGlynn**
> **STEPHEN P. McGLYNN**
> **U.S. District Judge**